# GIBSON DUNN

Jordan Estes
Partner
T: +1 212.351.3906
jestes@gibsondunn.com

<u>VIA ECF AND E-MAIL</u>
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004

Re: *S.E.C. v. Wander et al.*, Case No. 1:25-cv-08565 (S.D.N.Y.)

Dear Counsel:

We represent Defendant Joshua Wander in the above-captioned action. We write pursuant to Rule II.B of Judge Marrero's Individual Practices to inform you that Mr. Wander intends to move to dismiss the Securities and Exchange Commission's Complaint as soon as permitted by the Court.

Eager to hop on prosecutors' coattails, the SEC filed this Complaint during a government shutdown, despite the clear restrictions of the Anti-Deficiency Act. *See* 31 U.S.C. § 1341 *et seq*. This case is not an "emergenc[y] involving the safety of human life or the protection of property," and the SEC's decision to proceed despite these restrictions underscores the overreach here. *Id.* § 1342

Substantively, the Complaint attempts to transform a private contractual dispute into securities fraud. The SEC's fraud theory rests on forward-looking statements about projected income. But these statements were clearly identified as projections, were accompanied by appropriate cautionary language, and were made to sophisticated investors who understood the inherent uncertainty of financial forecasts. The Complaint also fails to allege with particularity any facts showing that these statements were materially false or misleading, let alone that Mr. Wander intended to mislead in making these statements. The case should be dismissed.

### A. Background

Mr. Wander and Steven Pasko founded 777 Partners LLC ("777 Partners") in May 2015. Compl. ¶ 19. 777 Partners and its related company, 600 Partners LLC (together, the "777 Companies"), were multi-billion dollar holding companies with dozens of portfolio companies invested in a variety of sectors: structured settlement annuities, lottery annuities, insurance, sports and entertainment, airlines, and litigation finance. *E.g.*, *id.* ¶ 25. The subsidiary companies generated long-term cashflows through annuities and other receivables; they also generated revenue through asset management fees, realized gains on assets, and interest income. The 777 Companies were profitable and growing until macroeconomic shocks—such as the outbreak of COVID-19 and later interest rate hikes—had adverse effects on the businesses.

According to the Complaint, the largest operating company within the 777 Companies was SuttonPark, a company that bought annuities and then either securitized or resold them. *Id.* ¶ 26.

# GIBSON DUNN

Page 2

Although the Complaint emphasizes that SuttonPark generated more net income than the other portfolio companies in 2020, *id.* ¶ 27, those companies operated in industries—airlines, entertainment, and sports, *id.* ¶ 25—that were among the hardest hit by the pandemic.

SuttonPark purchased annuities with funds obtained from credit facilities. *Id.* ¶ 31. One of those facilities (the "Credit Facility") was with Lender A, which had been providing credit to SuttonPark since March 2017. *Id.* ¶ 31. The Credit Facility was secured by annuities SuttonPark owned and pledged to the Credit Facility. *Id.* The Credit Facility [1] is a 100-plus page document with voluminous schedules and appendices. Ex. A. There are dozens of parties to the Credit Facility, including multiple lenders and four borrowers. Ex. A at 102-113. The Credit Facility allowed the borrowers to borrow money consistent with complex "Borrowing Base" calculations tied to the value of the receivables and cash collateral, and for two of the borrowers the value of interest rate hedges. *See*, *e.g.*, Ex. A at 266-306.

The Complaint alleges that the "heart" of the financial issues at the 777 Companies came from a contractual dispute with Lender A: a supposed "breach of the Credit Facility's terms," resulting in a $300 million overdraw. Compl. ¶ 3. It then goes on to allege various breaches of the Credit Facility during COVID, including alleged breaches of a "use of proceeds" covenant and alleged breaches of covenants related to the collateral. *Id.* ¶¶ 35-39.

Of course, a contractual dispute over a private lending agreement is not securities fraud. The SEC tries to evade this restriction by citing forward-looking statements and projections made in connection with a preferred equity offering the 777 Companies marketed in 2021. The Complaint alleges that these statements were false because the overdraw of the Credit Facility meant there was "no realistic prospect" of achieving that income. Compl. ¶ 5. But that is based only on *ipse dixit*–the SEC cites no documents showing that when making the projections, Mr. Wander had any intent to mislead or belief that those figures were unachievable.

   **B. Argument**

The centerpiece of the SEC's theory is that forward-looking statements in an investor presentation (the "Presentation")[2] were false. Compl. ¶¶ 52-53, 56-57. But the Presentation cannot be the basis of a securities law claim: it included precisely the "sufficient cautionary language" that "bespeaks caution" to the investors who received it. *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141-42 (2d Cir. 2010); Ex. B at 2. No reasonable investor—particularly the highly sophisticated investors here—could have found the statements materially misleading. *See id.*; *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 820 F. Supp. 2d 541, 546 (S.D.N.Y. 2011) (a sophisticated investor could not "reasonably or justifiably invest millions of dollars relying only upon a PowerPoint presentation. . . .").

---

[1] The Credit Facility is incorporated into the Complaint by reference. Compl. ¶ 3. It is attached as Exhibit A. For clarity, citations to Exhibit A are to the PDF page numbers.

[2] The Presentation is incorporated into the Complaint by reference. Compl. ¶ 6. It is attached as Exhibit B.

**GIBSON DUNN**

Page 3

The SEC also fails to plead fraud with the particularity required under Fed. R. Civ. P. 9(b). The Complaint is peppered with conclusory language stating that forward-looking statements were false. But it does not sufficiently allege that Mr. Wander *believed the projections were false* when they were made. And any such allegation would defy logic: Mr. Wander was a senior executive at a multi-billion dollar company that generated substantial income. The Complaint offers no plausible basis to infer that Mr. Wander intended to mislead investors by approving a Presentation drafted by his Chief Financial Officer, Compl. ¶ 6, with input from dozens of seasoned investment professionals, as well as outside counsel and investment bankers.

For example, the Complaint focuses on a slide in the Presentation stating that the 777 Companies were *projecting* $132 million in net income and a dividend of either $25 million or $50 million in 2021, depending on the amount of the equity raise. Compl. ¶ 53; Presentation at 11. But the Complaint cites no documents showing that Mr. Wander believed the forward-looking statements to be false at the time the Presentation was prepared. Nor does it reflect that these projections were based on the aggregated budgets of dozens of portfolio companies, each prepared by an accounting professional at that respective firm. The Complaint does not even allege that the dividend went unpaid. Instead, it cites alleged financial problems at SuttonPark, just one subsidiary of the dozens at the 777 Companies, and treats the alleged liquidity crisis at this one subsidiary as representative of *all* subsidiaries of the 777 Companies. That is plainly inadequate to show that the statements about the projected dividend were knowingly false.

The SEC similarly alleges that it was misleading to send the Presentation to a sophisticated institutional investor after the 777 Companies incurred paper losses caused by interest rate hikes. Compl. ¶ 72. But the Complaint fails to identify any specific statements that were rendered false by those paper losses. Instead, it relies on a generalized theory that Defendants "failed to disclose" losses, without pleading particularized facts showing that Mr. Wander believed the forward-looking deck would mislead a sophisticated institutional investor. That completely fails to meet the standard required by Rule 9(b).

The Complaint also suggests that it was misleading for the 777 Companies to state that proceeds from investors would be used for "general corporate purposes." Compl. ¶ 8. Not so. A "reasonable investor reviewing this statement would be left with an impression that the Company intended to use funds . . . for any number of corporate uses." *See In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 478 (S.D.N.Y. 2018). As the SEC itself acknowledges, the investor materials here specifically stated there were to be "no restrictions" on the use of investor funds. Compl. ¶ 65. And the investor funds *were* used for general corporate purposes: the funds were used to pay off preexisting shares of preferred equity that entitled Mr. Wander and Mr. Pasko to a higher 18% dividend—eliminating a potential disparity in classes of preferred equity.

For all these reasons, the Complaint should be dismissed.

**GIBSON DUNN**

Page 4

Sincerely,

*/s/ Jordan Estes*

cc: Hon. Victor Marrero, USDJ (*via ECF and E-Mail*)
    All counsel of record (*via ECF*)