**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE
COMMISSION,

                 Plaintiff,

v.

JOSHUA WANDER,
STEVEN PASKO,
DAMIEN ALFALLA,
777 PARTNERS LLC, and
600 PARTNERS LLC,

                 Defendants.

25 Civ. 8565 (VM)

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT JOSHUA WANDER'S MOTION TO DISMISS

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Defendant Joshua Wander*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 3

    A.   The 777 Companies and Joshua Wander .................................................. 3

    B.   SuttonPark and the Credit Facility .......................................................... 4

    C.   The Preferred Equity Offering ................................................................. 5

    D.   The Subscription Agreement .................................................................... 7

    E.   The Current Status of the 777 Companies ............................................... 8

    F.   Procedural History .................................................................................... 9

    G.   The SEC's Allegations Against Mr. Wander ........................................... 9

LEGAL STANDARD ........................................................................................................ 10

ARGUMENT ..................................................................................................................... 11

    I.   THE SEC'S THEORY IS WRONG AS A MATTER OF LAW. ................................. 11

        A.   Statements Regarding Future Dividend Payments Are Statements of Opinion And Are Therefore Not Actionable. ........................................................... 12

        B.   Statements Regarding the Issuer's Future Prospects Are Immaterial Under the Bespeaks Caution Doctrine. ....................................................................... 16

        C.   At Most, the Diligence Materials Contain Pure Omissions, Which Are Not Actionable Under the Securities Laws. ........................................................ 19

    II.   THE COMPLAINT FAILS TO ADEQUATELY PLEAD ITS CLAIMS. ...................... 21

        A.   The Complaint Fails to Allege that Mr. Wander Made Any Material Misrepresentation. ..................................................................................... 21

        B.   The Complaint Fails to Satisfy Rule 9(b)'s Heightened Pleading Requirement for Fraud. ................................................................................................... 22

        C.   The Complaint Fails to Adequately Allege That Mr. Wander Acted with Negligence. ................................................................................................ 24

CONCLUSION ................................................................................................................. 27

i

## TABLE OF AUTHORITIES

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) .................................................................................. 4, 23

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).................................................................................................. 19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................................. 10

*Brown v. E.F. Hutton Grp.*,
735 F. Supp. 1196 (S.D.N.Y. 1990) ........................................................................ 18

*Brown v. E.F. Hutton Grp., Inc.*,
991 F.2d 1020 (2d Cir. 1993) .................................................................................. 20

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020) ..................................................................... 17

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
639 F. App'x 664 (2d Cir. 2016) ............................................................................. 22

*Gregory v. ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018) ..................................................................... 12

*Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002) .................................................................................... 16

*Harris v. Mills*,
572 F.3d 66 (2d Cir. 2009) ...................................................................................... 10

*In re Braskem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017) ..................................................................... 20

*In re Duane Reade Inc. Sec. Litig.*,
2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003)....................................................... 15

*In re Hut 8 Corp. Sec. Litig.*,
2025 WL 2636150 (S.D.N.Y. Sept. 12, 2025).................................................... 16, 17

*In re Int'l Bus. Machines Corp. Sec. Litig.*,
163 F.3d 102 (2d Cir. 1998) .................................................................................... 12

*In re Lottery.com, Inc. Sec. Litig.*,
715 F. Supp. 3d 506 (S.D.N.Y. 2024) ................................................................ 17, 18

*In re Lululemon Sec. Litig.*,
　14 F. Supp. 3d 553 (S.D.N.Y. 2014) ................................................................. 11

*In re NovaGold Res. Inc. Sec. Litig.*,
　629 F. Supp. 2d 272 (S.D.N.Y. 2009) ................................................................ 25

*In re Omnicom Grp., Inc. Sec. Litig.*,
　2007 WL 2376170 (S.D.N.Y. Aug. 10, 2007) .................................................... 26

*In re Philip Morris Int'l Inc. Sec. Litig.*,
　89 F.4th 408 (2d Cir. 2023) ................................................................... 14, 15, 17

*Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*,
　620 F.3d 137 (2d Cir. 2010) ......................................................................... 16, 18

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
　564 U.S. 135 (2011) ..................................................................................... 21, 22

*Kramer v. Time Warner Inc.*,
　937 F.2d 767 (2d Cir. 1991) ................................................................................. 8

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
　601 U.S. 257 (2024) ........................................................................................... 19

*Meyer v. Jinkosolar Holdings Co.*,
　761 F.3d 245 (2d Cir. 2014) ............................................................................... 15

*Nadoff v. Duane Reade, Inc.*,
　107 F. App'x 250 (2d Cir. 2004) ........................................................................ 15

*Newman & Schwartz v. Asplundh Tree Expert Co.*,
　102 F.3d 660 (2d Cir. 1996) ............................................................................... 10

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
　575 U.S. 175 (2015) ............................................................................... 13, 14, 15

*Penfield v. Davis*,
　105 F. Supp. 292 (N.D. Ala. 1952) ..................................................................... 25

*PetEdge, Inc. v. Garg*,
　234 F. Supp. 3d 477 (S.D.N.Y. 2017) ........................................................... 22, 23

*Rohland v. Syn-Fuel Assocs.-1982 Ltd. P'ship*,
　879 F. Supp. 322 (S.D.N.Y. 1995) ..................................................................... 21

*Rombach v. Chang*,
　355 F.3d 164 (2d Cir. 2004) ......................................................................... 10, 16

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*,
    75 F.3d 801 (2d Cir. 1996) ............................................................................... 11

*SEC v. Farnsworth*,
    692 F. Supp. 3d 157 (S.D.N.Y. 2023) ........................................................ 11, 12

*SEC v. Laura*,
    2020 WL 1434114 (E.D.N.Y. Mar. 24, 2020) ................................................. 24

*SEC v. Monarch Funding Corp.*,
    192 F.3d 295 (2d Cir. 1999) ............................................................................ 11

*SEC v. One or More Unknown Traders in the Secs. of Onyx Pharms., Inc.*,
    296 F.R.D. 241 (S.D.N.Y. 2013) ..................................................................... 23

*SEC v. Sourlis*,
    851 F.3d 139 (2d Cir. 2016) ............................................................................ 10

*SEC v. Treadway*,
    430 F. Supp. 2d 293 (S.D.N.Y. 2006) ............................................................. 26

*SEC v. Wey*,
    246 F. Supp. 3d 894 (S.D.N.Y. 2017) ............................................................. 27

*Valcarcel v. Ahold U.S.A., Inc.*,
    577 F. Supp. 3d 268 (S.D.N.Y. 2021) ............................................................. 23

**Statutes**

15 U.S.C. § 77q(a)(2) ............................................................................................ 25

15 U.S.C. § 77q(a)(3) ............................................................................................ 27

**Other Authorities**

*SEC v. China Ne. Petroleum Holdings Ltd.*, No. 12-cv-08696-NRB, Complaint, ECF No. 1
    (S.D.N.Y. Nov. 29, 2012) ................................................................................ 25

**Regulations**

17 C.F.R. § 240.10b-5(b) ...................................................................................... 25

17 C.F.R. § 240.10b-5(c) ...................................................................................... 27

**PRELIMINARY STATEMENT**

Joshua Wander co-founded 777 Partners LLC (together with its subsidiaries, "777 Partners") in 2015 and built it into a multibillion-dollar enterprise with more than 50 portfolio companies and over 1,000 employees.  For years, the business generated returns exceeding 40 percent on equity and grew revenue at a compound annual rate of more than 70 percent.  When 777 Partners and its affiliate, 600 Partners LLC ("600 Partners") (together, the "777 Companies"), sought to raise preferred equity capital in 2021, they did it by the book:  they engaged a registered broker-dealer as placement agent, prepared a detailed Investor Presentation with the assistance of outside counsel and investment bankers, and distributed the materials to a small group of sophisticated institutional investors.  Those investors each signed a Subscription Agreement certifying that they had conducted their own diligence, asked all their own questions, and received satisfactory answers.  Thirteen accredited investors—many of whom were already affiliated with 777 Partners—committed $237 million.

The SEC now tries to characterize that offering as fraud.  Its theory hinges entirely on forward-looking financial projections by the 777 Companies—the same kind of opinion-based forecasts the securities laws protect.  The SEC contends the 777 Companies' financial projections were false because one of the 777 Companies' dozens of subsidiaries had an alleged $300 million overdraw on a single credit facility.  From that, the SEC leaps to the conclusion that the projections could not possibly be met.

But the alleged overdraw is not a new controversy.  "Lender A" became aware of the alleged collateral issues in late 2022 and commenced its own litigation against Mr. Wander, his co-founder Steven Pasko, the 777 Companies, and the portfolio companies that were borrowers under the credit facility, a case that remains pending in this Court.  That dispute is a private contractual disagreement between borrowers and their lenders over the terms of a complex,

1

hundred-plus-page credit facility with dozens of parties.  The SEC has taken that private dispute, attached it to a wholly separate preferred equity offering made to sophisticated investors, and asked this Court to treat it as securities fraud.  That is a bridge too far.

The two claims against Mr. Wander should be dismissed for two reasons.

*First*, the core allegations in the Complaint concern conduct that is non-actionable under the securities laws.  The Complaint alleges that Mr. Wander made statements of opinion, forward-looking statements protected by the bespeaks caution doctrine, or omissions without a duty to disclose, none of which can support a securities fraud claim.  The SEC cites projections prepared by 777 Chief Financial Officer Damien Alfalla, reviewed by outside counsel and investment bankers, and distributed to seasoned institutional investors who certified their own satisfaction with the diligence process.  But such statements regarding the company's prospects, including projected income and potential dividends, are classic opinion and forward-looking statements that are inactionable.  The Complaint's allegation that the 777 Companies were required to disclose their subsidiary's overdraw fares no better.  The SEC fails to identify a particularized duty requiring such disclosure.  And for good reason.  Every investor here certified that they had asked all material questions and received satisfactory answers.  The Complaint simply fails to allege an actionable misrepresentation or omission.

*Second*, the Complaint fails to plead appropriate facts under the applicable pleading standard.  With respect to the fraud-based claims, the SEC fails to meet the demanding Rule 9(b) standard requiring either motive to commit fraud or strong circumstantial evidence of conscious misbehavior or recklessness.  Neither is present here.  As to scienter, there is no allegation that Mr. Wander played any role in preparing the income projections, or that anyone conveyed to him that those projections failed to account for the credit facility overdraw.  The SEC's only

affirmative evidence of fraudulent intent consists of two text messages, but those messages contain no hint of an effort to deceive investors. They say nothing about the Investor Presentation at all, much less anything on whether the overdraw was reflected in the income projections. And as to motive, the only personal benefit the SEC identifies is that Mr. Wander needed capital and conducted an offering to raise it—a motive possessed by virtually every executive who runs a capital raise, and one that is not sufficient to plead fraud, as courts have repeatedly held. Finally, in what appears to be a misplaced reliance on its inadequate scienter allegations, the SEC wholly fails to plead negligence, never once asserting that Mr. Wander's conduct fell below a reasonable standard of care.

The SEC cannot transform a private lending dispute into securities fraud. The Court should dismiss its Complaint against Mr. Wander.

## STATEMENT OF FACTS[1]

### A.    The 777 Companies and Joshua Wander

Mr. Wander and Mr. Pasko founded 777 Partners in May 2015 as a private investment firm focused on alternative asset classes. Compl. ¶ 19. Over the following years, 777 Partners and its related entity 600 Partners grew into a multibillion-dollar enterprise with more than 50 portfolio companies spanning consumer and commercial finance, insurance, aviation, sports and entertainment, litigation finance, and structured settlements. Ex. 1 (Investor Presentation) at 87; Compl. ¶ 25. The 777 Companies were highly profitable, reporting consolidated total revenue of $489 million in 2019. Investor Presentation at 13; Compl. ¶ 27 (describing the profitability of the 777 Companies).[2]

---

[1] The following facts are taken from the Complaint and assumed to be true for purposes of this motion alone. At the appropriate time and forum, Mr. Wander will demonstrate that the Complaint is riddled with inaccuracies and misconceptions.

[2] All exhibits cited are attached to the Declaration of Jordan Estes and include the Investor Presentation and Subscription Agreement, which are "incorporated into the complaint by reference." *ATSI Commc'ns, Inc. v. Shaar*

Mr. Wander and Mr. Pasko were co-managing partners of 777 Partners, both serving on its board and holding substantial equity in the company.  Compl. ¶¶ 21-22.  Mr. Alfalla served as Chief Financial Officer of 777 Partners and also held a board seat.  *Id*. ¶ 23.

Mr. Wander's relationship to 600 Partners, however, was markedly narrower.  Although the Complaint alleges that Mr. Wander and Mr. Pasko formed 600 Partners in January 2017, Mr. Wander held no equity, official title, managerial role, or board seat in 600 Partners.  Compl. ¶ 20. His participation was defined entirely by a contract, limiting his economic interest to a fraction of Mr. Pasko's equity and constraining his executive discretion to a mere right to be consulted on certain decisions.  *Id.*  Mr. Pasko, on the other hand, was the sole managing partner of 600 Partners, served on the board, appointed board members, and indirectly owned 100 percent of the company by the end of the Relevant Period.  *Id.*  Even Mr. Alfalla held a managerial role (i.e., CFO) at 600 Partners and served on its board.  These distinctions matter because 600 Partners— not 777 Partners—was the entity that owned SuttonPark, the entity at the center of the SEC's Complaint.  *Id*. ¶ 24 ("During the Relevant Period, 600 Partners owned more than 99% of the equity in SuttonPark.  During the Relevant Period, Pasko served as the CEO and managing partner of SuttonPark.").

### B.    SuttonPark and the Credit Facility

SuttonPark Capital LLC ("SuttonPark") was a consumer and commercial finance company held as a subsidiary of 600 Partners.  Compl. ¶ 26.  Its business model involved purchasing annuity payment streams—primarily structured settlements and lottery payouts arising from court orders—which it then securitized or resold.  *Id.*

---

*Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see, e.g.*, Compl.¶¶ 52–62 (alleging that the Investor Presentation contained purported misrepresentations regarding financial projections and dividend payments), ¶¶ 65–74 (alleging that the Subscription Agreement misrepresented the intended use of Offering proceeds and financial condition of the 777 Companies).

SuttonPark financed its annuity purchases through credit facilities, including a facility with a lender the SEC calls "Lender A" (the "Credit Facility"), that was first signed in March 2017 and was renewed in May 2021.  Compl. ¶ 31.  The Credit Facility was a complex, hundred-plus page agreement with dozens of parties, including multiple lenders and four borrowers. Dkt. 21-1 at 102–113.  Borrowing capacity was determined by intricate "Borrowing Base" calculations tied to the value of pledged receivables, cash collateral, and, for certain borrowers, the value of interest rate hedges.  *Id.* at 266–306.  In 2020, SuttonPark generated $184 million in net income.  Compl. ¶ 27.

The Complaint alleges that beginning in approximately 2020, the Credit Facility was overdrawn by approximately $300 million because of three categories of alleged misuse: diversion of borrowed funds for purposes other than purchasing annuities, withdrawal of cash from the Collections Account, and double-pledging of annuity collateral.  Compl. ¶¶ 35–39.  The overdraw, the SEC contends, impaired SuttonPark's ability to generate profits.  *Id.* ¶ 42.  The 777 Companies operated dozens of other subsidiaries, however—in insurance, aviation, media, entertainment, litigation finance, and other sectors—and the Complaint does not allege that those businesses were incapable of generating profits during the relevant period.  Compl. ¶ 25.  The Complaint does not allege that any other figures in the Investor Presentation besides this reference to profit were false or misleading.

### C.    The Preferred Equity Offering

By early 2021, the 777 Companies sought to raise capital, in part to refinance existing debt facilities at lower rates.  Compl. ¶ 46; Investor Presentation at 7.  To that end, they engaged Placement Agent A, a registered broker-dealer, to conduct a preferred equity offering (the

"Offering"). Compl. ¶ 47.[3] The Offering ran from summer 2021 through February 2023 and ultimately raised approximately $237 million from 13 investors—all sophisticated, accredited institutional investors. Compl. ¶¶ 1, 51. Those institutional investors included entities directly affiliated with 777 Partners. *See, e.g.*, Ex. 2 (Sub. Agreement) (signed by 777 Re Ltd.)

777 Partners used the Investor Presentation to market the Offering to various investors. Compl. ¶ 52. The Investor Presentation began with a disclosure slide, making clear that the presentation contained "forward-looking statements" that were "subject to significant risks and uncertainties." Investor Presentation at 2. The slide further stated that "developments could have an adverse impact on our financial position and our results of operations." *Id.* Finally, it noted that the financial metrics for the year ending December 31, 2020 were "preliminary and unaudited and subject to change," including following an audit underway from an accounting firm. *Id.*

Mr. Alfalla drafted the financial slides of the Investor Presentation and related diligence materials. Compl. ¶ 52. Those projections were built from the aggregated budgets of dozens of portfolio companies, each prepared by accounting professionals at the respective firms. The Investor Presentation disclosed that the 777 Companies had about $3.06 billion in term and facility debt as of December 2020, making plain that this was a highly leveraged business. Investor Presentation at 11. The Investor Presentation further disclosed that the goal of the capital raise was to refinance existing debt facilities, and 777 Partners' diligence materials provided investors with a schedule of credit facilities listing each lender, the principal balance outstanding, the collateral description, and the maturity date. Compl. ¶ 55; Investor Presentation at 6.

---

[3] The 777 Companies also engaged with counsel in preparing the Investor Presentation and other offering materials.

The Investor Presentation included a slide titled "Dividend Service Coverage," which stated—expressly assuming the Offering raised $250 million—that the 777 Companies' net income, combined with anticipated savings from debt refinancing, would cover a projected $25 million dividend obligation in 2021 by a factor of six.  Compl. ¶ 53.  The Complaint calls this a "promised 10% dividend," *id.*, though there is nothing in the text of the slide that suggests this dividend was *promised*.  *See* Investor Presentation at 11.  Indeed, that slide is explicit that the dividend was projected, based on the "assumed" savings from a debt refinance following the equity raise.  *Id.*  The Investor Presentation also stated that the 777 Companies had earned approximately $113 million in net income in 2020—with the caveat that this was "preliminary and unaudited and subject to change"—and projected $132 million in net income for 2021.  Compl. ¶ 53; Investor Presentation at 2.

Thirteen investors invested in the Offering, through four different capital raises.  Compl. ¶ 51.  Eight investors invested in September 2021; four investors invested in December 2021, and an additional investor—Investor B—invested in August 2022 and February 2023.  *Id.*

The Complaint does not allege that 777 Partners failed to pay dividends to investors.

### D.    The Subscription Agreement

Every investor who participated in the Offering signed a Subscription Agreement. Compl. ¶ 48.  That Agreement made several representations relevant to the SEC's theory.

First, the Agreement required each investor to affirm that it had made its investment decision "based upon its own judgment . . . and not upon any view expressed by any other person or entity, including the Company or the Placement Agent."  Sub. Agreement at 2.  Second, the Agreement stated that the only representations attributable to the 777 Companies were those "contained in [the Subscription] Agreement."  *Id.*  Third, each investor certified that it had "had an opportunity to request and receive additional documents and information and ask questions of,

and receive answers from, the Company," and that "all questions asked . . . have been adequately answered to its satisfaction." *Id.* Fourth, the Agreement notified investors that the investment involved "numerous risks" and attached as Schedule A a non-exhaustive list of specific risk factors addressing, among other things, key-person risk, catastrophe losses, the COVID-19 pandemic, reputational risk, and regulatory risk. Sub. Agreement, Schedule A.

The Term Sheet incorporated by reference into the Subscription Agreement also stated expressly that there were "no restrictions" on the 777 Companies' use of proceeds from the Offering. Compl. ¶ 65.

### E.    The Current Status of the 777 Companies

According to the SEC, Lender A learned about a possible problem in the collateral underlying the Credit Facility and began inquiring about the status of its loan. Compl. ¶ 85. Without providing any more detail, the Complaint asserts that Mr. Wander and Mr. Alfalla attempted to conceal the purported misuse and overdraw from Lender A, but Lender A ultimately commenced litigation after determining that substantial collateral was missing. *Id.* ¶ 86. On information and belief, Lender A is Leadenhall Capital Partners LLP, and the litigation is a suit currently pending in this Court against Messrs. Wander and Pasko, 777 Partners, 600 Partners, and a number of other individuals and entities. *Leadenhall Capital Partners LLP v. Wander, et al.*, 24 Civ. 3453 (S.D.N.Y. May 2024).[4]

In 2024, Messrs. Alfalla, Wander and Pasko all resigned from 777 Partners and 600 Partners. Compl. ¶ 9. The 777 Companies are being managed by a restructuring firm. *Id.* ¶ 89.

---

[4] The Court can take judicial notice of the filing of this suit, and its current status. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("Also, courts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.")

F.      **Procedural History**

The SEC filed this suit on October 16, 2025, more than two years after the last investment in the Offering.  The same day, Mr. Wander was arrested and charged with criminal offenses by the U.S. Attorney's Office for the Southern District of New York.  *United States v. Wander*, 25 Cr. 473 (S.D.N.Y. October 2025).  While the indictment charges Mr. Wander with conspiracy to commit securities fraud and securities fraud, the gravamen of the indictment, just like the crux of the SEC's complaint, is that Mr. Wander purportedly defrauded his lenders.  Indictment ¶¶ 8–19 (describing the alleged lender fraud); Compl. ¶ 3 ("At the heart of the Issuers' dire financial situation" was not any conduct vis-à-vis the investors but rather the alleged "misuse and resulting $300 million overdraw of a credit facility.").  The same day, the U.S. Attorney's Office unsealed the criminal charges and cooperation guilty plea of Mr. Alfalla.  *United States v. Alfalla*, 25 Cr. 468 (S.D.N.Y. October 2025).

On December 15, 2025, pursuant to this Court's Individual Practices, Rule II.B, Mr. Wander filed a letter describing his intent to move to dismiss the SEC's Complaint.  Dkt. No. 22.  After the SEC responded to that letter, Dkt. No. 26, the parties agreed to and the Court ordered a briefing schedule for this motion, Dkt. No. 36.

G.      **The SEC's Allegations Against Mr. Wander**

In the Complaint, the SEC alleges that Mr. Wander misled investors through:  (1) statements in the Investor Presentation regarding future dividends, Compl. ¶ 53; (2) projections of net income for 2021, *id.*; (3) omissions regarding the Credit Facility overdraw, *id.* ¶ 55; (4) statements regarding use of Offering proceeds, *id.* ¶ 63; and (5) a representation to Investor B in August 2022 that there had been "no material adverse change" since the most recent financial statements provided, *id.* ¶ 73.  As to whether Mr. Wander, as opposed to Mr. Alfalla, *knew* that any of these statements included in the Investment Presentation were false, and thus that he had

9

appropriate *scienter* to commit fraud-based offenses, the SEC's only allegations consist of two text messages sent by Mr. Alfalla to Mr. Wander, which make no reference to the Investor Presentation at all.  Compl. ¶¶ 59–60.  The Complaint does not allege that Mr. Wander read, received, or responded to either message.  *Id.*

The SEC brings two claims against Mr. Wander:  violations of Section 17(a) (Claim One) and violations of Section 10(b) and Rule 10b-5 (Claim Three).

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the SEC must plead more than "labels and conclusions."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).  In reviewing the complaint, a court may consider "documents attached to the complaint as exhibits or incorporated in the complaint by reference."  *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996).  While factual allegations are accepted as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

Under Rule 9(b), the SEC must allege fraud "with particularity."  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).  This requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Id.* (citations omitted).

To establish a violation of Section 10(b) and Rule 10b-5, the SEC must prove that the defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities."  *SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016) (citations omitted).  "A violation of Section 10(b) and Rule 10b–5 premised on misstatements cannot occur unless an

10

alleged material misstatement was false *at the time it was made*." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (emphasis in original); *see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812 (2d Cir. 1996) (explaining plaintiffs must allege that the statements at issue "were false at the time made").

To establish fraud under Section 17(a), "[e]ssentially the same elements" are required as those necessary under Section 10(b). *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). Although "no showing of *scienter* is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3) [of Section 17]," *id.*, a claim under Section 17(a)(2) still requires allegations that "defendant actually obtained money or property by means of the untrue statements." *SEC v. Farnsworth*, 692 F. Supp. 3d 157, 177 (S.D.N.Y. 2023).

## ARGUMENT

The SEC has tried to shoehorn the private complaint filed by Lender A into a claim of securities violations. The Court should dismiss the Complaint. *First,* the SEC's underlying theory can *never* state a claim for securities violations. The Complaint rests on projections that were not false and were accompanied by adequate warnings. The remaining allegations are based on purported omissions for which Mr. Wander had no duty to disclose. *Second*, even assuming the SEC's theory is adequate, its Complaint is not. The fraud claims are insufficiently pled under Rule 9(b), and the negligence claims are insufficiently pled under Rule 8.

## I.    THE SEC'S THEORY IS WRONG AS A MATTER OF LAW.

The SEC's theory has three fundamental defects. *First*, the statements the SEC characterizes as material misrepresentations are statements of opinion about the company's future prospects, which cannot be false and therefore cannot be the basis of a securities claim. *Second*, the statements within the Investor Presentation are forward-looking statements that were accompanied by sufficient terms that bespeak caution to any investor, rendering them immaterial

11

as a matter of law.  *Third*, any remaining allegations are predicated on omissions for which there was no duty to disclose.  The Court should dismiss the claims against Mr. Wander with prejudice.

### A.     Statements Regarding Future Dividend Payments Are Statements of Opinion And Are Therefore Not Actionable.

The Complaint's central allegation is that Mr. Wander "falsely represent[ed] that the Issuers were earning, and would continue to earn, substantial positive net income sufficient to pay investors a 10% annual dividend."  Compl. ¶ 2.  But the Investor Presentation on which the SEC relies does not support that characterization.  The SEC's allegation is based on a single slide in the Investor Presentation, titled "Dividend Service Coverage."  The slide presents a complex spreadsheet, which the Complaint summarizes as "***assuming the Offering raised $250 million***, the Issuers' net income, ***together with anticipated savings from debt refinance***, would cover the anticipated dividend obligation ($25 million) sixfold."  Compl. ¶ 53 (emphases added); Investor Presentation at 11.  But the slide makes clear that these numbers are based on the company's view of projected income and an "assumed" debt refinance savings following the preferred equity raise.  *Id.*  These statements thus are not false representations but rather "statements of opinion."  *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 406 (S.D.N.Y. 2018); *see also In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (statements regarding dividend payments were "predictions or opinions, and not guarantees" because "the directors of a corporation owe a duty to shareholders to declare dividends only when it is in the best interests of the corporation to do so"); *Farnsworth*, 692 F. Supp. 3d at 179 (applying the opinion statement doctrine to Section 17(a) claims).

To survive a motion to dismiss based on a statement of opinion, the SEC must allege that Mr. Wander:  (1) "did not hold the belief" listed in the Investor Presentation, (2) supplied

12

supporting facts that "were untrue," or (3) omitted facts "whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186, 194 (2015). The SEC alleges none of these things.

*First*, the Complaint contains no well-pled allegation that Mr. Wander "did not hold the belief" that the 777 Companies would have sufficient income to pay the projected dividend. *Id.* Nor could it. The Complaint is based on the false premise that an overdraw on the credit facility of one subsidiary—of 52—would necessarily cause a reduction in the 777 Companies' net income. Compl. ¶ 56 (asserting that the "overdraw meant the Issuers had no realistic prospect of earning profits in 2021"). But that overdraw meant only that the subsidiary could not draw cash from the facility while it was undercollateralized. It had no bearing on the subsidiary's income from its existing revenue-producing assets, which would continue to generate returns regardless of the facility's overdraw. And one subsidiary's overdraw would not affect the income of the 777 Companies as a whole—a diversified enterprise with portfolio companies in insurance, consumer and commercial finance, aviation, and media and entertainment. Compl. ¶ 25. The Complaint does not allege that any of those businesses were incapable of generating expected profits during the relevant period.[5] Nor does the Complaint account for the fact that the Offering could be used to correct the overdraw through debt refinancing, which was a use of the proceeds specifically contemplated and disclosed in the Investor Presentation. Investor Presentation at 11. And most tellingly, the SEC does not allege that the dividends went unpaid. The dividends were

---

[5] Although SuttonPark had an outsized contribution to the 777 Companies' net income in 2020, Compl. ¶ 27, that reflected the temporary effects of the COVID-19 pandemic on other portfolio companies; it was not a permanent reflection of the enterprise's earnings composition. Many of the 777 Companies' other subsidiaries operated in industries particularly hard-hit by the pandemic—including aviation and media and entertainment, Compl. ¶ 25— which depressed their 2020 results. As those industries recovered, the other portfolio companies were well-positioned to contribute meaningfully to the 777 Companies' income—which is precisely what the 2021 projections reflected.

obligations of the 777 Companies, not SuttonPark, and the SEC offers no basis to conclude that the 777 Companies as a whole could not meet them.

The SEC's theory boils down to the assertion that Mr. Wander should have been less optimistic about his company's prospects. But Supreme Court and Second Circuit precedent foreclose exactly that sort of hindsight pleading. *See Omnicare*, 575 U.S. at 186 ("A sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless [of] whether an investor can ultimately prove the belief wrong."); *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 420 (2d Cir. 2023) (the "securities laws do not require the people in charge of an enterprise to take a gloomy, fearful or defeatist view of the future, and instead allow them to be confident about their stewardship and the prospects of the business that they manage." (citation modified)).

*Second,* the Supreme Court's seminal opinion in *Omnicare* requires the SEC to plead that there was an untrue *present* fact relayed in the dividend opinion. *Omnicare*, 575 U.S. at 187. It cannot do so. The only statement even relayed in present tense was that "the Issuers had earned $113 million in net income in the year 2020." Compl. ¶ 53. The Investor Presentation was clear, however, that the "Company's presentation of financial and operating metrics for the year ended December 31, 2020 included in this presentation are preliminary and unaudited and subject to change." Investor Presentation at 2. Accordingly, even this statement was not an assertion of present fact but a preliminary estimate that, by its own terms, could change. All other statements the SEC cites are either projections or omissions. For example, the statement that "the Issuers were projecting $132 million in net income for the year 2021," Compl. ¶ 53, is of course a forecast, and not a "thing done or existing" or "[a]n actual happening." *Omnicare*, 575 U.S. at 183. Coupled with the clear language stating that the projections are forward-looking estimates,

14

not guarantees, the SEC has wholly failed to allege that Mr. Wander supplied any untrue present fact, and thus cannot rely on these opinion statements in its Complaint. *See In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *4 (S.D.N.Y. Nov. 25, 2003), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004) ("A company's statements of hope, opinion, or belief about its future performance or general market conditions are not actionable under the securities laws.").

*Third*, the Complaint does not identify any omission that makes the dividend opinion actionable. *Omnicare*, 575 U.S. at 189. A statement of opinion is not rendered misleading by omission because of the "speaker's failure to mention the *possibility* of contrary *opinions*," *Philip Morris*, 89 F.4th at 420, or "fact[s] cutting the other way." *Id.* at 189. Mr. Wander was not required to take a "defeatist view of the future"; the securities laws permitted him to be confident about the "prospects of the business that [he] manage[d]." *Philip Morris*, 89 F.4th at 420. And a "reasonable investor does not expect that every fact known to an issuer supports its opinion statement." *Omnicare*, 575 U.S. at 190; *see also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("[T]here is no duty to disclose a fact in the offering documents merely because a reasonable investor would very much like to know that fact[.]") (internal quotation marks and citation omitted). The SEC focuses on the fact that the 777 Companies did not disclose a subsidiary's credit facility overdraw. Compl. ¶ 56. But it fails to make a single allegation even suggesting that the dozens of other subsidiaries were incapable of generating profits to cover any purported shortfall. The SEC's silence betrays the truth.

Any allegations that rest on purely forward-looking statements of opinion about a potential dividend cannot support claims under Sections 10(b) and 17(a).

15

**B.    Statements Regarding the Issuer's Future Prospects Are Immaterial Under the Bespeaks Caution Doctrine.**

The other statements cited in the Complaint are independently protected by the bespeaks caution doctrine.  The information relayed by Mr. Wander and the 777 Companies was not merely forward-looking; it was consistently couched in explicitly detailed cautionary language.  That means the statements cited by the SEC are "immaterial as a matter of law."  *In re Hut 8 Corp. Sec. Litig.*, 2025 WL 2636150, at *12 (S.D.N.Y. Sept. 12, 2025) (quoting *Rombach*, 355 F.3d at 173).  The Investor Presentation and Subscription Agreement contained precisely the type of "cautionary language" that "bespeaks caution" to the investors who received it.  *See Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010) ("[I]t cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency.").

The cautionary language was extensive and specific.  The Investor Presentation itself opened with a two-page disclosure that expressly mentioned the presentation contained forward-looking statements, identified 17 specific risk categories that could cause actual results to materially differ, and noted that the forward-looking statements were based on beliefs and assumptions.  The Subscription Agreement that every investor signed reinforced those warnings.  Sub. Agreement at Schedule A.  It required each investor to guarantee that it "made its own investment decision based upon its own judgement . . . and not upon any view expressed by any other person or entity, including the Company or the Placement Agent."  *Id.* at 2.  The Agreement clarified that the only representations attributable to the 777 Companies were those "contained in [the Subscription] Agreement."  *Id.*  It also notified investors that the investment involved "numerous risks."  *Id.*  And it attached as Schedule A a non-exhaustive list of risks that "expressly warn[ed] of" and "directly relate[d] to the risk that brought about plaintiffs' [alleged] loss."  *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002); *see also In re Hut*

16

*8*, 2025 WL 2636150, at \*16 ("[E]ach Statement is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially.").

Schedule A warned investors, among other things:

1. We are dependent on a few key people for our major investment and capital allocation decisions . . .
2. High levels of catastrophe losses . . . could adversely impact our ratings, our ability to raise capital and the availability and cost of reinsurance . . .
3. The COVID-19 pandemic and measures to reduce its spread have had, and will likely continue to have, a material adverse impact on our business, results of operations and financial condition . . .
4. Unfavorable press reports about us or the industries in which we operate may make prospective customers less willing to use us for their financial needs, lead to increased regulation or make third party vendors less willing to work with us . . .

    We are subject to extensive federal, state and local laws and regulations. Failure to comply with these laws and regulations and changes in the laws and regulations could have a material adverse effect on our business, financial condition, results of operations and cash flows . . . .

Sub. Agreement at Schedule A. This cautionary language was sufficient to bespeak caution to investors, rendering any overly "positive picture of the Issuers' prospects" immaterial as a matter of law. Compl. ¶ 6; *see City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 398 (S.D.N.Y. 2020) (recognizing statements in a company's IPO material as immaterial under the bespeaks caution doctrine where the company "provided a slew of factors that could cause actual results to differ materially from those expressed or implied" (internal quotations omitted)).

To the extent the SEC's theory turns on projections or expectations about future performance, those were just that: projections. "As a general rule, statements whose truth cannot be ascertained until some time after the time they are made are forward-looking statements." *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 538 (S.D.N.Y. 2024) (quoting *Philip Morris*, 89 F.4th at 428).

17

Judge Rochon's recent decision in *In re Lottery.com* is instructive.  There, two merging parties filed a final proxy statement and prospectus that "projected that Lottery would generate more than $70 million in revenue, more than $3 million in [EBITDA], a 32 percent gross-profit margin, and a 5 percent EBITDA margin for the 2021 fiscal year."  *In re Lottery.com*, 715 F. Supp. 3d at 523.  The proxy statement continued by warning that Lottery "[a]s a private company . . . [had] not been required to document and test [their] internal controls over financial reporting."  *Id.* at 523–24.  After the merger, Lottery continued to file reports which painted a picture of explosive revenue growth.  *Id.* at 525–26.  But several months later, the company disclosed that "an internal investigation had revealed issues pertaining to the Company's internal accounting controls and instances of non-compliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment," and continued that its prior financial statements could no longer be relied upon.  *Id.* at 528 (internal quotations omitted).  Judge Rochon held that "financial projections were forward-looking statements" and were therefore protected by the bespeaks caution doctrine.  *Id.* at 538.

The parallels to this case are apparent.  As in *Lottery.com*, 777 Partners made revenue projections accompanied by cautionary language about the projections, as well as the prior preliminary, unaudited financials.  Investor Presentation at 2.  These statements are immaterial as a matter of law under the bespeaks caution doctrine.  *See Iowa Pub. Employees' Ret. Sys.*, 620 F.3d at 144 ("[A] statement of confidence in a firm's operations may be forward-looking—and thus insulated by the bespeaks-caution doctrine."); *Brown v. E.F. Hutton Grp.*, 735 F. Supp. 1196, 1200 (S.D.N.Y. 1990) ("[T]he offering materials taken as a whole 'bespeak caution' and sufficiently disclose the relevant risks of the investment.").  The SEC's theory necessarily presumes that sophisticated institutional investors were incapable of recognizing a forward-

looking projection for what it was, even when accompanied by express cautionary language. That premise cannot sustain a securities fraud claim, and the bespeaks caution doctrine exists precisely to foreclose it.

### C. At Most, the Diligence Materials Contain Pure Omissions, Which Are Not Actionable Under the Securities Laws.

Finally, the SEC cannot plead a securities violation by pointing to pure omissions. The Complaint's allegation that Mr. Wander failed to disclose that a subsidiary of 777 Partners was out of compliance with the terms of one of its credit facilities, Compl. ¶ 55, is "not actionable under Rule 10b–5(b)," *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 266 (2024). Rule 10b–5 does not impose a free-floating obligation to volunteer all facts. It "requires disclosure of information necessary to ensure that statements already made are clear and complete." *Id.* at 264. Mere "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). Besides the projections and other statements covered by the warranties, the Complaint rests on purported omissions. *See* Compl. ¶ 55 (alleging that Mr. Wander "***did not disclose*** that the Issuers had misused the Credit Facility to purchase non-income-generating assets" (emphasis added)); *id.* ¶ 56 (alleging that Mr. Wander "***did not disclose*** the overdraw of the Credit Facility to prospective investors in the offering" (emphasis added)). It identifies no *affirmative* statement from Mr. Wander representing that the Credit Facility was not in default or otherwise free of borrowing base deficiencies. The SEC's theory would impose on any issuer a duty to disclose every adverse internal detail about any credit facility at any subsidiary company—an obligation the securities laws have never recognized.

The SEC identifies no source for any such duty, and none exists. The "federal securities law does not create an affirmative duty to disclose any and all material information." *In re*

19

*Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 752 (S.D.N.Y. 2017) (citation modified).

"Disclosure of ... information is not required ... simply because it may be relevant or of interest to a reasonable investor." *Id.* (citation modified). That means Mr. Wander could not have violated the securities laws by omitting information that investors may have found relevant. That principle applies with particular force here, where the offerees were sophisticated, accredited investors who, per the terms of the Subscription Agreement, undertook the responsibility to request any additional information they deemed material and assumed the risk of investing without doing so. *See Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993) ("An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth."). The Subscription Agreement clearly stated:

> [T]he undersigned (or its representatives) has had an opportunity to request and receive additional documents and information and ask questions of, and receive answers from, the Company or a person acting on behalf of the Company concerning the terms and conditions of an investment in the Preferred Units, and (iii) all questions asked by the undersigned (or its representatives) have been adequately answered to its satisfaction. The undersigned represents that it has had access to all information that it deems material to an investment decision with respect to an investment in the Preferred Units.

Sub. Agreement at 2. The Complaint does not allege that investors lacked an opportunity to ask for more information about the credit facility and were denied information or given a false answer. The absence of any such inquiry—in a transaction where sophisticated investors certified their own diligence—underscores that the alleged overdraw was not material to the investment decision. The SEC's omission-based claims fail as a matter of law and should be dismissed.

20

## II.    THE COMPLAINT FAILS TO ADEQUATELY PLEAD ITS CLAIMS.

Beyond the basic flaws of the SEC's theory, the Complaint is also entirely deficient. *First*, the Complaint fails to allege that Mr. Wander "made" any material misrepresentations. *Second*, rather than plead the specific facts about Mr. Wander's *scienter* required by Rule 9(b) for its fraud claims, the SEC makes only conclusory and unsupported allegations. *Third*, its negligence-based claims fare no better: the SEC has failed to provide adequate information in the Complaint to clear the bar of Rule 8.

### A.    The Complaint Fails to Allege that Mr. Wander Made Any Material Misrepresentation.

The Complaint is premised entirely on five alleged misstatements[6] the SEC attributes to Mr. Wander:  (1) The 777 Companies were financially healthy and could pay the 10% dividend; (2) They had $113 million of 2020 net income; (3) They were projected to earn $132 million in 2021; (4) Offering proceeds would be used for general corporate purposes; (5) There had been no material adverse change to the 777 Companies before Investor B invested.  The Complaint fails to plead that any of them were material misrepresentations "made" by Mr. Wander.

The "maker" of a statement "is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011).  And where, as here, the SEC sues multiple defendants, it must "establish a connection between the fraudulent statements and each defendant so that each defendant receives notice of the nature of his participation in the alleged fraud." *Rohland v. Syn-Fuel Assocs.-1982 Ltd. P'ship*, 879 F. Supp. 322, 334 (S.D.N.Y. 1995). The Complaint does not do so as to Mr. Wander.

---

[6] Omissions, as discussed above, generally cannot form the basis of a securities claim. *See supra* Section I.C.

The first four statements are embedded in the Investor Presentation that, by the SEC's own allegation, "Alfalla drafted." Compl. ¶ 6. The Complaint alleges only that Wander "reviewed and approved" the presentation. *Id.* That does not suffice to state a claim. *See Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 F. App'x 664, 669 (2d Cir. 2016) (The SEC's "allegations that the POM [private offering memorandum] was drafted with the approval and input of some . . . Defendants [are] not sufficient to demonstrate the control essential to maker liability."). The SEC does not allege that Mr. Wander drafted the presentation, dictated the content of the challenged statements, or orally made those statements to investors. It is not enough to "merely tack[] on conclusory assertions" that statements were made "with [Mr. Wander's] knowledge and approval." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 493 (S.D.N.Y. 2017). The same defect applies to the Term Sheet, which the SEC only alleges that Mr. Wander "approved." Compl. ¶ 65.

Nor does the SEC allege that Mr. Wander made the "no material adverse change" representation in Investor B's Subscription Agreement. *Id.* ¶ 73. The allegation is framed so vaguely that the Complaint identifies no maker at all—only that the Subscription Agreement "*included* a representation." *Id.* But, under *Janus*, statements do not make themselves. *Janus Cap. Grp.*, 564 U.S. at 142 ("One 'makes' a statement by stating it.").

## B. The Complaint Fails to Satisfy Rule 9(b)'s Heightened Pleading Requirement for Fraud.

The Complaint fails to satisfy Rule 9(b)'s heightened pleading requirements for fraud. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this standard, the SEC must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*

*Commc'ns, Inc.*, 493 F.3d at 99.  Allegations cannot be "conclusory or unsupported by factual assertions."  *Id*.  Further, "[c]omplaints under Rule 9(b) are simultaneously subject to the 'strong inference' standard."  *SEC v. One or More Unknown Traders in the Secs. of Onyx Pharms., Inc.*, 296 F.R.D. 241, 249 (S.D.N.Y. 2013).  Under this standard, "a general allegation about the defendant's state of mind must be supported by specific facts that strongly support an inference of fraudulent intent."  *Id*. at 248.  This can be established by either (1) "alleging facts to show that defendants had both motive and opportunity to commit fraud" or (2) "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Valcarcel v. Ahold U.S.A., Inc.*, 577 F. Supp. 3d 268, 281 (S.D.N.Y. 2021).  The SEC does neither here.

The SEC fails to allege that Mr. Wander had any concrete personal motive to commit fraud.  "[I]n the corporate context, . . . [m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, [the SEC] must assert a concrete and personal benefit to the individual defendants resulting from the fraud."  *PetEdge, Inc.*, 234 F. Supp. 3d at 494.  The only motive the SEC alleges is that "the Issuers needed capital to refinance their debts and fund their commitments" and Mr. Wander "decided to address this need for capital by conducting the Offering."  Compl. ¶ 46.  That is a motive possessed by virtually every executive who conducts a capital raise; it is not a "*personal* benefit to [Mr. Wander] himself."  *PetEdge, Inc.*, 234 F. Supp. 3d at 495.

The Complaint similarly fails to allege "strong circumstantial evidence of conscious misbehavior or recklessness."  *Valcarcel*, 577 F. Supp. 3d at 281.  The SEC alleges that Mr. Wander "knew[] or recklessly disregarded" that the information in the Investor Presentation, Model, and Diligence Materials was "false and misleading" as to the "actual and expected net income."  Compl. ¶ 56.  But this is entirely unsupported.  The SEC points to no emails or text

23

messages showing an intent to deceive investors. There are no emails or text messages showing Mr. Wander was involved in putting together the net income figures. There aren't even emails or texts showing Mr. Wander knew that the figures in the Offering materials did not include the credit facility overdraw or that omitting that information would be misleading.

All the SEC offers to support its allegation of fraudulent intent are two text messages that Mr. Alfalla sent Mr. Wander. *Id.* ¶¶ 59–60. But nowhere does the SEC allege that Mr. Wander acknowledged, read, or even received these text messages. And the messages do not even mention the Investor Presentation, much less show that it was intended to deceive investors. *Id.* The messages simply acknowledge that an overdraw existed and that the Company was working to cure it, which is entirely *consistent* with the competing inference, that Mr. Wander had a good-faith belief that the company's prospects justified the projections. *See SEC v. Laura*, 2020 WL 1434114, at *6 (E.D.N.Y. Mar. 24, 2020) ("In alleging scienter, a plaintiff must plead facts giving rise to a strong inference of fraud that is at least as compelling as any opposing inference one could draw from the facts alleged." (internal quotations marks omitted)). Indeed, the Complaint contains no allegations that would negate such a good-faith belief, such as by alleging that the income projections were inconsistent with the net income for any of the preceding years.

The SEC's Complaint fails to meet its burden of pleading with particularity the circumstances regarding the alleged fraud in the materials provided to investors.

### C. The Complaint Fails to Adequately Allege That Mr. Wander Acted with Negligence.

The SEC also fails to adequately plead that Mr. Wander acted with negligence for its claims under Section 17(a)(2) and (3). Specifically, the Complaint fails to adequately allege that the two statements not discussed in Section I, *supra*, were in fact misleading or that either of the

24

alleged misrepresentations was material.  15 U.S.C. § 77q(a)(2); *see also* 17 C.F.R. § 240.10b-5(b).

*First*, the Complaint fails to adequately allege that Mr. Wander misled investors in stating, through the Term Sheet appended to the Subscription Agreement, that Offering proceeds would be used for "general corporate purposes."  Compl. ¶ 8.  The SEC concedes that the Term Sheet expressly stated there were "no restrictions" on the 777 Companies' use of the proceeds. *Id.* ¶ 65.  While the SEC calls the uses of the funds for Mr. Wander's "personal benefit," *id.*, the only allegation is that money was transferred to Mr. Wander and Mr. Pasko.  That is perfectly consistent with many legitimate corporate purposes.[7]  *Contra SEC v. China Ne. Petroleum Holdings Ltd.*, No. 12-cv-08696-NRB, Complaint at ¶ 6, ECF No. 1 (S.D.N.Y. Nov. 29, 2012) (alleging that "none of the transfers [to company insiders] had any documented business purpose").  Accordingly, the Complaint does not foreclose that the payment to Mr. Wander was for a general corporate purpose and thus consistent with the Term Sheet, such as, for example, buying out Mr. Wander's preexisting shares of stock to eliminate disparities in the classes of preferred equity.  Without factual allegations that the payment to Mr. Wander had no business justification, the Complaint fails to allege that the statement was misleading.  *See In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 295 (S.D.N.Y. 2009) (granting motion to dismiss on alleged misrepresentation because "[o]n its face, payment to a contractor appears to be a 'general corporate purpose'").

---

[7]  As a matter of fact, a portion of these funds was paid to Mr. Wander to buy out his preexisting shares of preferred equity that entitled him to a higher 18% dividend.  Eliminating disparities in the classes of preferred equity is a permissible corporate use of proceeds.  *See Penfield v. Davis*, 105 F. Supp. 292, 300 (N.D. Ala. 1952), *aff'd*, 205 F.2d 798 (5th Cir. 1953) (recognizing that "the elimination of potential differences in interest inherent in the voting power of the preferred" is a legitimate business purpose).

*Second*, the SEC fails to adequately allege that Mr. Wander misled Investor B by continuing to use the "materially false and misleading Investor Presentation and Diligence Materials" and "fail[ing] to disclose to Investor B losses that the Issuers suffered in the first quarter of 2022." Compl. ¶ 70. Specifically, the Complaint fails to allege that the statement of "no material adverse change" in the Subscription Agreement provided to Investor B in August 2022 was misleading or material. *Id.* ¶ 73 ("no material adverse change to the financial condition of the Company since the date of the most recent Financial Statements provided [in December 2021]"). It does not follow that, because Mr. Wander did not disclose "large losses" in the first quarter of 2022, *id.* ¶ 72, a statement regarding the financial condition of the company in the *third* quarter of 2022 was therefore false or misleading, *id.* ¶ 73. Without an allegation that the financial condition of the company in August 2022 was in fact materially different than in December 2021, the Complaint fails to allege that the statement in the Subscription Agreement was misleading.

The Complaint also fails to allege that the statement was material. The Complaint includes no allegation that a reasonable investor would consider a one-time quarterly loss driven by temporary macroeconomic conditions, *id.* ¶ 72, "important in making an investment decision," *SEC v. Treadway*, 430 F. Supp. 2d 293, 323 (S.D.N.Y. 2006). *See also In re Omnicom Grp., Inc. Sec. Litig.*, 2007 WL 2376170, at *12 n.15 (S.D.N.Y. Aug. 10, 2007) ("[A] temporary decline in an investment's fair value does not need to be accounted for as a loss in a company's earnings, but an 'other than temporary' decline must be."). Because the Complaint fails to allege that the statement at issue was misleading at the time it was made or material to Investor B, it cannot support a claim for securities fraud.

Apart from the alleged misrepresentations, the Complaint fails to identify any practices in which Mr. Wander engaged that would operate as a fraud or deceit. 15 U.S.C. § 77q(a)(3); *see also* 17 C.F.R. § 240.10b-5(c). Even if the Complaint had sufficiently pleaded such facts, the Complaint contains no allegations that Mr. Wander's conduct fell below "the degree of care that a reasonably careful person would use under like circumstances." *SEC v. Wey*, 246 F. Supp. 3d 894, 912 (S.D.N.Y. 2017) (citation omitted).

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety as to Mr. Wander.

Dated: March 27, 2026

*/s/ Jordan Estes*
Jordan Estes
Michael Martinez
Samuel Raymond
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2315
jestes@gibsondunn.com
mmartinez2@gibsondunn.com
sraymond@gibsondunn.com

*Attorneys for Defendant Joshua Wander*

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume requirements of Local Civil Rule 7.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York because it is 8,547 words (exclusive of the table of contents and authorities); and

2.      This document complies with the typeface requirements of Local Civil Rule 7.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York  because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 12-point Times New Roman font, with footnotes that are at least 10-point font.

*/s/ Jordan Estes*
Jordan Estes
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2315
jestes@gibsondunn.com

28