# EXHIBIT 2

**SUBSCRIPTION AGREEMENT AND LIMITED POWER OF ATTORNEY**

**To Purchase Preferred Membership Unit Interests**

**777 PARTNERS LLC**
**600 PARTNERS LLC**
**AS JOINT ISSUERS**
Attn: Damien Alfalla and Joshua C. Wander

THE METHOD OF DELIVERY OF THIS SUBSCRIPTION AGREEMENT AND LIMITED
POWER OF ATTORNEY AND ALL OTHER REQUIRED DOCUMENTS (INCLUDING <u>EXHIBIT A</u>
AND THE PAYMENT OF FUNDS) IS AT THE ELECTION AND RISK OF THE SUBSCRIBER.
IF DELIVERY IS BY MAIL, REGISTERED MAIL WITH RETURN RECEIPT REQUESTED,
OR OVERNIGHT DELIVERY IS RECOMMENDED.  IN ALL CASES,
SUFFICIENT TIME SHOULD BE ALLOWED FOR TIMELY DELIVERY.

Ladies and Gentlemen:

1.      <u>Subscription</u>.

(a)      The undersigned hereby irrevocably subscribes to purchase the number of preferred membership unit interests to be issued by 777 Partners LLC ("<u>777</u>") and 600 Partners LLC ("<u>600</u>" and, together with 777, the "<u>Company</u>") set forth on the signature page of this Agreement, for a price equal to $1,000 per unit (the "<u>Preferred Units</u>").  Each Preferred Unit consists of a preferred membership interest in each of 777 Partners LLC and 600 Partners LLC. This subscription is submitted to the Company in accordance with and subject to the terms and conditions described in this Subscription Agreement and Limited Power of Attorney (this "<u>Agreement</u>"), and the Summary Term Sheet Cumulative Perpetual Preferred Equity Interests dated as of September 2021, as it may be amended or supplemented from time to time (the "<u>Term Sheet</u>"), which is incorporated into and made part of this Agreement and a copy of which the undersigned has received and carefully reviewed.  The Company has engaged Performance Trust Capital Partners, LLC to serve as its exclusive placement agent in connection with the offering of the Preferred Units (the "<u>Placement Agent</u>").

(b)      A duly executed and properly completed copy of this Agreement and a Counterpart Signature Page, in the form attached hereto as <u>Exhibit A</u>, to the First Amendment (the "<u>777 Amendment</u>") to the Fourth Amended and Restated LLC Operating Agreement of 777 (the "<u>777 Operating Agreement</u>"), a copy of which is attached hereto as <u>Exhibit B</u>-1 and the First Amendment (the "<u>600 Amendment</u>") to the Third Amended and Restated LLC Operating Agreement of 600 (the "<u>600 Operating Agreement</u>"), a copy of which is attached hereto as <u>Exhibit B-2</u> and each of which the undersigned has carefully reviewed, is being delivered to the Company, together with a the subscription proceeds wire transferred to the Company.

(c)      The undersigned understands that if its subscription is not accepted in whole or in part by the Company, the full or ratable amount, as the case may be, of any subscription payment received will be promptly refunded to the undersigned without deduction therefrom or interest thereon.  The undersigned understands and agrees that the Company shall have the right to accept or reject this subscription, in whole or in part, in its sole and absolute discretion.  Unless this subscription is accepted in whole or in part, or rejected in part, by the Company prior to the expiration date of the offering or any extensions thereto, as set forth in the Term Sheet, this subscription shall be deemed rejected in whole.  The undersigned understands and agrees that the subscription funds will be deposited in an account at First Republic Bank in the name of the Company.

(d)      The undersigned understands that once delivered to the Company, this subscription is irrevocable by the undersigned.

2.      <u>Representations and Warranties of the Subscriber</u>.  The undersigned hereby represents and warrants to, and agrees with, the Company as follows:

(a)      <u>No Public Solicitation</u>.  The undersigned (or its representatives) has a business association with the Company or one or more of its principals, executive officers, representatives or agents.  The undersigned did

{40972783:2}

not learn of the offering, and is not subscribing for the Preferred Units, as a result of or subsequent to any general solicitation, advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over the air or radio, or presented at any seminar or meeting.

(b)    Economic Loss and Sophistication.  The undersigned is able to bear the economic risk of losing its entire investment in the Preferred Units.  In making this statement, consideration has been given to whether the undersigned can afford to hold the investment for an indefinite period of time and whether the undersigned can afford a complete loss of its investment.  The undersigned acknowledges and agrees that it is able to hold the Preferred Units indefinitely and to afford a complete loss of this investment in the Preferred Units. The undersigned's overall commitment to investments that are not readily marketable is not disproportionate to its net worth.  The undersigned's investment in the Preferred Units will not cause such overall commitment to become excessive.  The undersigned has such knowledge and experience in financial and business matters that it is capable of evaluating the risks and merits of this investment in the Company.

(c)    Accredited Investor Determination.  The undersigned is an institutional "accredited investor" as such term is defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), or a "qualified institutional buyer" as such term is defined in Rule 144A under the Securities Act.

(d)    Access.  The undersigned acknowledges and agrees that (i) the Company has made all documents available to the undersigned (or its representatives) relating to an investment in the Preferred Units, including, without limitation, this Agreement, the Term Sheet, the Investor Presentation, a copy of all material records of the Company and any and all additional material agreements, documents, records and books, that have been requested by it or them and the other information contained in the data room established by the Company (or the Placement Agent on the behalf of the Company) in connection with the transactions contemplated by this Agreement, (ii) the undersigned (or its representatives) has had an opportunity to request and receive additional documents and information and ask questions of, and receive answers from, the Company or a person acting on behalf of the Company concerning the terms and conditions of an investment in the Preferred Units, and (iii) all questions asked by the undersigned (or its representatives) have been adequately answered to its satisfaction.  The undersigned represents that it has had access to all information that it deems material to an investment decision with respect to an investment in the Preferred Units.  The undersigned represents that no person representing the Company or purporting to do so has made any oral representation or warranty to the undersigned which is inconsistent with the information provided in writing to it.

(e)    Investment Decision.  The undersigned has made its own investment decision based upon its own judgment, due diligence and advice from such advisors or representatives as it has deemed necessary and the undersigned has relied solely on such judgment, due diligence and advice from such advisors or representatives, and not upon any view expressed by any other person or entity, including the Company or the Placement Agent.  The undersigned is not relying upon, and has not relied upon, any advice, statement, representation or warranty made by any person or entity by or on behalf of the Company, including, without limitation, the Placement Agent, except for the express statements, representations and warranties of the Company made or contained in this Agreement.  Furthermore, the undersigned acknowledges and agrees that (i) the Placement Agent has not performed any due diligence review on behalf of it, (ii) nothing in this Agreement or any other materials presented by or on behalf of the Company to it in connection with the purchase of the Preferred Units constitutes legal, tax or investment advice, and (iii) the undersigned has consulted its own legal, tax or investment advisors regarding an investment in the Preferred Units.  The undersigned acknowledges that it (and not the Company) shall be responsible for any of its tax liabilities that may arise as a result of this investment or the transactions contemplated by this Agreement.

(f)    Speculative Investment.  The undersigned understands and acknowledges that (i) an investment in the Preferred Units involves numerous risks, including but not limited to those set forth on Schedule A hereto, which the undersigned has carefully considered, (ii) no federal or state agency has passed upon the merits of the sale of the Preferred Units of any of the information provided in connection with the offering, (iii) there is expected to be no public market for the Preferred Units and it may not be possible for it to liquidate its investment in the Preferred Units, (iv) transfer of the Preferred Units may be restricted in accordance with the terms of the Preferred Units and the Amendments to the Operating Agreements of 777 Partners LLC and 600 Partners LLC creating the Preferred Units, and (v) the Preferred Units are a speculative investment involving a significant degree of risk for which there is no guarantee that the undersigned will recover its initial investment or realize any gain from any investment.

USAO_REL_01_00491112

(g) <u>Exempt Transaction</u>. The undersigned understands and acknowledges that the Preferred Units are being sold by the Company without registration under the Securities Act in reliance on the exemption from federal and state registration set forth in, respectively, Rule 506(c) of Regulation D promulgated under Section 4(a)(2) of the Securities Act and Section 18 of the Securities Act, and under applicable state securities laws, and accordingly, may be resold, pledged or otherwise transferred only if exemptions from the Securities Act and applicable state securities laws are available to it. Neither the Company nor the Placement Agent has made or is making any representation, warranty or covenant, express or implied, as to the availability of any exemption from registration under the Securities Act or any applicable state securities laws for the resale, pledge or other transfer of the Preferred Units, or that the Preferred Units purchased by the undersigned will ever be able to be lawfully resold, pledged or otherwise transferred.

(h) <u>No Registration of Interests; Limitation on Transfers</u>. The undersigned acknowledges and agrees that, based in part upon its representations, warranties and agreements set forth in this Agreement and in reliance upon applicable exemptions, no interest in the Preferred Units acquired or to be acquired by the undersigned has been or will be registered under the Securities Act, any state securities laws or the securities laws of any other domestic or foreign jurisdiction. The undersigned agrees not to offer, sell, pledge or otherwise dispose of all or any portion of the Preferred Units purchased by it without registration or qualification except pursuant to an offering duly registered or qualified under the Securities Act and any applicable state securities laws, unless (i) in the opinion of counsel for, or counsel satisfactory to, the Company, registration or qualification under the Securities Act and any applicable state securities laws is not required, and (ii) if required, the undersigned has received any necessary regulatory approvals. The undersigned understands that a legend to this effect will be placed on the Preferred Units and that stop-transfer instructions will be issued by the Company to its transfer agent, if any. The undersigned further understands that Rule 144 under the Securities Act may not be available to it with respect to resale of the Preferred Units. Further, the undersigned acknowledges that even if the Preferred Units may be legally transferred under the Securities Act, transfer of the Preferred Units may still be restricted under the terms of the Preferred units and the Amendments to the Operating Agreements of 777 Partners LLC and 600 Partners LLC creating the Preferred Units.

(i) <u>Investment Intent</u>. The undersigned is acquiring the Preferred Units for its own account for investment, and not with a view to any distribution, resale, subdivision or fractionalization thereof in violation of the Securities Act or any other applicable domestic or foreign securities law, and the undersigned has no present plans to enter into any contract, undertaking, agreement or arrangement for any such distribution, resale, subdivision or fractionalization. The Preferred Units are not being acquired, directly or indirectly, as nominee, trustee or representative of or for any other person or persons.

(j) <u>Placement Agent</u>. The undersigned will purchase the Preferred Units directly from the Company and not from the Placement Agent and understands that neither the Placement Agent nor any other broker or dealer has any obligation to make a market in the Preferred Units.

(k) <u>Power and Authority</u>. The natural person executing this Agreement is authorized to execute, deliver this Agreement, the Counterpart Signature Page to each of the 777 Amendment and the 600 Amendment, and such other agreements, certificates or other instruments, including, without limitation, an Accredited Investor Questionnaire and a FINRA Compliance and Suitability Questionnaire, as are executed and delivered, by, in the name of or behalf of the undersigned in connection with this Agreement or the undersigned's subscription for the Preferred Units (collectively, the "<u>Subscriber Agreements</u>"), to perform its respective obligations under the Subscriber Agreements, and to consummate the respective transactions contemplated by the Subscriber Agreements. The Subscriber Agreements have been duly executed by the undersigned, and, when delivered by the undersigned in accordance with the terms hereof, will constitute the valid and legally binding obligation of the undersigned, enforceable against it in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights, generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(l) <u>Compliance with Laws and Other Instruments</u>. The execution and delivery of, and the performance of its obligations under, the Subscriber Agreements by, in the name of or on behalf of the undersigned and the consummation of the transactions contemplated by the Subscriber Agreements do not and will not conflict with, violate, constitute a breach of or result in a default (whether with or without the giving of notice or lapse of time or both) under (i) any provision of the organizational documents of the undersigned, (ii) any agreement, certificate or other instrument to which the undersigned is a party or by which the undersigned or any of its properties is bound,

USAO_REL_01_00491113

(iii) any permit, license, franchise, statute, rule regulation or other law applicable to the undersigned or its business or any of its properties, or (iv) any order, writ, judgment, injunction, decree, determination or award binding upon or affecting the undersigned.

(m)     Legal Counsel.  The undersigned has reviewed with its own legal counsel, the legal consequences of this investment and the transactions contemplated by this Agreement.  The undersigned acknowledges and agrees that it did not receive any legal advice from legal counsel of the Company or the Placement Agent and that the undersigned shall be responsible to consult with its own legal counsel in connection with this investment or the transactions contemplated by this Agreement.

(n)     Not a Benefit Plan Investor. The undersigned is not an entity that would be deemed a "benefit plan investor" (as defined in U.S. Department of Labor Reg. § 2510.3-1010 et seq., as amended; benefit plan investors would ordinarily include, for example, governmental plans, foreign pension plans, domestic pension plans, individual retirement accounts and nonqualified retirement plans).

(o)     Patriot Act Representations.  The undersigned hereby represents, covenants, and agrees that, to the best of undersigned's knowledge based on reasonable investigation:

(i)     Neither it nor, to its knowledge, any person or entity controlling, controlled by or under common control with it, nor any person having a beneficial interest in it, nor any person on whose behalf the undersigned is acting:  (A) is a person listed in the Annex to Executive Order No. 13224 (2001) issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism); (B) is named on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Assets Control; (C) is a non-U.S. shell bank or is providing banking services indirectly to a non-U.S. shell bank; (D) is a senior non-U.S. political figure or an immediate family member or close associate of such figure; or (E) is otherwise prohibited from investing in the Company pursuant to applicable U.S. anti-money laundering, anti-terrorist and asset control laws, regulations, rules or orders (categories (A) through (E), each a "Prohibited Subscriber").

(ii)     None of the undersigned's subscription funds paid or payable to the Company were or shall be derived from money laundering or similar activities deemed illegal under federal laws and regulations.

(iii)     To the extent within the undersigned's control, none of the undersigned's subscription funds paid or payable to the Company will cause the Company or any of its personnel to be in violation of federal anti-money laundering laws, including without limitation the Bank Secrecy Act (31 U.S.C. 5311 et seq.), the United States Money Laundering Control Act of 1986 or the International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, and any regulations promulgated thereunder.

(iv)     The undersigned will provide the Company, promptly upon request, all information that the Company reasonably deems necessary or appropriate to comply with applicable U.S. anti-money laundering, anti-terrorist and asset control laws, regulations, rules and orders and the undersigned consents to the disclosure to U.S. regulators and law enforcement authorities by the Company and its affiliates and agents of such information about the undersigned as the Company reasonably deems necessary or appropriate to comply with applicable U.S. anti-money laundering, anti-terrorist and asset control laws, regulations, rules and orders.

(v)     If the undersigned is a financial institution that is subject to the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "PATRIOT Act"), it has met all of its obligations under the PATRIOT Act.

(vi)     If the undersigned is affiliated with a non-U.S. banking institution (a "Foreign Bank"), or if the undersigned receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, the undersigned represents and warrants to the Company that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains operating records related to

{40972783:2}                                            4

USAO_REL_01_00491114

its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated Affiliate.

(vii)    The undersigned acknowledges that if, following its investment in the Company, the Company reasonably believes that the undersigned is or has become a Prohibited Subscriber or is otherwise engaged in suspicious activity or refuses to promptly provide information that the Company requests, the Company may undertake appropriate actions, and the undersigned agrees to cooperate with such actions, to ensure compliance with such laws or regulations, including, but not limited to segregation and/or redemption of the undersigned's interest in the Company.  The undersigned further acknowledges that the undersigned will have no claim against the Company or any of their affiliates or agents for any form of damages as a result of any of the foregoing actions.

(p)    Performance Guarantee.  None of the Company, the Placement Agent, any other broker or dealer, any of the officers, managers, members, partners, employees, representatives or agents of the Company, the Placement Agent or any other broker or dealer, or any other persons, whether expressly or by implication, has represented, guaranteed or warranted that (i) the Company or the undersigned will realize any given percentage of profits and/or amount or type of consideration, profit or loss as a result of the Company's activities or its investment in the Company, or  (ii) the past performance or experience of the management of the Company, or of any other person, will in any way indicate the predictable results of the ownership of the Preferred Units or of the Company's activities.

(q)    Effect and Time of Representations.  The representations, warranties and agreements set forth in this Agreement are true and correct, and have been complied with, as of the date of the execution of this Agreement and shall be true and correct, and shall have been complied with, until such time as this subscription is accepted or rejected, in whole or in part, by the Company.  If in any respect such representations, warranties or agreements shall not be true and correct, or shall not have been complied with, as of any date set forth in the preceding sentence, the undersigned shall promptly give written notice of such fact to the Company and the Placement Agent and shall specify which representations, warranties or agreements are not true or have not been complied with, along with the reasons therefor.  The undersigned understands that each of the Company and the Placement Agent has relied, are relying and will rely upon the truth and accuracy of the representations, warranties, acknowledgments and agreements set forth in this Agreement and that all such representations, warranties, acknowledgements and agreements shall survive the issuance and delivery of the Preferred Units under this Agreement and shall remain in effect thereafter.  The undersigned hereby acknowledges and agrees that this subscription is irrevocable with respect to it and acknowledges and agrees that the representations, warranties and agreements set forth in this Agreement shall become effective and binding upon it and its legal representatives, successors and assigns upon the Company's acceptance of this subscription, in whole or in part, as evidenced by the Company's execution of the countersignature on the signature page of this Agreement.

3.    Representations and Warranties of the Company.  The Company hereby represents and warrants to, and agrees with, the undersigned as follows:

(a)    Each of 777 and 600 is duly organized and validly existing as a limited liability company, is in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and is qualified to do business in, and is in good standing in (to the extent the concept is applicable in such jurisdiction), every jurisdiction where such qualification is required.

(b)    The Company has provided the undersigned the following financial statements (the "Financial Statements"):  (i) the audited combined balance sheet of the Company as of December 31, 2020 and December 31, 2019, and the related audited combined statements of income, retained earnings and cash flows for the years then ending, together with notes thereto and the opinion of Grant Thornton LLP relating thereto. The Financial Statements are true, correct and complete in all material respects, have been prepared from the books and records of the Company in accordance with GAAP consistently applied throughout the periods indicated and fairly present the financial condition and results of operations and cash flows of the Company and the changes in its financial position for the periods indicated.

{40972783:2}    5

USAO_REL_01_00491115

(c)      Each of the issuance of the Preferred Units and the execution and delivery of this Agreement are within the Company's organizational powers and have been duly authorized by all necessary organizational and, if required, equity holder action.  The Company has duly executed and delivered this Agreement, and this Agreement constitutes the legal, valid and binding obligations of the Company, enforceable in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(d)      The Company has engaged Performance Trust Capital Partners, LLC as its Placement Agent in connection with the offering of the Preferred Units.  Except for such engagement, neither the Company nor any of its officers, directors, employees or agents has employed any broker or finder or incurred any liability for any financial advisory fees, brokerage fees, commissions or finder's fees, and no broker or finder has acted directly or indirectly for the Company in connection with the sale of the Preferred Units.

(e)      The issuance of the Preferred Units and the execution, delivery and performance by the Company of this Agreement:  (i) do not require any consent or approval of, registration or filing with, or any other action by, any governmental authority, except such as have been obtained or made and are in full force and effect; (ii) will not violate any applicable law or regulation or any order of any governmental authority applicable to the Company; (iii) will not violate any organizational document of the Company; and (iv) will not violate or result in a default under any indenture, agreement or other instrument (other than the agreements and instruments referred to in clause (iii)) binding upon the Company or its assets, in each case (other than clause (iii) above) as would not reasonably be expected to result in a Material Adverse Effect.

(f)      The Preferred Units, and the preferred membership interests of 777 Partners LLC and 600 Partners LLC included therein, when issued, will be duly authorized, validly issued and outstanding, fully paid and nonassessable, and subject to no preemptive rights (and were not issued in violation of any preemptive rights).

4.      <u>Limited Power of Attorney</u>.  The undersigned hereby irrevocably constitutes and appoints The Capital Corps, LLC, the Company's Member Manager (the "Manager"), as the undersigned's true and lawful attorney-in-fact, with full power and authority for the undersigned (the "Limited POA"), and in the undersigned's name, place and stead, to execute, acknowledge, verify, deliver, record, publish and file on the undersigned's behalf the following:

(a)      The 777 Amendment and the 600 Amendment and any amendments thereto or cancellations thereof;

(b)      Any other certificates, instruments and documents as may be required by, or may be appropriate under, the laws of any state or other jurisdiction in which the Company is doing or intends to do business; and

(c)      Any documents that may be required to effect the continuation of the Company, the admission of an additional or substituted Member, or the dissolution and termination of the Company.

This Limited POA is a special power of attorney and is coupled with an interest in favor of the Manager and as such:

(x)      Shall be irrevocable and continue in full force and effect notwithstanding the subsequent death or incapacity of any party granting this limited power of attorney, regardless of whether the Company or the Manager shall have had notice thereof;

(y)      May be exercised for a Member by a facsimile signature of the Manager or, after listing more than one Member including the undersigned, by a single signature of the Manager acting as attorney in fact for all of them; and,

(z)      Shall survive the delivery of an assignment by a Member of the whole or any portion of the Member's Preferred Units in the Company, except that where the assignee thereof has been approved by the Manager for admission to the Company and a substituted Member, this limited power of attorney given by the assignor shall survive the delivery of such assignment for the sole purpose of enabling the Manager to execute, acknowledge and file any instrument necessary to effect such substitution.

USAO_REL_01_00491116

5.      Indemnification.   The undersigned understands the meaning and legal consequences of the representations, warranties and agreements set forth in this Agreement and agrees to indemnify and hold harmless the Company, its officers, managers, employees, agents and controlling persons thereof, past, present or future, from and against any and all liabilities, losses, costs, damages and expenses, including costs and reasonable attorneys' fees, arising out of or related to (i) the resale or other distribution by the undersigned of all or any portion of the Preferred Units in violation of the Securities Act or of any applicable state securities laws, or (ii) any breach of any representation, warranty or agreement contained in this Agreement or in any other document provided by the undersigned to the Company in connection with its investment in the Preferred Units.

6.      Closing Deliveries.     The closing of the subscription provided for herein (the "Closing") is conditioned upon the following:

(a)      On or prior to the Closing, the Company shall issue, deliver or cause to be delivered to each Purchaser the following (the "**Company Deliverables**"):

(i)      this Agreement, duly executed by the Company;

(ii)      a legal opinion of Company's counsel, dated as of the date of the Closing  (the "Closing Date") and in the form attached hereto as Schedule B, executed by such counsel and addressed to the Purchasers and the Placement Agent;

(iii)      a certificate of the Secretary of the Company, dated as of the Closing Date, (a) certifying the resolutions adopted by the Managers of the Company or a duly authorized committee thereof approving the transactions contemplated by this Agreement and the other Subscriber Agreements, including the issuance of the Preferred Units and the preferred membership interests of 777 Partners LLC and 600 Partners LLC included therein, and (b) certifying as to the signatures and authority of persons signing the Transaction Documents and related documents on behalf of the Company;

(iv)      a certificate of the Chief Executive Officer or Chief Financial Officer of the Company dated as of the Closing Date, certifying to the accuracy of the representations and warranties et forth in Section 3 hereof as of the Closing Date; and

(v)      a Certificate of Good Standing from the Secretary of State of the State of Delaware for each of 777 Partners LLC and 600 Partners LLC  as of a recent date.

(b)      On or prior to the Closing, each Subscriber shall deliver or cause to be delivered to the Company, the following (the "**Purchaser Deliverables**"):

(i)      this Agreement, duly executed by such Subscriber;

(ii)      its Subscription Amount, in U.S. dollars and in immediately available funds, by wire transfer in accordance with the Company's written instructions; and

(iii)      a fully completed and duly executed Accredited Investor Questionnaire, reasonably satisfactory to the Company in the form attached hereto as Schedule C.

7.      Miscellaneous.

(a)      This Agreement, including the other documents referred to herein, or incorporated herein by reference, which form a part of this Agreement, contains the entire understanding of the parties hereto in respect of the subject matter contained herein.  There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein.  This Agreement supersedes all prior agreements and understandings among the parties with respect to such subject matter.  This Agreement may be amended or modified only by a written instrument duly executed by the party to be charged.  No provision of this Agreement may be waived except by a written document executed by the party entitled to the benefits of the provision. No waiver of a provision will be deemed to be or will constitute a waiver of any other provision of this Agreement.

{40972783:2}                                                   7

A waiver will be effective only in the specific instance and for the purpose for which it was given, and will not constitute a continuing waiver.

(b)    All notices or communications required or permitted to be made hereunder shall be in writing, duly signed by the party giving such notice or communication and shall be by hand, by a nationally recognized overnight courier service, by registered or certified mail, postage prepaid, or by facsimile transmission, receipt confirmed, as follows (or at such other address for a party as shall be specified by like notice): (i) if to the Company, at the address set forth on the first page of this Agreement, and (ii) if to the undersigned, at the address set forth on the signature page of this Agreement. Any notice or other communication given by certified mail shall be deemed given at the time of certification thereof, except for a notice changing a party address which shall be deemed given at the time of receipt thereof. Any notice or other communication given by other means permitted by this Section 7(b) shall be deemed given at the time of receipt thereof.

(c)    Neither this Agreement, nor any interest herein, shall be assignable or transferable by the undersigned in whole or in part except by operation of law. The representations, warranties and agreements set forth in this Agreement shall be binding upon the successors and assigns of the undersigned, and shall inure to the benefit of the Company's successors and assignees.

(d)    The captions and headings used in this Agreement are for convenience only and do not in any way affect, limit, amplify or modify the terms and provisions of this Agreement. All references to "Sections" contained herein, unless otherwise provided herein, are references to sections of this Agreement. Whenever the singular number is used herein, the same shall include the plural where appropriate, words of any gender shall include each other gender where appropriate, and the word "person" shall include an individual or entity. All references to "including" has the inclusive meaning frequently identified with the phrase "including but not limited to" or "including without limitation." All references to "hereunder," "herein" or "hereof" relate to this Agreement as a whole. Any reference in this Agreement to any statute, rule, regulation or agreement, including this Agreement, shall be deemed to include such statute, rule, regulation or agreement as it may be modified, varied, amended or supplemented from time to time.

(e)    This Agreement may be executed by each party in one or more counterparts, each of which when so executed and delivered shall be deemed to be an original, but all of which taken together shall constitute but one and the same instrument. This Agreement may be executed by each party by manual signature, facsimile or scan of manual signature or by electronic signature. In the event that any signature is delivered by facsimile transmission, or by delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or scanned signature page were an original thereof. Any use by a party of an electronic signature must be in accordance with the federal Electronic Signature In Global and National Commerce Act.

(f)    This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York excluding choice of law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.

(g)    Each of the Company and the undersigned irrevocably submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Agreement. To the fullest extent permitted by applicable law, each of the Company and the undersigned irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(h)    Each of the Company and the undersigned agree, to the fullest extent permitted by applicable law, that a final judgment in any suit, action or proceeding of the nature referred to in Section 7(g) brought in any such court shall be conclusive and binding upon it subject to rights of appeal, as the case may be, and may be enforced in the courts of the United States of America or the State of New York (or any other courts to the jurisdiction of which it or any of its assets is or may be subject) by a suit upon such judgment.

{40972783:2}                                              8

USAO_REL_01_00491118

(i)        Each of the Company and the undersigned consents to process being served in any suit, action or proceeding of the nature referred to in Section 7(g) by mailing a copy thereof by registered, certified, priority or express mail (or any substantially similar form of mail), postage prepaid, return receipt or delivery confirmation requested, to it at its address specified in on the signature pages hereto or at such other address of which the Company or the undersigned, as applicable, shall then have been notified.  Each of the Company and the undersigned agrees that such service upon receipt (i) shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding and (ii) shall, to the fullest extent permitted by applicable law, be taken and held to be valid personal service upon and personal delivery to it.  Notices hereunder shall be conclusively presumed received as evidenced by a delivery receipt furnished by the United States Postal Service or any reputable commercial delivery service.

(j)        **THE PARTIES HERETO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH**.

(k)        If any provision of this Agreement, or the application thereof, shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.  The parties further agree to replace such invalid, illegal or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of the invalid, illegal or unenforceable provision.  If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only as broad as is enforceable.

(l)        This Agreement does not create, and shall not be construed as creating, any rights enforceable by any person not a party to this Agreement; *provided*, that the Placement Agent may rely on the representations, warranties and agreements set forth in this Agreement to the same extent as if it were a party to this Agreement.

(m)        The undersigned hereby authorizes the Company to disclose any and all information contained in this Agreement to counsel to the Company, other persons legally responsible for the offering, and other persons where necessary, in the opinion of counsel to the Company, to establish the availability of an exemption under applicable federal or state securities law.

(n)        The undersigned hereby agrees to keep confidential at all times any nonpublic information that it may acquire concerning the Company pursuant to this Agreement or otherwise.  Nothing in this subsection (n) shall be construed to impose a confidentiality obligation on such persons in connection with (i) any information that can be demonstrated to have already been possessed by such persons that such persons acquired from sources other than the Company or other than a source with an obligation of confidentiality to the Company where such obligation was known to such persons, or (ii) any matter that is, as of the date of this Agreement or thereafter, becomes, public knowledge through no act or failure to act by the undersigned or designated representatives of undersigned.

*[remainder of page intentionally left blank]*

{40972783:2}                                        9

USAO_REL_01_00491119

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date set forth below and hereby certifies that the information contained herein is true and correct as of such date.

**Subscription Commitment:**

No. of Preferred Units: 15,000

Subscription Price:    $15,000,000  (No. of Preferred Units x $ 1,000 )

| | |
|---|---|
| 777 Re Ltd | September 17, 2021 |
| (Name of Entity) | (Date) |

By: _____
(Signature)

Will Rinehimer, Chief Executive Officer
(Print Name and Title)

Canon's Court 22 Victoria Street, Suite 505      Hamilton HM 12      Bermuda
(Street Address)                                              (City)            (Country)

1.305.921.2817                                          98-1507400
(Telephone Number)                             (U.S. Tax Identification Number)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ACCEPTANCE OF SUBSCRIPTION
(to be completed by and at the discretion of the Company)

The Company hereby accepts the foregoing subscription by _____ as to _____ Preferred Units on this _____ day of _____, 2021.

777 PARTNERS LLC
By:
Its:      Managing Member

_____

600 PARTNERS LLC
By:
Its:      Managing Member

_____

{40972783:2}

USAO_REL_01_00491120

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date set forth below and hereby certifies that the information contained herein is true and correct as of such date.

**Subscription Commitment:**

No. of Preferred Units: _____

Subscription Price:    $_____ (No. of Preferred Units x $_____)

_____          _____
                (Name of Entity)                                                    (Date)

By: _____
                (Signature)

_____
        (Print Name and Title)

_____          _____
(Street Address)                                       (City)          (State)        (Zip Code)

_____          _____
        (Telephone Number)                                    (U.S. Tax Identification Number)

*********************************************************************************

ACCEPTANCE OF SUBSCRIPTION
(to be completed by and at the discretion of the Company)

The Company hereby accepts the foregoing subscription by 777 Re Ltd to 15,000 Preferred Units on this 20th day of September, 2021.

777 PARTNERS LLC
By: Steven W. Pasko
Its:    Managing Member
_Steven W. Pasko_____
DocuSigned by:
DF9B492F396A415...

600 PARTNERS LLC
By: Steven W. Pasko
Its:    Managing Member
_Steven W. Pasko_____
DocuSigned by:
DF9B492F396A415...

{40972783:2}

USAO_REL_01_00491121

**EXHIBIT A – COUNTERPART SIGNATURE PAGE**

USAO_REL_01_00491122

MEMBERS:

USAO_REL_01_00491123

**EXHIBIT B-1 – FIRST AMENDMENT TO THE FOURTH AMENDED AND RESTATED LLC OPERATING AGREEMENT OF 777**

USAO_REL_01_00491124

# FIRST AMENDMENT TO THE
# FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY
# AGREEMENT OF
# 777 PARTNERS LLC

This First Amendment (the "**Amendment**") to the Fourth Amended and Restated Limited Liability Company Agreement of 777 Partners LLC, a Delaware limited liability company (the "**Company**"), dated as of September 20, 2021, as amended from time to time (the "**Agreement**") is hereby adopted by Managers of the Company, effective as of September 20, 2021. Capitalized terms used but not defined herein have the meaning given such terms in the Agreement.

WHEREAS, pursuant to Article VII and Section 16.05(d) of the Agreement, the Managers, without the approval of any Member, may amend any provision of the Agreement to reflect the issuance of a class of Preferred Units;

WHEREAS, in connection with the transactions contemplated by those certain Subscription Agreements, dated as of September 20, 2021, by and between the Company and the investors named therein, the Company has agreed to issue Preferred Units designated as "Series A Preferred Units," having the rights, preferences and privileges set forth in this Amendment; and

WHEREAS, the Managers have determined that the amendments to the Agreement set forth herein are necessary or appropriate in connection with the authorization of the issuance of the Series A Preferred Units.

NOW THEREFORE, the Managers do hereby amend the Agreement as follows:

1.      Amendment of Agreement.  Pursuant to Article VII and Section 16.05(d) of the Agreement, the Agreement is hereby amended as follows:

(a) Section 1.01 of the Agreement is amended to add or to amend and restate the following definitions in their entirety in the appropriate alphabetical order:

"**600 LLC**" means 600 Partners, LLC or its successors.

"**600 Series A Preferred Units**" means the Series A Preferred Units issued by 600 LLC pursuant to Amendment No. 1 to the Third Amended and Restated Limited Liability Company Agreement of 600 LLC.

"**Arrears**" means the full cumulative Series A Distributions through the most recent Series A Distribution Payment Date that have not been paid on all Outstanding Series A Preferred Units.

"**Outstanding**" means, with respect to Series A Preferred Units, all Series A Preferred Units that are issued by the Company and reflected as outstanding on Schedule A hereto as of the date of determination.

"**Series A Base Liquidation Preference**" means a liquidation preference for each Series A Preferred Unit initially equal to $1,000.00 per Series A Preferred Unit.

"**Series A Distribution Payment Date**" means the 30th day of each March, June, September and December of each year (except that the Series A Distribution Payment Date for the initial Series A Distribution Period shall be December 30, 2021); *provided however*, that if any Series A Distribution Payment Date would otherwise occur on a day

USAO_REL_01_00491125

that is not a Business Day, such Series A Distribution Payment Date shall instead be on the immediately succeeding Business Day.

"**Series A Distribution Period**" means a period of time from and including the preceding Series A Distribution Payment Date (other than the initial Series A Distribution Period, which shall commence on and include the Series A Original Issue Date), to, but excluding, the next Series A Distribution Payment Date for such Series A Distribution Period.

"**Series A Distribution Rate**" means 10.0% per annum of the $1,000.00 liquidation preference per Series A Preferred Unit.

"**Series A Distribution Record Date**" has the meaning given such term in Section 7.04(b)(ii)(B).

"**Series A Distributions**" means distributions with respect to Series A Preferred Units pursuant to Section 7.04(b)(ii).

"**Series A Holder**" means a Holder of Series A Preferred Units as set forth on Schedule A hereto.

"**Series A Junior Securities**" means any class or series of Membership Interests that, with respect to distributions on such Membership Interests and distributions upon liquidation of the Company, ranks junior to the Series A Preferred Units, including any Membership Interests other than Preferred Units.

"**Series A Liquidation Preference**" means a liquidation preference for each Series A Preferred Unit initially equal to $1,000.00 per Series A Preferred Unit (subject to adjustment for any splits, combinations or similar adjustments to the Series A Preferred Units), which liquidation preference shall be subject to increase by the per Series A Preferred Unit amount of any accumulated and unpaid Series A Distributions (whether or not such distributions shall have been declared).

"**Series A Mandatory Redemption Date**" has the meaning given such term in Section 7.04(b)(iv)(B).

"**Series A Mandatory Redemption Notice**" has the meaning given such term in Section 7.04(b)(iv)(B).

"**Series A Mandatory Redemption Price**" has the meaning given such term in Section 7.04(b)(iv)(B).

"**Series A Original Issue Date**" means September 20, 2021.

"**Series A Parity Securities**" means any class or series of Membership Interests established after the Series A Original Issue Date by the Board, the terms of which class or series expressly provide that it ranks on parity with the Series A Preferred Units as to distributions and amounts payable upon a dissolution or liquidation.

"**Series A Preferred Units**" has the meaning given such term in Section 7.04(a).

"**Series A Redemption Date**" has the meaning given such term in Section 7.04(b)(iv)(A).

USAO_REL_01_00491126

"**Series A Redemption Notice**" has the meaning given such term in Section 7.04(b)(iv)(A).

"**Series A Redemption Price**" has the meaning given such term in Section 7.04(b)(iv)(A).

"**Series A Senior Securities**" means any class or series of Membership Interests established after the Series A Original Issue Date by the Board, the terms of which class or series expressly provide that it ranks senior to the Series A Preferred Units as to distributions and amounts payable upon a dissolution or liquidation.

(b) Article VII of the Agreement is hereby amended by adding a new Section 7.04 at the end thereof as follows:

"Section 7.04 Establishment of Series A Preferred Units.

(a) General. The Company hereby designates and creates a class of Preferred Units to be designated as "10.0% Series A Preferred Units" (the "**Series A Preferred Units**"), having the preferences, rights, powers, and duties set forth herein, including this Section 7.04. Each Series A Preferred Unit shall be identical in all respects to every other Series A Preferred Unit, except as to the respective dates from which the Series A Liquidation Preference shall increase or from which Series A Distributions may begin accruing, to the extent such dates may differ. The Series A Preferred Units represent perpetual equity interests in the Company and shall not give rise to a claim by the Company or a Series A Holder for conversion or, except as set forth in Section 7.04(b)(iv), redemption thereof at a particular date.

(b) Rights of Series A Preferred Units. The Series A Preferred Units shall have the following rights, preferences and privileges and shall be subject to the following duties and obligations:

(i) Series A Preferred Units. The authorized number of Series A Preferred Units shall be unlimited. Series A Preferred Units that are purchased or otherwise acquired by the Company shall be cancelled.

(ii) Distributions and Allocation of Net Profits and Net Losses.

(A) Distributions on each Outstanding Series A Preferred Unit shall be cumulative and shall accumulate at the Series A Distribution Rate from and including the Series A Original Issue Date (or, for any subsequently issued and newly Outstanding Series A Preferred Units, from and including the Series A Distribution Payment Date immediately preceding the issue date of such Series A Preferred Units) *minus* any distributions paid with respect to the 600 Series A Preferred Units until such time as the Company or 600 LLC pays the Series A Distributions or redeems such Series A Preferred Unit in accordance with Section 7.04(b)(iv), whether or not such Series A Distributions shall have been declared. Series A Holders shall be entitled to receive Series A Distributions from time to time out of Distributable Cash, following any distributions pursuant to Section 12.03(a) but prior to any distributions pursuant to Section 12.03(b) at the Series A Distribution Rate per Series A Preferred Unit when, as, and, if declared by the Board. Series A Distributions, to the extent declared by the Board to be paid by the Company in accordance with this Section 7.04(b)(ii), shall be paid, in Arrears, on each Series A Distribution Payment Date (other than the initial Series A Distribution, which shall be paid on December 30, 2021). Series A Distributions shall accumulate in each Series A Distribution Period from and including the preceding Series A Distribution Payment Date (other than the initial Series A Distribution Period, which shall commence on and include

USAO_REL_01_00491127

the Series A Original Issue Date), to, but excluding, the next Series A Distribution Payment Date for such Series A Distribution Period; provided that distributions shall accrue on accumulated but unpaid Series A Distributions at the Series A Distribution Rate. If any Series A Distribution Payment Date otherwise would occur on a date that is not a Business Day, declared Series A Distributions shall be paid on the immediately succeeding Business Day without the accumulation of additional distributions.

(B) Not later than 5:00 p.m., New York City time, on each Series A Distribution Payment Date, the Company shall pay those Series A Distributions, if any, that shall have been declared by the Board to Series A Holders on the Record Date for the applicable Series A Distribution. The Record Date (the "**Series A Distribution Record Date**") for the payment of any Series A Distributions shall be as of the close of business on the first Business Day of the month of the applicable Series A Distribution Payment Date, except that in the case of payments of Series A Distributions in Arrears, the Series A Distribution Record Date with respect to a Series A Distribution Payment Date shall be such date as may be designated by the Board in accordance with this Section 7.04. Accumulated Series A Distributions in Arrears for any past Series A Distribution Period may be declared by the Board and paid on any date fixed by the Board, whether or not a Series A Distribution Payment Date, to Series A Holders on the Record Date for such payment. The Series A Holders shall not participate in any other distributions to Members of any other class. Notwithstanding Section 12.01, Net Profit, to the extent of the Series A Distributions, shall be allocated first to the Series A Holders.

(iii) Voting Rights.

(A) Notwithstanding anything to the contrary in this Agreement, without the affirmative vote or consent of the holders of a majority of the Outstanding Series A Preferred Units, voting as a separate class, the Board shall not adopt any amendment to this Agreement that the Board determines would have a material adverse effect on the powers, preferences, duties, or special rights of the Series A Preferred Units; provided, however, that (x) the issuance of additional Membership Interests (and any amendment to this Agreement in connection therewith) shall not be deemed to constitute such a material adverse effect for purposes of this Section 7.04(b)(iii)(A) and (ii) for purposes of this Section 7.04(b)(iii)(A), no amendment of this Agreement in connection with a merger or other transaction in which the Series A Preferred Units remain Outstanding with the terms thereof materially unchanged in any respect adverse to the Series A Holders (as determined by the Board) shall be deemed to materially and adversely affect the powers, preferences, duties, or special rights of the Series A Preferred Units.

(B) Notwithstanding Section 7.04(b)(iii)(A), no vote of the Series A Holders shall be required if, at or prior to the time when such action is to take effect, provision is made for the redemption of all Series A Preferred Units at the time Outstanding.

(iv) Redemption.

(A) Optional Redemption.

(1) The Company shall have the right, at any time beginning three years after the Series A Original Issue Date, to redeem the Series A Preferred Units, which redemption may be in whole or in part, on one or more occasions, using any source of funds legally available for such purpose. Any such redemption shall occur on a date set by the Board (the "**Series A Redemption Date**"). The Company shall effect any such redemption by paying cash for each Series A Preferred Unit to be redeemed equal to the Series A Liquidation Preference for such Series A Preferred Unit on such Series A Redemption Date plus an amount equal to all unpaid Series A Distributions thereon from the Series A Original Issue Date to, but excluding, the Series A Redemption Date (whether or not such

USAO_REL_01_00491128

distributions shall have been declared) *minus* any amount paid in cash by 600 LLC to redeem the 600 Series A Preferred Units on the Series A Redemption Date or pursuant to Section 7.04(b)(v) of the 600 LLC Agreement (the "**Series A Redemption Price**").

(2) The Company shall give notice of any redemption by mail, postage prepaid, not less than 90 calendar days and not more than 120 calendar days before the scheduled Series A Redemption Date to the Series A Holders (as of 5:00 p.m. New York City time on the Business Day next preceding the day on which notice is given) of any Series A Preferred Units to be redeemed. Such notice (the "**Series A Redemption Notice**") shall state, as applicable: (1) the Series A Redemption Date, (2) the number of Series A Preferred Units to be redeemed and, if less than all Outstanding Series A Preferred Units are to be redeemed, the number of Series A Preferred Units to be redeemed from such Series A Holder, (3) the Series A Redemption Price, and (4) that distributions on the Series A Preferred Units to be redeemed shall cease to accumulate from and after such Series A Redemption Date. The Company shall not redeem any Series A Preferred Units unless 600 LLC redeems an equal number of 600 Series A Preferred Units on the same date.

(3) If the Company elects to redeem less than all of the Outstanding Series A Preferred Units, the number of Series A Preferred Units to be redeemed shall be determined by the Board Pro Rata, with adjustments to avoid redemption of fractional Series A Preferred Units. The aggregate Series A Redemption Price for any such partial redemption of the Outstanding Series A Preferred Units shall be allocated correspondingly among the redeemed Series A Preferred Units. The Series A Preferred Units not redeemed shall remain Outstanding and entitled to all the rights, preferences and duties provided in this Section 7.04.

(B) Mandatory Redemption.

Each Series A Holder shall have the right, at any time beginning ten years after the Series A Original Issue Date, to deliver a written notice to the Company and 600 LLC (the "**Series A Mandatory Redemption Notice**"), pursuant to which such Series A Holder may cause the Company to redeem the Series A Preferred Units and 600 Series A Preferred Units held by such Series A Holder, in whole but not in part. Any such redemption shall occur 90 calendar days following the Company's receipt of the applicable Series A Mandatory Redemption Notice (the "**Series A Mandatory Redemption Date**"). The Company shall effect any such redemption by paying cash for each Series A Preferred Unit to be redeemed equal to the Series A Liquidation Preference for such Series A Preferred Unit on such Series A Mandatory Redemption Date plus an amount equal to all unpaid Series A Distributions thereon from the Series A Original Issue Date to, but excluding, the Series A Mandatory Redemption Date (whether or not such distributions shall have been declared) *minus* any amount paid in cash by 600 LLC to redeem the 600 Series A Preferred Units of such Series A Holder on the Series A Mandatory Redemption Date or pursuant to Section 7.04(b)(v) of the 600 LLC Agreement (the "**Series A Mandatory Redemption Price**").

(C) If a Series A Redemption Notice or Series A Mandatory Redemption Notice shall have been given, from and after the Series A Redemption Date or Series A Mandatory Redemption Date, as applicable, unless the Company defaults in providing funds sufficient for such redemption, all Series A Distributions on such Series A Preferred Units to be redeemed shall cease to accumulate and all rights of holders of such Series A Preferred Units with respect to such Series A Preferred Units to be redeemed shall cease, except the right to receive the Series A Redemption Price or Series A Mandatory Redemption Price, as applicable.

(D) Any Series A Preferred Units that are redeemed or otherwise acquired by the Company shall be cancelled.

USAO_REL_01_00491129

(v) Liquidation Rights.

In the event of the dissolution and winding up of the Company under Article 15 or a sale, exchange, or other disposition of all or substantially all of the assets of the Company, either voluntary or involuntary, the Series A Holders shall be entitled to receive, out of the assets of the Company available for distribution to the Members, prior and in preference to any distribution of any assets of the Company to any class or series of Membership Interests (other than Preferred Units), (i) first, any accumulated and unpaid distributions on the Series A Preferred Units (regardless of whether previously declared) and (ii) then, any positive value in each such holder's Capital Account in respect of such Series A Preferred Units *minus* any amounts received on or prior to the date of such event from 600 LLC pursuant to Section 7.04(b)(v) of the 600 LLC Agreement. A merger, consolidation or other corporate reorganization or sale of control, or any transaction in which a majority of the assets of the Company are sold will not be deemed to be liquidation for these purposes.

(vi)   Rank.

The Series A Preferred Units shall each be deemed to rank as to distributions on such Series A Preferred Units and distributions upon liquidation of the Company:

(A)   senior to any Series A Junior Securities;

(B)   on a parity with any Series A Parity Securities;

(C)   junior to any Series A Senior Securities; and

(D)   junior to all existing and future indebtedness of the Company and other liabilities with respect to assets available to satisfy claims against the Company.

(v) Preemptive Rights.

The Series A Holders will not have preemptive or preferential rights to purchase additional membership unit interests of the Company.

(vi) Transfer Restrictions

Notwithstanding any other provision of this Agreement, each Series A Holder agrees that it will not, directly or indirectly, Transfer any of its Series A Preferred Units:

(A)      if such Transfer will result in the violation by such Series A Holder or by the Company of the Securities Act, or any other applicable securities laws;

(B)      if, in the Board's determination, such Transfer or issuance could reasonably be expected to, by itself or in the aggregate with other Transfers, cause the Company to be treated as a "publicly traded partnership" taxable as a corporation for federal tax purposes;

(C)      if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Act;

(D)      if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

USAO_REL_01_00491130

(E) if such Transfer or issuance would cause the Company or any of its Subsidiaries to be required to register as an investment company under the Investment Company Act of 1940, as amended;

(F) if such Transfer or issuance would cause the assets of the Company or any of the Company Subsidiaries to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company or any of its Subsidiaries; or

(G) if the Board determines, in its reasonable discretion, that an otherwise Exempt Transfer will have a material adverse effect on Company, unless such transfer has been approved by a majority of the Voting Interests voting as a single class.

In any event, the Board may refuse any Transfer to any Person if such Transfer would have a material adverse effect on the Company as a result of any regulatory or other restrictions imposed by any governmental authority.

For each Transfer, the transferring Series A Holder shall provide to the Company either: (x) an opinion of counsel to such transferring Member satisfactory in form and substance to counsel for the Company with respect to the matters referred to in this Section 7.04(b)(vi) (to the extent applicable) or (y) sufficient information to allow counsel to the Company to make a determination that the proposed Transfer will not result in any of the consequences referred to in this Section 7.04(b)(vi) (to the extent applicable).

No Series A Holder shall Transfer any Series A Preferred Units unless the Company and the transferee execute a joinder to this Agreement pursuant to which such transferee agrees to be bound by the terms of this Agreement as a Series A Holder.

2. <u>Confirmation of Agreement</u>.  Except as set forth in Paragraph 1 of this Amendment, the terms, conditions and agreements set forth in the Agreement are hereby ratified and confirmed and shall continue in full force and effect.

3. <u>Applicable Law</u>.  This Amendment and the rights and obligations of the parties hereto shall be interpreted and enforced in accordance with and governed by the laws of the State of Delaware applicable to agreements made and to be performed wholly within that jurisdiction without reference to conflict of law provisions.

*[Signature Page Follows]*

USAO_REL_01_00491131

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed as of the date first above written.

<u>MANAGERS</u>:

_____

Steven W. Pasko

_____

Joshua Wander

_____

Damien Alfalla

_____

John Sicilian

_____

Tom Staz

USAO_REL_01_00491132

<u>MEMBERS</u>:

USAO_REL_01_00491133

SCHEDULE A

| Name, Mailing Address and Email Address of Series A Holder | Number of Series A Preferred Units |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

USAO_REL_01_00491134

**EXHIBIT B-2 – FIRST AMENDMENT TO THE THIRD AMENDED AND RESTATED LLC OPERATING AGREEMENT OF 600**

USAO_REL_01_00491135

# FIRST AMENDMENT TO THE
# THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY
# AGREEMENT OF
# 600 PARTNERS LLC

This First Amendment (the "**Amendment**") to the Third Amended and Restated Limited Liability Company Agreement of 600 Partners LLC, a Delaware limited liability company (the "**Company**"), dated as of September 20, 2021, as amended from time to time (the "**Agreement**") is hereby adopted by Managers of the Company, effective as of September 20, 2021. Capitalized terms used but not defined herein have the meaning given such terms in the Agreement.

WHEREAS, pursuant to Article VII and Section 16.05(d) of the Agreement, the Managers, without the approval of any Member, may amend any provision of the Agreement to reflect the issuance of a class of Preferred Units;

WHEREAS, in connection with the transactions contemplated by those certain Subscription Agreements, dated as of September 20, 2021, by and between the Company and the investors named therein, the Company has agreed to issue Preferred Units designated as "Series A Preferred Units," having the rights, preferences and privileges set forth in this Amendment; and

WHEREAS, the Managers have determined that the amendments to the Agreement set forth herein are necessary or appropriate in connection with the authorization of the issuance of the Series A Preferred Units.

NOW THEREFORE, the Managers do hereby amend the Agreement as follows:

2.      Amendment of Agreement.  Pursuant to Article VII and Section 16.05(d) of the Agreement, the Agreement is hereby amended as follows:

> (a) Section 1.01 of the Agreement is amended to add or to amend and restate the following definitions in their entirety in the appropriate alphabetical order:
>
> "**777 LLC**" means 777 Partners, LLC or its successors.
>
> "**777 Series A Preferred Units**" means the Series A Preferred Units issued by 777 LLC pursuant to Amendment No. 1 to the Fourth Amended and Restated Limited Liability Company Agreement of 777 LLC.
>
> "**Arrears**" means the full cumulative Series A Distributions through the most recent Series A Distribution Payment Date that have not been paid on all Outstanding Series A Preferred Units.
>
> "**Outstanding**" means, with respect to Series A Preferred Units, all Series A Preferred Units that are issued by the Company and reflected as outstanding on Schedule A hereto as of the date of determination.
>
> "**Series A Base Liquidation Preference**" means a liquidation preference for each Series A Preferred Unit initially equal to $1,000.00 per Series A Preferred Unit.
>
> "**Series A Distribution Payment Date**" means the 30th day of each March, June, September and December of each year (except that the Series A Distribution Payment Date for the initial Series A Distribution Period shall be December 30, 2021); *provided however*, that if any Series A Distribution Payment Date would otherwise occur on a day

that is not a Business Day, such Series A Distribution Payment Date shall instead be on the immediately succeeding Business Day.

"**Series A Distribution Period**" means a period of time from and including the preceding Series A Distribution Payment Date (other than the initial Series A Distribution Period, which shall commence on and include the Series A Original Issue Date), to, but excluding, the next Series A Distribution Payment Date for such Series A Distribution Period.

"**Series A Distribution Rate**" means 10.0% per annum of the $1,000.00 liquidation preference per Series A Preferred Unit.

"**Series A Distribution Record Date**" has the meaning given such term in Section 7.04(b)(ii)(B).

"**Series A Distributions**" means distributions with respect to Series A Preferred Units pursuant to Section 7.04(b)(ii).

"**Series A Holder**" means a Holder of Series A Preferred Units as set forth on Schedule A hereto.

"**Series A Junior Securities**" means any class or series of Membership Interests that, with respect to distributions on such Membership Interests and distributions upon liquidation of the Company, ranks junior to the Series A Preferred Units, including any Membership Interests other than Preferred Units.

"**Series A Liquidation Preference**" means a liquidation preference for each Series A Preferred Unit initially equal to $1,000.00 per Series A Preferred Unit (subject to adjustment for any splits, combinations or similar adjustments to the Series A Preferred Units), which liquidation preference shall be subject to increase by the per Series A Preferred Unit amount of any accumulated and unpaid Series A Distributions (whether or not such distributions shall have been declared).

"**Series A Mandatory Redemption Date**" has the meaning given such term in Section 7.04(b)(iv)(B).

"**Series A Mandatory Redemption Notice**" has the meaning given such term in Section 7.04(b)(iv)(B).

"**Series A Mandatory Redemption Price**" has the meaning given such term in Section 7.04(b)(iv)(B).

"**Series A Original Issue Date**" means September 20, 2021.

"**Series A Parity Securities**" means any class or series of Membership Interests established after the Series A Original Issue Date by the Board, the terms of which class or series expressly provide that it ranks on parity with the Series A Preferred Units as to distributions and amounts payable upon a dissolution or liquidation.

"**Series A Preferred Units**" has the meaning given such term in Section 7.04(a).

"**Series A Redemption Date**" has the meaning given such term in Section 7.04(b)(iv)(A).

USAO_REL_01_00491137

"**Series A Redemption Notice**" has the meaning given such term in Section 7.04(b)(iv)(A).

"**Series A Redemption Price**" has the meaning given such term in Section 7.04(b)(iv)(A).

"**Series A Senior Securities**" means any class or series of Membership Interests established after the Series A Original Issue Date by the Board, the terms of which class or series expressly provide that it ranks senior to the Series A Preferred Units as to distributions and amounts payable upon a dissolution or liquidation.

(b) Article VII of the Agreement is hereby amended by adding a new Section 7.04 at the end thereof as follows:

"Section 7.04 Establishment of Series A Preferred Units.

(a) General. The Company hereby designates and creates a class of Preferred Units to be designated as "10.0% Series A Preferred Units" (the "**Series A Preferred Units**"), having the preferences, rights, powers, and duties set forth herein, including this Section 7.04. Each Series A Preferred Unit shall be identical in all respects to every other Series A Preferred Unit, except as to the respective dates from which the Series A Liquidation Preference shall increase or from which Series A Distributions may begin accruing, to the extent such dates may differ. The Series A Preferred Units represent perpetual equity interests in the Company and shall not give rise to a claim by the Company or a Series A Holder for conversion or, except as set forth in Section 7.04(b)(iv), redemption thereof at a particular date.

(b) Rights of Series A Preferred Units. The Series A Preferred Units shall have the following rights, preferences and privileges and shall be subject to the following duties and obligations:

(i) Series A Preferred Units. The authorized number of Series A Preferred Units shall be unlimited. Series A Preferred Units that are purchased or otherwise acquired by the Company shall be cancelled.

(ii) Distributions and Allocation of Net Profits and Net Losses.

(A) Distributions on each Outstanding Series A Preferred Unit shall be cumulative and shall accumulate at the Series A Distribution Rate from and including the Series A Original Issue Date (or, for any subsequently issued and newly Outstanding Series A Preferred Units, from and including the Series A Distribution Payment Date immediately preceding the issue date of such Series A Preferred Units) *minus* any distributions paid with respect to the 777 Series A Preferred Units until such time as the Company or 777 LLC pays the Series A Distributions or redeems such Series A Preferred Unit in accordance with Section 7.04(b)(iv), whether or not such Series A Distributions shall have been declared. Series A Holders shall be entitled to receive Series A Distributions from time to time out of Distributable Cash, following any distributions pursuant to Section 12.03(a) but prior to any distributions pursuant to Section 12.03(b) at the Series A Distribution Rate per Series A Preferred Unit when, as, and, if declared by the Board. Series A Distributions, to the extent declared by the Board to be paid by the Company in accordance with this Section 7.04(b)(ii), shall be paid, in Arrears, on each Series A Distribution Payment Date (other than the initial Series A Distribution, which shall be paid on December 30, 2021). Series A Distributions shall accumulate in each Series A Distribution Period from and including the preceding Series A Distribution Payment Date (other than the initial Series A Distribution Period, which shall commence on and include

the Series A Original Issue Date), to, but excluding, the next Series A Distribution Payment Date for such Series A Distribution Period; provided that distributions shall accrue on accumulated but unpaid Series A Distributions at the Series A Distribution Rate. If any Series A Distribution Payment Date otherwise would occur on a date that is not a Business Day, declared Series A Distributions shall be paid on the immediately succeeding Business Day without the accumulation of additional distributions.

(B) Not later than 5:00 p.m., New York City time, on each Series A Distribution Payment Date, the Company shall pay those Series A Distributions, if any, that shall have been declared by the Board to Series A Holders on the Record Date for the applicable Series A Distribution. The Record Date (the "**Series A Distribution Record Date**") for the payment of any Series A Distributions shall be as of the close of business on the first Business Day of the month of the applicable Series A Distribution Payment Date, except that in the case of payments of Series A Distributions in Arrears, the Series A Distribution Record Date with respect to a Series A Distribution Payment Date shall be such date as may be designated by the Board in accordance with this Section 7.04. Accumulated Series A Distributions in Arrears for any past Series A Distribution Period may be declared by the Board and paid on any date fixed by the Board, whether or not a Series A Distribution Payment Date, to Series A Holders on the Record Date for such payment. The Series A Holders shall not participate in any other distributions to Members of any other class. Notwithstanding Section 12.01, Net Profit, to the extent of the Series A Distributions, shall be allocated first to the Series A Holders.

(iii) Voting Rights.

(A) Notwithstanding anything to the contrary in this Agreement, without the affirmative vote or consent of the holders of a majority of the Outstanding Series A Preferred Units, voting as a separate class, the Board shall not adopt any amendment to this Agreement that the Board determines would have a material adverse effect on the powers, preferences, duties, or special rights of the Series A Preferred Units; provided, however, that (x) the issuance of additional Membership Interests (and any amendment to this Agreement in connection therewith) shall not be deemed to constitute such a material adverse effect for purposes of this Section 7.04(b)(iii)(A) and (ii) for purposes of this Section 7.04(b)(iii)(A), no amendment of this Agreement in connection with a merger or other transaction in which the Series A Preferred Units remain Outstanding with the terms thereof materially unchanged in any respect adverse to the Series A Holders (as determined by the Board) shall be deemed to materially and adversely affect the powers, preferences, duties, or special rights of the Series A Preferred Units.

(B) Notwithstanding Section 7.04(b)(iii)(A), no vote of the Series A Holders shall be required if, at or prior to the time when such action is to take effect, provision is made for the redemption of all Series A Preferred Units at the time Outstanding.

(iv) Redemption.

(A) Optional Redemption.

(1) The Company shall have the right, at any time beginning three years after the Series A Original Issue Date, to redeem the Series A Preferred Units, which redemption may be in whole or in part, on one or more occasions, using any source of funds legally available for such purpose. Any such redemption shall occur on a date set by the Board (the "**Series A Redemption Date**"). The Company shall effect any such redemption by paying cash for each Series A Preferred Unit to be redeemed equal to the Series A Liquidation Preference for such Series A Preferred Unit on such Series A Redemption Date plus an amount equal to all unpaid Series A Distributions thereon from the Series A Original Issue Date to, but excluding, the Series A Redemption Date (whether or not such

USAO_REL_01_00491139

distributions shall have been declared) *minus* any amount paid in cash by 777 LLC to redeem the 777 Series A Preferred Units on the Series A Redemption Date or pursuant to Section 7.04(b)(v) of the 777 LLC Agreement (the "**Series A Redemption Price**").

(2) The Company shall give notice of any redemption by mail, postage prepaid, not less than 90 calendar days and not more than 120 calendar days before the scheduled Series A Redemption Date to the Series A Holders (as of 5:00 p.m. New York City time on the Business Day next preceding the day on which notice is given) of any Series A Preferred Units to be redeemed. Such notice (the "**Series A Redemption Notice**") shall state, as applicable: (1) the Series A Redemption Date, (2) the number of Series A Preferred Units to be redeemed and, if less than all Outstanding Series A Preferred Units are to be redeemed, the number of Series A Preferred Units to be redeemed from such Series A Holder, (3) the Series A Redemption Price, and (4) that distributions on the Series A Preferred Units to be redeemed shall cease to accumulate from and after such Series A Redemption Date. The Company shall not redeem any Series A Preferred Units unless 777 LLC redeems an equal number of 777 Series A Preferred Units on the same date.

(3) If the Company elects to redeem less than all of the Outstanding Series A Preferred Units, the number of Series A Preferred Units to be redeemed shall be determined by the Board Pro Rata, with adjustments to avoid redemption of fractional Series A Preferred Units. The aggregate Series A Redemption Price for any such partial redemption of the Outstanding Series A Preferred Units shall be allocated correspondingly among the redeemed Series A Preferred Units. The Series A Preferred Units not redeemed shall remain Outstanding and entitled to all the rights, preferences and duties provided in this Section 7.04.

(B) Mandatory Redemption.

Each Series A Holder shall have the right, at any time beginning ten years after the Series A Original Issue Date, to deliver a written notice to the Company and 777 LLC (the "**Series A Mandatory Redemption Notice**"), pursuant to which such Series A Holder may cause the Company to redeem the Series A Preferred Units and 777 Series A Preferred Units held by such Series A Holder, in whole but not in part. Any such redemption shall occur 90 calendar days following the Company's receipt of the applicable Series A Mandatory Redemption Notice (the "**Series A Mandatory Redemption Date**"). The Company shall effect any such redemption by paying cash for each Series A Preferred Unit to be redeemed equal to the Series A Liquidation Preference for such Series A Preferred Unit on such Series A Mandatory Redemption Date plus an amount equal to all unpaid Series A Distributions thereon from the Series A Original Issue Date to, but excluding, the Series A Mandatory Redemption Date (whether or not such distributions shall have been declared) *minus* any amount paid in cash by 777 LLC to redeem the 777 Series A Preferred Units of such Series A Holder on the Series A Mandatory Redemption Date or pursuant to Section 7.04(b)(v) of the 777 LLC Agreement (the "**Series A Mandatory Redemption Price**").

(C) If a Series A Redemption Notice or Series A Mandatory Redemption Notice shall have been given, from and after the Series A Redemption Date or Series A Mandatory Redemption Date, as applicable, unless the Company defaults in providing funds sufficient for such redemption, all Series A Distributions on such Series A Preferred Units to be redeemed shall cease to accumulate and all rights of holders of such Series A Preferred Units with respect to such Series A Preferred Units to be redeemed shall cease, except the right to receive the Series A Redemption Price or Series A Mandatory Redemption Price, as applicable.

(D) Any Series A Preferred Units that are redeemed or otherwise acquired by the Company shall be cancelled.

USAO_REL_01_00491140

(v) Liquidation Rights.

In the event of the dissolution and winding up of the Company under Article 15 or a sale, exchange, or other disposition of all or substantially all of the assets of the Company, either voluntary or involuntary, the Series A Holders shall be entitled to receive, out of the assets of the Company available for distribution to the Members, prior and in preference to any distribution of any assets of the Company to any class or series of Membership Interests (other than Preferred Units), (i) first, any accumulated and unpaid distributions on the Series A Preferred Units (regardless of whether previously declared) and (ii) then, any positive value in each such holder's Capital Account in respect of such Series A Preferred Units *minus* any amounts received on or prior to the date of such event from 777 LLC pursuant to Section 7.04(b)(v) of the 777 LLC Agreement. A merger, consolidation or other corporate reorganization or sale of control, or any transaction in which a majority of the assets of the Company are sold will not be deemed to be liquidation for these purposes.

(vi)    Rank.

The Series A Preferred Units shall each be deemed to rank as to distributions on such Series A Preferred Units and distributions upon liquidation of the Company:

(A)    senior to any Series A Junior Securities;

(B)    on a parity with any Series A Parity Securities;

(C)    junior to any Series A Senior Securities; and

(D)    junior to all existing and future indebtedness of the Company and other liabilities with respect to assets available to satisfy claims against the Company.

(v) Preemptive Rights.

The Series A Holders will not have preemptive or preferential rights to purchase additional membership unit interests of the Company.

(vi) Transfer Restrictions

Notwithstanding any other provision of this Agreement, each Series A Holder agrees that it will not, directly or indirectly, Transfer any of its Series A Preferred Units:

(A)    if such Transfer will result in the violation by such Series A Holder or by the Company of the Securities Act, or any other applicable securities laws;

(B)    if, in the Board's determination, such Transfer or issuance could reasonably be expected to, by itself or in the aggregate with other Transfers, cause the Company to be treated as a "publicly traded partnership" taxable as a corporation for federal tax purposes;

(C)    if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Act;

(D)    if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(E)    if such Transfer or issuance would cause the Company or any of its Subsidiaries to be required to register as an investment company under the Investment Company Act of 1940, as amended;

(F)    if such Transfer or issuance would cause the assets of the Company or any of the Company Subsidiaries to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company or any of its Subsidiaries; or

(G)    if the Board determines, in its reasonable discretion, that an otherwise Exempt Transfer will have a material adverse effect on Company, unless such transfer has been approved by a majority of the Voting Interests voting as a single class.

In any event, the Board may refuse any Transfer to any Person if such Transfer would have a material adverse effect on the Company as a result of any regulatory or other restrictions imposed by any governmental authority.

For each Transfer, the transferring Series A Holder shall provide to the Company either: (x) an opinion of counsel to such transferring Member satisfactory in form and substance to counsel for the Company with respect to the matters referred to in this Section 7.04(b)(vi) (to the extent applicable) or (y) sufficient information to allow counsel to the Company to make a determination that the proposed Transfer will not result in any of the consequences referred to in this Section 7.04(b)(vi) (to the extent applicable).

No Series A Holder shall Transfer any Series A Preferred Units unless the Company and the transferee execute a joinder to this Agreement pursuant to which such transferee agrees to be bound by the terms of this Agreement as a Series A Holder.

2.    <u>Confirmation of Agreement</u>.  Except as set forth in Paragraph 1 of this Amendment, the terms, conditions and agreements set forth in the Agreement are hereby ratified and confirmed and shall continue in full force and effect.

3.    <u>Applicable Law</u>.  This Amendment and the rights and obligations of the parties hereto shall be interpreted and enforced in accordance with and governed by the laws of the State of Delaware applicable to agreements made and to be performed wholly within that jurisdiction without reference to conflict of law provisions.

*[Signature Page Follows]*

USAO_REL_01_00491142

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed as of the date first above written.

MANAGERS:

_____

Steven W. Pasko


_____

Mollie Wander


_____

Damien Alfalla


_____

John Sicilian


_____

Tom Staz

{40972783:2}

USAO_REL_01_00491143

<u>MEMBERS</u>:

{40972783:2}

USAO_REL_01_00491144

<u>MEMBERS</u>:

{40972783:2}

USAO_REL_01_00491145

SCHEDULE A

| Name, Mailing Address and Email Address of Series A Holder | Number of Series A Preferred Units |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

{40972783:2}

USAO_REL_01_00491146

**SCHEDULE A – RISK FACTORS**

{40972783:2}

USAO_REL_01_00491147

**Risks Related to Preferred Units**

***The Preferred Units are subordinated to our existing and future debt obligations, and your interests could be diluted by the issuance of additional preferred units.***

The Preferred Units are subordinated to all of our existing and future indebtedness. The payment of principal and interest on our debt reduces cash available for distribution to our unitholders, including the holders of the Preferred Units.

The issuance of any senior or parity units would dilute the interests of the holders of the Preferred Units and could affect our ability to pay distributions on, redeem, or pay the liquidation preference on the Preferred Units.

***The Preferred Units have extremely limited voting rights.***

The voting rights of the holders of the Preferred Units will be extremely limited. Except as required by Delaware law, holders of the Preferred Units generally will have no voting rights.

**Risks Related to Our Business**

***We are subject to certain cyber security risks.***

We rely on technology in virtually all aspects of our business. Like those of many businesses, certain of our information systems have been subject to computer viruses, malicious codes, unauthorized access, phishing efforts, denial-of-service attacks and other cyber-attacks and we expect to be subject to similar attacks in the future as such attacks become more sophisticated and frequent. A significant disruption or failure of our technology systems could result in service interruptions, safety failures, security events, regulatory compliance failures, an inability to protect information and assets against unauthorized users and other operational difficulties. Attacks perpetrated against our systems could result in loss of assets and critical information and expose us to remediation costs and reputational damage.

***We are dependent on a few key people for our major investment and capital allocation decisions.***

Major investment decisions and all major capital allocation decisions are made by certain key personnel. If for any reason the services of our key personnel were to become unavailable, there could be a material adverse effect on our operations.

***We need qualified personnel to manage and operate our various businesses.***

We need qualified and competent management to direct day-to-day business activities of our operating subsidiaries and to manage changes in future business operations due to changing business or regulatory environments. Our operating subsidiaries also need qualified and competent personnel in executing their business plans and serving their customers, suppliers and other stakeholders. Our inability to recruit and retain qualified and competent managers and personnel could negatively affect the operating results, financial condition and liquidity.

**Risks Related to Our Insurance Business**

***High levels of catastrophe losses, including as a result of factors such as increased concentrations of insured exposures in catastrophe-prone areas, could materially and adversely affect our results of operations, our financial position and/or liquidity, and could adversely impact our ratings, our ability to raise capital and the availability and cost of reinsurance.***

Our property and casualty insurance operations expose us to claims arising out of catastrophes in each of the geographies where we write business and to varying peak catastrophe perils in different countries and regions. Catastrophes can be caused by various natural events, including, among others, hurricanes, tornadoes and other windstorms, earthquakes, hail, wildfires, severe winter weather, floods, tsunamis, volcanic eruptions, solar flares and other naturally-occurring events. Catastrophes can also be man-made, such as terrorist attacks and other

{40972783:2}

USAO_REL_01_00491148

intentionally destructive acts including those involving nuclear, biological, chemical and radiological events, cyber events, civil unrest, explosions and destruction of infrastructure.

The incidence and severity of catastrophes are inherently unpredictable, and it is possible that both the frequency and severity of natural and man-made catastrophic events could increase. Severe weather events over the last two decades have underscored the unpredictability of future climate trends, and changing climate conditions could add to the frequency and severity of natural disasters and create additional uncertainty as to future trends and exposures. The insurance industry has experienced increased catastrophe losses due to a number of potential factors, including, in addition to weather/climate variability, more people living in high-risk areas, population growth in areas with weaker enforcement of building codes, urban expansion and an increase in the average size of a house. For example, hurricane activity has impacted areas further inland than previously experienced by us, and demographic changes have resulted in larger populations located in coastal areas which historically have been subject to severe storms and related storm surge, thus expanding our potential for losses from hurricanes. Additionally, both the frequency and severity of tornado and hail storms in the United States have been more volatile during the last decade. The frequency and severity of wildfire losses have been elevated in more recent years, due in part to record droughts in western states that some climate studies suggest are likely to increase over time, as well as demographic changes in areas prone to wildfires.

All of the catastrophe modeling tools that we use or rely on to evaluate our catastrophe exposures are based on significant assumptions and judgments and are subject to error and mis-estimation. As a result, these models may produce estimates that are materially different than actual results.

The extent of losses from a catastrophe is a function of the total amount of insured exposure affected by the event, the severity of the event and the coverage provided. Increases in the value and geographic concentration of insured property, the number of policyholders exposed to certain events and the effects of inflation could increase the severity of claims resulting from a catastrophe. For example, the specific location impacted by tornadoes is inherently random and unpredictable and the specific location impacted by a tornado may or may not be highly populated and may or may not have a high concentration of our insured exposures. Similarly, the potential for losses from a cyber event can be magnified to the extent that the event impacts platforms, systems or vulnerabilities shared by a large number of policyholders.

States have from time to time passed legislation, and regulators have taken action, that have the effect of limiting the ability of insurers to manage catastrophe risk, such as by restricting insurers from reducing exposures or withdrawing from catastrophe-prone areas or mandating that insurers participate in residual markets. Residual markets have resulted in, and may in the future result in, significant losses or assessments to insurers, including us. Legislative, regulatory and legal actions also from time to time may seek to expand insurance coverage for catastrophe claims beyond the original intent of the policies, prevent the application of deductibles or limit other rights of insurers. We may not be able to adjust terms or raise prices to offset the costs of catastrophes.
The estimation of claims and claim adjustment expense reserves related to catastrophe losses can be affected by, among other things, the nature of the information available at the time of estimation, coverage issues, and legal, regulatory and economic uncertainties. The estimates related to catastrophe losses are adjusted in subsequent periods as actual claims emerge and additional information becomes available, and these adjustments could be material. Exposure to catastrophe losses could adversely affect our financial strength and claims-paying ratings and could impair our ability to raise capital on acceptable terms or at all. Also, as a result of our exposure to catastrophe losses, rating agencies may further increase capital requirements, which may require us to raise capital to maintain our ratings. A ratings downgrade could hurt our ability to compete effectively or attract new business. In addition, catastrophic events could cause us to exhaust our available reinsurance limits and could adversely impact the cost and availability of reinsurance on a going-forward basis. Such events can also impact the credit of our reinsurers. Because of the risks set forth above, catastrophes could materially and adversely affect our results of operations, financial position and/or liquidity. Further, we may not have sufficient resources to respond to claims arising from a high frequency of high-severity natural catastrophes and/or of man-made catastrophic events involving conventional means or claims arising out of one or more man-made catastrophic events involving "unconventional" means, such as nuclear, biological, chemical or radiological events.

***If actual claims exceed our claims and claim adjustment expense reserves, or if changes in the estimated level of claims and claim adjustment expense reserves are necessary, including as a result of, among other things,***

{40972783:2}

*changes in the legal/tort, regulatory and economic environments in which the Company operates, our financial results could be materially and adversely affected.*

Claims and claim adjustment expense reserves ("loss reserves") represent management estimates of what the ultimate settlement and administration of claims will cost, generally utilizing actuarial expertise and projection techniques, at a given accounting date. The process of estimating loss reserves involves a high degree of judgment and is subject to a number of variables. These variables can be affected by both internal and external events, such as: changes in claims handling procedures; adverse changes in loss cost trends, including inflationary pressures, technology or other changes that may impact medical, auto and home repair costs (e.g., more costly technology in vehicles resulting in increased severity of claims); economic conditions, including general and wage inflation; legal trends, including adverse changes in the tort environment (e.g., increased and more aggressive attorney involvement in insurance claims, increased litigation, expanded theories of liability, higher jury awards, lawsuit abuse and third-party litigation finance, among others); and legislative changes, among others. The impact of many of these items on ultimate costs for loss reserves is difficult to estimate and could be material. Loss reserve estimation difficulties also differ significantly by product line due to differences in claim complexity, the volume of claims, the potential severity of individual claims, the determination of occurrence date for a claim and lags in reporting of events to insurers, among other factors.

It is possible that, among other things, past or future steps taken by the federal government and the Federal Reserve to stimulate the U.S. economy, including actions taken in response to COVID-19 (such as fiscal and monetary policy measures), tax reform, the imposition of increased or additional tariffs and other changes in international trade regulation, could lead to higher inflation than we had anticipated, which could in turn lead to an increase in our loss costs. The impact of inflation on loss costs could be more pronounced for those lines of business that are considered "long tail," such as general liability, as they require a relatively long period of time to finalize and settle claims for a given accident year. In addition, a significant portion of claims costs, including those in "long tail" lines of business, consists of medical costs. Changes in healthcare legislation could significantly impact the availability, cost and allocation of payments for medical services, and it is possible that, as a result, inflationary pressures in medical costs may increase or claim frequency and/or severity may otherwise be adversely impacted. The estimation of loss reserves may also be more difficult during extreme events, such as a pandemic, or during volatile or uncertain economic conditions, due to unexpected changes in behavior of claimants and policyholders, including an increase in fraudulent reporting of exposures and/or losses, reduced maintenance of insured properties, increased frequency of small claims or delays in the reporting or adjudication of claims.

We refine our loss reserve estimates in a regular, ongoing process as historical loss experience develops, additional claims are reported and settled, and the legal, regulatory and economic environment evolves. Business judgment is applied throughout the process, including the application of various individual experiences and expertise to multiple sets of data and analyses. Different experts may choose different assumptions when faced with material uncertainty, based on their individual backgrounds, professional experiences and areas of focus. As a result, such experts may at times produce estimates materially different from each other. This risk may be exacerbated in the context of an extreme event or an acquisition. Experts providing input to the various estimates and underlying assumptions include actuaries, underwriters, claim personnel and lawyers, as well as other members of management. Therefore, management may have to consider varying individual viewpoints as part of its estimation of loss reserves.
Due to the inherent uncertainty underlying loss reserve estimates, the final resolution of the estimated liability for claims and claim adjustment expenses will likely be higher or lower than the related loss reserves at the reporting date. In addition, our estimate of claims and claim adjustment expenses may change. These additional liabilities or increases in estimates, or a range of either, could vary significantly from period to period and could materially and adversely affect our results of operations and/or our financial position.

*Our insurance businesses are heavily regulated by the states and countries in which we conduct business, including licensing, market conduct and financial supervision, and changes in regulation, including higher tax rates, may reduce our profitability and limit our growth.*

These regulatory systems are generally designed to protect the interests of policyholders, and not necessarily the interests of insurers, their shareholders and other investors. For example, to protect policyholders whose insurance company becomes financially insolvent, guaranty funds have been established in all 50 states to pay the covered claims of policyholders in the event of an insolvency of an insurer, subject to applicable state limits. The funding of

{40972783:2}

USAO_REL_01_00491150

guaranty funds is provided through assessments levied against remaining insurers in the marketplace. As a result, the insolvency of one or more insurance companies or an increase in amounts paid by guaranty funds could result in additional assessments levied against us.

These regulatory systems also address authorization for lines of business, statutory capital and surplus requirements, limitations on the types and amounts of certain investments, underwriting limitations, transactions with affiliates, dividend limitations, changes in control, premium rates and a variety of other financial and non-financial components of an insurer's business including, recently, cyber-security. In addition, many jurisdictions restrict the timing and/or the ability of an insurer to discontinue writing a line of business or to cancel or non-renew certain policies. Insurance regulators may also increase the statutory capital and surplus requirements for our insurance subsidiaries or reject rate increases or other terms and conditions due to the economic environment or other factors. In addition, state tax laws that specifically impact the insurance industry, such as premium taxes, or more general tax laws, such as U.S. federal corporate taxes, could be enacted or changed and could have a material adverse impact on us. Other legislative actions could impact our business as well. For example, changes to state law regarding workers' compensation insurance could impact the demand for our products, and the legalization of cannabis in certain states could potentially increase loss costs. In addition, the potential repeal of the McCarran-Ferguson Act (which exempts insurance from most federal regulation) or a change to the federal health care system that eliminates or reduces the need for the medical coverage component of workers' compensation insurance, could also significantly harm the insurance industry, including us. State, federal or international laws or regulations that are adopted or amended may be more restrictive than current laws or regulations and may result in lower revenues and/or higher costs of compliance and, as a result, could materially and adversely affect our results of operations.

**Risks Related to Our Aviation Business**

We own a significant minority interest in a discount airline and also own a fleet of aircraft, which we lease to our affiliate airline and other airlines. This aviation business exposes us to certain risks, including the following.

***The COVID-19 pandemic and measures to reduce its spread have had, and will likely continue to have, a material adverse impact on our business, results of operations and financial condition.***

The outbreak of COVID-19 and implementation of measures to reduce its spread have adversely impacted our aviation business and continue to adversely impact our business in a number of ways. Multiple governments in countries served by our aviation affiliate or by airlines that lease our aircraft have responded to the virus with air travel restrictions and closures, testing requirements or recommendations against air travel, and certain countries have required airlines to limit or completely stop operations.

The extent of the impact of COVID-19 on our aviation business, results of operations and financial condition will depend on future developments, including the currently unknowable duration of the COVID-19 pandemic; the efficacy of, ability to administer and extent of adoption of any COVID-19 vaccines domestically and globally; the impact of existing and future governmental regulations, travel advisories and restrictions that are imposed in response to the pandemic, including pursuant to executive orders, such as mask mandates; additional reductions to our flight capacity, or a voluntary temporary cessation of all flights, that we implement in response to the pandemic; and the impact of COVID-19 on consumer behavior, such as a reduction in the demand for air travel, especially in our destination cities. The total potential economic impact brought on by the COVID-19 pandemic is difficult to assess or predict, and it has already caused, and is likely to result in further, significant disruptions of global financial markets, which may reduce our ability to access capital on favorable terms or at all, and increase the cost of capital. In addition, a recession, depression or other sustained adverse economic event resulting from the spread of the coronavirus would materially adversely impact our business.

***Aviation is in an extremely competitive industry.***

We face significant competition with respect to routes, fares and services. Within the airline industry, we compete with traditional network airlines, other low-cost airlines and regional airlines on many of our routes. Competition in most of the destinations we presently serve is intense, sometimes due to the large number of carriers in those markets. Furthermore, other airlines may begin service or increase existing service on routes where we currently

{40972783:2}

USAO_REL_01_00491151

face little competition. Most of our competitors are larger than us and have significantly greater financial and other resources than we do.

The airline industry is particularly susceptible to price discounting because once a flight is scheduled, airlines incur only nominal additional costs to provide service to passengers occupying otherwise unsold seats. Increased fare or other price competition has, and may continue to, adversely affect our revenue generation. Moreover, many other airlines have begun to unbundle services by charging separately for services such as baggage and advance seat selection. This unbundling and other cost reducing measures could enable competitor airlines to reduce fares on routes that we serve.

***Our low-cost structure is one of our primary competitive advantages, and many factors could affect our ability to control our costs.***

Our low-cost structure is one of our primary competitive advantages. However, we have limited control over many of our costs. For example, we have limited control over the price and availability of aircraft fuel, aviation insurance, airport costs and related infrastructure taxes, the cost of meeting changing regulatory requirements and our cost to access capital or financing. In addition, the compensation and benefit costs applicable to a significant portion of our employees are established by the terms of our collective bargaining agreements. We cannot guarantee we will be able to maintain a cost advantage over our competitors. If our cost structure increases and we are no longer able to maintain a sufficient cost advantage over our competitors, it could have a material adverse effect on our business, results of operations and financial condition.

***The airline industry is heavily influenced by the price and availability of aircraft fuel. Continued volatility in fuel costs or significant disruptions in the supply of fuel, including hurricanes and other events affecting the Gulf Coast in particular, could materially adversely affect our business, results of operations and financial condition.***

Aircraft fuel costs represent a significant percentage of the total operating expenses of our aviation affiliate. As such, our aviation operating results are significantly affected by changes in the availability and the cost of aircraft fuel, especially aircraft fuel refined in the U.S. Gulf Coast region, on which we are highly dependent. Both the cost and the availability of aircraft fuel are subject to many meteorological, economic and political factors and events occurring throughout the world, which we can neither control nor accurately predict. For example, a major hurricane making landfall along the Gulf Coast could disrupt oil production, refinery operations and pipeline capacity in that region, possibly resulting in significant increases in the price of aircraft fuel and diminished availability of aircraft fuel supply. Any disruption to oil production, refinery operations, or pipeline capacity in the Gulf Coast region could have a disproportionate impact on our operating results compared to other airlines that have more diversified fuel sources. Fuel prices also may be affected by geopolitical and macroeconomic conditions and events that are outside of our control, including volatility in the relative strength of the U.S. dollar, the currency in which oil is denominated. Instability within major oil producing regions, such as the Middle East and Venezuela, changes in demand from major petroleum users such as China, and secular increases in competing energy sources are examples of these trends.

**Risks Related to Our Structured Settlements Business**

***Competition in the structured settlements industry is intense and may adversely affect our business, financial condition, results of operations and cash flows.***

Competition in the structured settlements industry is intense. In the structured settlement industry, we compete with other purchasers of those payment streams. It is possible that some competitors may have a lower cost of funds or access to funding sources that may not be available to us. In addition, some of our competitors may have higher risk tolerances or different risk assessments, which could allow them to consider a wider variety of asset purchases and establish relationships with our customers. Furthermore, competition for purchases of structured settlement payment streams may lead to the price of such assets increasing, which may further limit our ability to generate desired returns. We also face competition from insurance companies that have recently begun offering payees the option to accelerate payments (at a stated discount rate) from structured settlements that the specific insurance company has issued to that payee.

{40972783:2}

USAO_REL_01_00491152

The competitive pressures we face may have a material adverse effect on our business, financial condition, results of operations and cash flows.

***We have access to personally identifiable confidential information of current and prospective customers and the improper use of or failure to protect that information could adversely affect our business and reputation. Furthermore, any significant security breach of our software applications or technology that contains personally identifiable confidential information of current customers could adversely affect our business and reputation.***

Our business often requires that we handle personally identifiable confidential information, the use and disclosure of which is significantly restricted under federal and state privacy laws. As part of our normal operations, we rely on secure processing, storage, and transmission of confidential customer information through computer software systems and networks. Our information technology infrastructure is potentially vulnerable to security breaches, and a party able to circumvent our security measures could misappropriate private customer information. We maintain and rely on external and internal cybersecurity solutions as part of our internal controls that are designed to provide reasonable assurance that unauthorized access to our customers' confidential data is prevented or detected in a timely manner. However, although we have not had any occurrences of a breach of our cybersecurity solutions, these internal controls may not continue to prevent unauthorized access to our software systems and networks.

In addition, our employees, vendors and business partners may have access to such confidential information. It is not always possible to deter misconduct by our employees, vendors and business partners, and the precautions we take to prevent disclosure of confidential information by our employees, vendors and business partners may not be effective in all cases. If our employees, vendors or business partners improperly use or disclose such confidential information, we could be subject to legal proceedings or regulatory sanctions.

Loss or misappropriation of confidential information of our customers may result in a loss of confidence in our transactions, may greatly harm our reputation, may adversely affect our ability to maintain current or potential customer relationships, and may have a material adverse effect on our business, financial condition and results of operations and cash flows. We maintain insurance coverage for certain losses associated with a cybersecurity breach, but we cannot guarantee that our insurance policies will fully protect us against all such losses and liabilities.

***Unfavorable press reports about us or the industries in which we operate may make prospective customers less willing to use us for their financial needs, lead to increased regulation or make third party vendors less willing to work with us.***

The structured settlement industry is periodically the subject of negative press reports from the media and consumer advocacy groups. The structured settlement industry is relatively new and is susceptible to confusion about the role of purchasers of structured settlements.

We depend upon direct response marketing and our reputation to attract prospective customers and maintain existing customers. A sustained campaign of negative press reports about us or the industries in which we participate could adversely affect the public's perception of us and these industries as a whole, as well as the willingness of prospective customers to use us for their financial needs. In addition, such unfavorable press reports can gain the attention of law makers and lead to additional regulation or reform in the industries in which we operate.

If people are reluctant to sell structured settlement, annuity and lottery payment streams and other assets to us or to originate mortgages with us due to negative public perception, if our compliance costs are increased due to increased regulation, or if third party vendors terminate their relationship with us, our business, financial condition, results of operations and cash flows could be negatively impacted.

***We are subject to extensive federal, state and local laws and regulations. Failure to comply with these laws and regulations and changes in the laws and regulations could have a material adverse effect on our business, financial condition, results of operations and cash flows.***

The structured settlements industry is subject to extensive and evolving federal, state and local laws and regulations, and we are subject to extensive and increasing regulation by a number of governmental entities at the federal, state and local levels. These regulations directly impact our business and require constant compliance, monitoring and internal and external audits. In the event that we fail to comply with any of these laws or regulations, the CFPB and applicable federal and state agencies may have the power to levy fines or file suits against us or compel settlements with monetary penalties and operational requirements. In addition, a material failure to comply with any state laws

{40972783:2}

USAO_REL_01_00491153

or regulations could result in the loss or suspension of our licenses in the applicable jurisdictions where such violations occur. Any of these outcomes could have a material adverse effect on our business, financial condition, results of operations and cash flows.

Changes to statutory, licensing and regulatory regimes could result in the enforcement of stricter compliance measures or adoption of additional measures on us or on the third parties, with whom we conduct our business, could restrict our ability to originate, finance, acquire or securitize financial assets or could lead to significantly increased compliance costs and operating expenses.

***We could be assessed excise taxes that result from IRS audits of our compliance with Section 5891 of the Code which could have a material adverse impact on our business, financial condition and results of operations in future periods.***

Section 5891 of the Code, as set forth in the Tax Relief Act, levies an excise tax upon those people or entities that acquire structured settlement payments from a seller on or after February 22, 2002, unless certain conditions are satisfied. Such tax equals 40% of the discount obtained by the purchaser of the structured settlement payments. However, no such tax is levied if the transfer of such structured settlement payments is approved in a qualified court order. A qualified court order under the Tax Relief Act means a final order, judgment or decree that finds that the transfer does not contravene any federal or state law or the order of any court or administrative authority and is in the best interest of the payee, taking into account the welfare and support of the payee's dependents. The order must be issued under the authority of an applicable state statute of the state in which the seller is domiciled, or, if there is no such statute, under the authority of an applicable state statute of the state in which the payment obligor or annuity provider has its principal place of business, and issued by a court of such state, or by the responsible administrative authority (if any) that has exclusive jurisdiction over the underlying action or proceeding. If we fail to satisfy these conditions, we could be assessed excise taxes which could have a material adverse effect on our business, financial condition, results of operations and cash flows.

***Our structured settlements business could be adversely affected if the Bankruptcy Code is changed or interpreted in a manner that affects our rights to scheduled payments with respect to a payment stream we have purchased.***

If a holder of a structured settlement, annuity or lottery payment stream were to become a debtor in a case under the Bankruptcy Code, a court could hold that the scheduled payments transferred by the holder under the applicable purchase agreement do not constitute property of the estate of the claimant under the Bankruptcy Code. If, however, a trustee in bankruptcy or other receiver were to assert a contrary position, such as by requiring us, or any securitization vehicle, to establish our right to those payments under federal bankruptcy law or by persuading courts to recharacterize the transaction as secured loans, such result could have a material adverse effect on our business. If the rights to receive the scheduled payments are deemed to be property of the bankruptcy estate of the claimant, the trustee may be able to avoid assignment of the receivable to us.

Furthermore, a general creditor or representative of the creditors, such as a trustee in bankruptcy, of a special purpose vehicle to which an insurance company assigns its obligations to make payments under a structured settlement, annuity or lottery payment stream could make the argument that the payments due from the annuity provider are the property of the estate of such special purpose vehicle (as the named owner thereof). To the extent that a court accepted this argument, the resulting delays or reductions in payments on our receivables could have a material adverse effect on our business, financial condition, results of operations and cash flows.

***Our purchases of certain financial assets may be viewed as consumer lending, which could subject us to adverse regulatory limitations and litigation.***

If a structured settlements transaction is characterized as a loan rather than a sale, then various consumer lending laws may apply, such as usury statutes, consumer credit statutes or truth-in-lending statutes. If a court finds any of our structured settlement transactions are subject to consumer lending laws, we may not have complied in all respects with the requirements of the applicable statutes with respect to those transactions. The failure to comply could result in remedies including the rescission of the agreement under which we purchased the right to the stream of periodic payments and the repayment of amounts we received under that agreement.

{40972783:2}

**SCHEDULE B – OPINION OF COUNSEL**

{40972783:2}

USAO_REL_01_00491155

September 20, 2021

Each of the Subscribers (as defined below) under
the Subscription Agreements (as defined below)

Performance Trust Capital Partners, LLC, as Placement Agent

Re:    777 Partners LLC and 600 Partners LLC
Offering of Preferred Units

Ladies and Gentlemen:

       We have acted as special counsel to 777 Partners LLC ("777") and 600 Partners LLC, each a Delaware limited liability company ("600" and, together with 777, the "Issuers"), in connection with the issuance and sale by the Issuers of up to an aggregate of $250 million in cumulative perpetual preferred Class A membership unit interests of each of 777 and 600 ("Preferred Units"), pursuant to the Subscription Agreements and Limited Power of Attorney, dated September 20, 2021 (the "Subscription Agreements"), by and among the Issuers and each of the subscribers party thereto (the "Subscribers"). This letter is being furnished to you pursuant to Section 6(a)(ii) of the Subscription Agreements. Any capitalized term used and not otherwise defined herein shall have the meaning assigned to it in the Subscription Agreements.

       In connection with the opinions set forth below, we have examined originals or copies certified or otherwise identified to our satisfaction of each of the following:

       (a)    the Subscription Agreements;

       (b)    the Fourth Amended and Restated LLC Operating Agreement of 777 (the "777 Operating Agreement");

       (c)    the First Amendment (the "777 Amendment") to the 777 Operating Agreement;

       (d)    the Third Amended and Restated LLC Operating Agreement of 600 (the "600 Operating Agreement" and, together with the 777 Operating Agreement, the "Operating Agreements"); and

       (e)    the First Amendment (the "600 Amendment" and, together with the 777 Amendment, the "Amendments") to the 600 Operating Agreement.

       For purposes of this opinion, the term "Transaction Document" or "Transaction Documents" shall mean, individually or collectively, as the context allows, the Subscription Agreements, the Operating Agreements and the Amendments.

       We have also reviewed such other agreements, certificates and documents of public officials, officers and other representatives of each of the Issuers and others, as we have deemed necessary as a basis for the opinions set forth below. We have relied, without independent investigation, as to factual matters on the representations and warranties contained in the Subscription Agreements and on certificates of public officials and of officers and other representatives of each of the Issuers and others.

{40972783:2}

USAO_REL_01_00491156

We have assumed (a) the legal capacity of all natural persons executing the Transaction Documents and such other agreements, certificates and documents, (b) the genuineness of all signatures thereon, (c) the authority of all persons signing the Transaction Documents and such other agreements, certificates and documents on behalf of the parties thereto, (d) the authenticity of all documents submitted to us as originals and (e) the conformity to the original of all copies submitted to us and the authenticity of the originals of such copies. In rendering the opinions set forth below, we have also assumed that, except to the extent expressly set forth in the opinions below: (i) each Transaction Document has been duly authorized by the parties thereto; (ii) each Transaction Document has been duly executed and delivered by each party thereto; (iii) each party to a Transaction Document has the requisite power and authority (corporate, company, partnership or other) to execute, deliver and perform its obligations under each Transaction Document to which it is a party; (iv) each party to a Transaction Document will perform its obligations thereunder in accordance with the terms of such Transaction Document; and (v) each party to a Transaction Document is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. We have also assumed that (A) each Transaction Document constitutes a valid and binding agreement of the parties to the Transaction Documents other than the Issuers, enforceable against such parties in accordance with their respective terms and (B) each Transaction Document constitutes a valid and binding agreement of the parties to the Transaction Documents, enforceable against such parties in accordance with their respective terms, to the extent that laws other than New York law are relevant thereto. We have also assumed that (i) each party to the Operating Agreements had full power and authority or legal capacity to execute and deliver such Operating Agreements, (ii) such Operating Agreements have been duly executed and delivered by the parties thereto and are a valid, binding and enforceable agreement under Delaware law and (iii) the construction and interpretation of the terms of such Operating Agreements under Delaware contract law is the same as it would be under New York.

Based upon the foregoing and such other investigations as we have deemed necessary and subject to the qualifications included in this letter, we are of the opinion that:

8.    Each of the Issuers, based solely on our review of its certificate of formation and a good standing certificate issued by the Secretary of State of the State of Delaware, is a limited liability company validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to (x) execute, deliver and perform its obligations set forth in the Transaction Documents and (y) issue the Preferred Units.

9.    Each of the Transaction Documents to which it is a party have been duly authorized, executed and delivered by each of the Issuers.

10.    Each of the Transaction Documents to which it is a party constitutes a valid and binding obligation of each of the Issuers, enforceable against each of the Issuers in accordance with its terms.

11.    The Preferred Units have been duly authorized and, when issued and delivered and paid for by the Subscribers in accordance with the terms of the Subscription Agreements, the Operating Agreements and the Amendments, will be validly issued, fully paid and non-assessable. The Preferred Units will not be issued in violation of preemptive rights or other similar rights of any security holder of each the Issuers to subscribe for or purchase membership interests under the Operating Agreements, each as in effect on the date of this letter.

12.    The issuance and sale of the Preferred Units by each of the Issuers, the execution and delivery by each of the Issuers of each Transaction Document to which it is a party, and the performance by each of the Issuers of its obligations thereunder, (i) do not contravene any provision of such Issuer's certificate of formation or Operating Agreement or any applicable provision of the Delaware Limited Liability Company Act and (ii) other than any federal securities laws, as to which we express no opinion in this paragraph 5, or state securities laws, as to which we express no opinion, do not contravene any statute, rule or regulation of the State of New York or of the United States, applicable in each case to each of the Issuers.

13.    No authorization or approval or other action by, and no notice to or filing with, any governmental authority or other regulatory body of the State of New York or the United States or pursuant to the Delaware Limited Liability Company Act is required to be obtained or made by each of the Issuers in connection with the issuance and sale of the Preferred Units, the due execution and delivery by each of the Issuers of any Transaction Document to which it is a party and the consummation by each of the Issuers of the transactions contemplated under such Transaction Documents, except as have been obtained or made.

{40972783:2}

USAO_REL_01_00491157

14. No registration under the Securities Act of 1933, as amended (the "Securities Act"), of the Preferred Units is required in connection with the sale of the Preferred Units to the Subscribers as contemplated by the Subscription Agreements in reliance upon the exemption provided in Section 4(a)(2) thereof; *provided, however*, that we express no opinion as to when and under what circumstances the Preferred Units may be reoffered or resold and we express no opinion as to the effect of prior or subsequent issuances of securities of each of the Issuers to the extent that such issuances may be integrated with the issuance of the Preferred Units, in each case assuming (i) that each of the Issuers and any person acting on behalf of each of the Issuers who sells such Preferred Units reasonably believes that each of the Subscribers is an "accredited investor" (as such term is defined in Rule 501(a) under the Securities Act) and (ii) the accuracy of the Subscribers' representations in Section 2 of the Subscription Agreements and those of the Issuers contained in the Subscription Agreements.

The opinions set forth above are subject to the following qualifications:

(a)     Our opinions above as they relate to laws, statutes, rules or regulations are limited to those laws, statutes, rules or regulations which, in our experience, are normally applicable to transactions of the type contemplated in the Transaction Documents, without our having made any special investigation as to the applicability of any specific law. We express no opinion herein with respect to: (1) federal securities laws, except as otherwise provided herein, or state securities laws or banking laws or regulations; (2) federal or state antitrust or unfair competition laws or regulations; (3) federal or state environmental laws or regulations; (4) federal or state tax laws or regulations; (5) federal or state public utility laws or regulations; (6) pension or employee benefit laws or regulations; (7) federal or state labor laws or regulations; (8) federal or state laws, regulations or policies relating to national or local emergencies; (9) laws or regulations relating to foreign asset or trading controls, national security, terrorism or money laundering (including, without limitation, the Foreign Investment Risk Review Modernization Act of 2018 and the Exon-Florio amendments to the Defense Production Act of 1950); (10) statutes, ordinances, administrative decisions, rules or regulations of counties, towns, municipalities or special political subdivisions (whether created or enabled through legislative action at the federal, state or regional level); (11) ERISA; (12) the USA Patriot Act (Title III of Public L. 107-56) or other anti-money laundering laws and regulations; or (13) judicial decisions to the extent that they deal with any of the foregoing.

(b)     The opinions expressed in paragraphs 3 and 4 above as to the validity and enforceability against each of the Issuers of the Transaction Documents referred to therein are subject to:

(i)     the effect of bankruptcy, insolvency, receivership, fraudulent transfer or conveyance, reorganization, moratorium, arrangement or other similar laws from time to time in effect affecting generally enforcement of creditors' rights and remedies;

(ii)    the application of general principles of equity, whether considered in a case or proceeding at law or in equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing and the discretion of the court before which any proceeding therefor may be brought;

(iii)   the qualification that indemnification or contribution provisions in the Transaction Documents may be unenforceable to the extent that such indemnification or contribution relates to claims made under any federal or state securities laws or is otherwise limited by public policy; and

(iv)    there being no mutual mistake of fact.

{40972783:2}

(c)    With respect to the opinions expressed in paragraphs 3 and 4 above as to the validity and enforceability against each of the Issuers of the Transaction Documents referred to therein we express no opinion as to:

(i)      any provision of any Transaction Document to the effect that rights or remedies are not exclusive, that every right or remedy is cumulative and may be exercised in addition to any other right or remedy, that the election of some particular remedy does not preclude recourse to one or more other remedies or that a failure to exercise or delay in exercising rights or remedies will not operate as a waiver of any such right or remedy;

(ii)     any waiver or consent relating to the rights of each of the Issuers under any Transaction Document or applicable law or the duties owing to each of the Issuers existing as a matter of law, in each case to the extent such waivers or consents are found by a court to be against public policy or are ineffective pursuant to applicable law;

(iii)    any waiver or consent contained in any Transaction Document relating to unknown future rights;

(iv)    any provision in any Transaction Document that: (1) relates to the subject matter jurisdiction of a Federal court to consider any dispute arising out of the Transaction Document; (2) waives any objection by any party to the laying of venue of any action or proceeding brought in any court; (3) restricts competition; or (4) prohibits, restricts or requires consent to assignment or transfer of any right or property;

(v)     waiver of any rights to trial by jury;

(vi)    the availability of equitable remedies;

(vii)   any provision of any Transaction Document requiring written amendments or waivers of such documents insofar as it suggests that oral or other modifications, amendments or waivers could not effectively be agreed upon by the parties or that the doctrine of promissory estoppel might not apply;

(viii)  any provision in any Transaction Document as to forum selection or as to the submission to jurisdiction (including, without limitation, any waiver of any objection that a court is an inconvenient forum);

(ix)    any provision in any Transaction Document insofar as such provision requires each of the Issuers to make any payment without setoff, counterclaim or other defense or authorizes any other party to set off and apply any deposits at any time held, and any indebtedness at any time owing, by such other party, to or for the account of each of the Issuers in a manner not otherwise permitted under New York law; and

(x)     any provision in any Transaction Document relating to the enforceability of default interest (to the extent deemed a premium or a penalty), liquidated damages and other similar provisions.

(d)    Our opinions in paragraphs 3 and 4 above insofar as they concern the choice of New York as the governing law in the Transaction Documents and the submission to jurisdiction of New York courts therein is rendered in reliance upon the Act of July 19, 1984, ch. 421, 1984 McKinney's Sess. Law of N.Y. 1406 (codified as N.Y. Gen. Oblig.

{40972783:2}

Law §§ 5-1401, 5-1402 (McKinney 2001) and N.Y. C.P.L.R. 327(b) (McKinney (2001)) (the "Act") and is subject to the qualification that such provisions may not be enforced by any jurisdiction, other than the courts of the State of New York. The choice of New York law or the law of any other jurisdiction does not apply to the extent that the application of New York law pursuant to the Act to a transaction that has no contact or only insignificant contact with New York State may raise constitutional issues.

(e)     We express no opinion as to the effect on the opinions set forth herein of (i) the compliance or non-compliance by any person with any United States federal, state or other laws or regulations applicable to it, other than each of the Issuers, but only to the extent specifically contemplated by any such opinion, (ii) the legal or regulatory status or the nature of the business of any such person, other than each of the Issuers, but only to the extent specifically contemplated by any such opinion, or (iii) the effect of the laws of any jurisdiction other than New York that limit the interest, fees or other charges that may be imposed under any Transaction Document.

The opinions expressed above are limited to the laws of the State of New York, the Delaware Limited Liability Company Act and the Federal laws of the United States, and we do not express any opinion herein concerning any other law. The opinions expressed above relate only to authorizations, approvals and filings required under laws which, in our experience in the exercise of customary professional diligence, are normally applicable to transactions of the type provided for in the Subscription Agreements.

We are not admitted to practice in the State of Delaware and our opinions with respect to the Delaware Limited Liability Company Act are based solely on our review of the statutory language of the Delaware Limited Liability Company Act and not on any legislative history or judicial decisions or any rules, regulations, guidelines, releases or interpretations concerning the Delaware Limited Liability Company Act.

The opinions expressed herein have been rendered at the request of the Issuers, are solely for your benefit in connection with the transactions contemplated by the Subscription Agreements, may not be relied upon by you in any other manner or by any other person in any manner or for any purpose and may not be communicated or published by you to any other person for any purpose without our prior written approval in each instance. We do not undertake to update, revise or supplement any opinion herein for any reason whatsoever.

*Very truly yours,*

{40972783:2}

USAO_REL_01_00491160



**PERFORMANCE TRUST**
CAPITAL PARTNERS

# CERTIFICATE OF RULE 144A
## QUALIFIED INSTITUTIONAL BUYER

> This Certificate will be deemed valid for the Institution named below. If there are additional institutions (e.g. subaccounts or mutual funds) to be designated as Qualified Institutional Buyers by this Certificate, please attach a list of such institutions.

To:    **Performance Trust Capital Partners, LLC**

Certain securities are available only to Qualified Institutional Buyers (QIBs) as defined in Rule 144A of the Securities Act of 1933, for account under the jurisdiction of the SEC.

In connection with a purchase or purchases of privately offered securities pursuant to Rule 144A under the Securities Act of 1933, the undersigned certifies that it is familiar with Rule 144A, agrees that persons selling securities to the undersigned in reliance upon Rule 144A may rely on the information contained in this certificate and represents and warrants that:

(i)    It is a Qualified Institutional buyer ("QIB") of the following type:

**Insurance Company**

*[Insert type of institution (e.g., insurance company, bank, savings & loan, Investment Company, etc.)]*

(ii)    It is an institution as defined in the rule and owns or invests on a discretionary basis at least $100 million ($10 million if Client is a registered broker/dealer) in eligible securities as defined in the rule.  Or, if Client is a bank, Client has an audited net worth of at least $25 million in addition to holding $100 million in eligible securities.

(iii)    If the undersigned decides to purchase Rule 144A securities for the accounts of others, it will only purchase Rule 144A securities for accounts that independently qualify as QIBs as defined in Rule 144A (unless the undersigned is an insurance company and is purchasing for the account of one or more of its "separate accounts"); and

(iv)    The undersigned agrees to promptly advise Performance Trust Capital Partners if it ceases to be a QIB.

☑    Includes affiliates and wholly owned subsidiaries (check if applicable)

Date: **September 17** , 20 **21**

| To be completed by Performance Trust Capital Partners Representative: |
| --- |
| Customer Account #: 5AK-_____ |
| Account Representative: _____ |
| (Print or Type) |

Name and Address of Institution (Print or Type):

**777 Re Ltd**

**22 Victoria St, Suite 505**

**Hamilton HM 12 Bermuda**

Telephone Number: **1.305.921.2817**

By: _____
(Signature of Authorized Buyer or Executive Officer)

USAO_REL_01_00491161