UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

        v.

JOSHUA WANDER, et al.,

        Defendants.

25-CV-8565-VM

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF JOSHUA WANDER'S MOTION TO DISMISS

Ben Kuruvilla
Nicholas Andrew Flath
Securities and Exchange Commission
New York Regional Office
100 Pearl Street
New York, New York 10007
(212) 336-5599
kuruvillabe@sec.gov

*Attorney for Plaintiff*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**...................................................................................... iii

**PRELIMINARY STATEMENT** ....................................................................................1

**SUMMARY OF COMPLAINT'S ALLEGATIONS**.................................................3

    A.  The Issuers and Their Dependence on SuttonPark .............................................3

    B.  SuttonPark's Dependence on the Credit Facility ...............................................3

    C.  Wander Misuses the Credit Facility, Creating a $300 Million Overdraw...........................4

    D.  The Preferred Equity Offering .........................................................................5

    E.  Wander Misleads Investors About the Issuers' Financial Condition ..................5

    F.  Wander Diverts Investor Funds to Himself .......................................................7

    G.  Wander Misleads Investor B .............................................................................8

**LEGAL STANDARD**..................................................................................................8

**ARGUMENT**............................................................................................................10

    I.    **THE COMPLAINT ADEQUATELY PLEADS FRAUD** .............................10

        A.  The Complaint Pleads that Wander Made Material Misrepresentations .............10

        B.  The Complaint Satisfies Rule 9(b) ..................................................................12

            1.  Particularity..............................................................................................12

            2.  Scienter ....................................................................................................13

        C.  The Complaint Adequately Pleads Misrepresentations Regarding Use of Proceeds and Investor B .......................................................................16

        D.  Wander's Defenses Concerning His Material Misrepresentations are Baseless .17

            1.  The Opinion Doctrine Does not Shield Statements the Speakers Knows are False ..................................................................................................17

            2.  The Bespeaks Caution Doctrine Does Not Protect Known, Specific Risks Deliberately Withheld. ................................................................20

3.   The Complaint Does Not Plead Pure Omissions ....................................21

E.  The Complaint Pleads Scheme Liability .............................................................23

F.  Because the Complaint Adequately Pleads Scienter, the Negligence Standard is Satisfied ...................................................................................................................24

**CONCLUSION** ..................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*1199SEIU United Healthcare Workers E. v. Alaris Health at Hamilton Park,*
   No. 1:22-CV-00531 (LJL), 2022 WL 17251772 (S.D.N.Y. Nov. 28, 2022) ............................14

*Aaron v. SEC*, 446 U.S. 680 (1980) .................................................................................................9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................................................8

*ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) .................................................13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................................8

*Braxton/Obed-Edom v. City of New York,*
   No. 17-cv-00199 (GBD)(SDA)*,* 2018 WL 11316020 (S.D.N.Y. Dec. 20, 2018) .....................14

*Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395 (2d Cir. 2015) ................................9, 13

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 F. App'x 664 (2d Cir. 2016) ..............................11

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352 (2d Cir. 2002)..................................................20

*Hunt v. All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723 (2d Cir. 1998) ......................................20

*In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102 (2d Cir. 1998) ......................................18

*Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46 (2d Cir. 2022)...........................8, 15, 16, 18

*Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137 (2d Cir. 2010) ...............................21

*Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)...................................2, 10

*Leeds v. Meltz*, 85 F.3d 51 (2d Cir. 1996) ...........................................................................8, 15, 16

*Li v. Eqonex Ltd.*, No. 1:23-CV-03346-GHW, 2024 WL 4241951 (S.D.N.Y. Sept. 18, 2024)......10

*Liberty Media Corp. v. Vivendi Universal, S.A.,* 861 F. Supp. 2d 262 (S.D.N.Y. 2012)..........10, 12

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d160 (2d Cir. 2015) .............25

*Lorenzo v. SEC*, 587 U.S. 71 (2019) ..............................................................................................9, 24

*In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506 (S.D.N.Y. 2024)......................................21

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024)............................22

*Matignon Fin., Inc. v. Ameritel Commc'ns Corp.*,
  No. 88 Civ. 5742 (JFK), 1989 WL 153282 (S.D.N.Y. Dec. 14, 1989) ....................................21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ........................................................................................17, 19, 22

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68 (S.D.N.Y. 1996)......................20, 21

*In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 261 (S.D.N.Y. 2014) .........................................12

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001)........................................................14

*SEC v. Amah*, 2023 WL 6386956 (S.D.N.Y. Sept. 28, 2023).........................................................19

*SEC v. Carter*, No. 10 C 6145, 2011 WL 5980966 (N.D.Ill. Nov. 28, 2011) ................................12

*SEC v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379 (S.D.N.Y. 2014) ........................16

*SEC v. Collector's Coffee, Inc.*, 697 F. Supp. 3d 138 (S.D.N.Y. 2023)....................................23, 25

*SEC v. Farnsworth*, 692 F. Supp. 3d 157 (S.D.N.Y. 2023)............................................................25

*SEC v. Kane*, No. 97 Civ. 2931 (CBM), 2003 WL 1741293 (S.D.N.Y. Apr. 1, 2003)...................24

*SEC v. Kinetic Inv. Grp., LLC*,
  No. 8:20-CV-394-MSS-SPF, 2024 WL 4869623 (M.D. Fla. Nov. 22, 2024)..........................24

*SEC v. McNulty,* 137 F.3d 732 (2d Cir. 1998)..........................................................................9, 13

*SEC v. Obus*, 693 F.3d 276 (2d Cir. 2012) ......................................................................................9

*SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279 (2d Cir. 2013) ...............................................9

*SEC v. Rio Tinto plc*, 41 F.4th 47 (2d Cir. 2022)...........................................................................24

*SEC v. Sason*, 433 F. Supp. 3d 496 (S.D.N.Y. 2020) ....................................................................23

*SEC v. Saw*, No. 23 CIV. 6573 (PGG), 2025 WL 2105903 (S.D.N.Y. July 25, 2025)...................23

*SEC v. Solarwinds*, 741 F.Supp.3d 37 (S.D.N.Y. 2024).................................................................24

*SEC v. Thompson*, 238 F. Supp. 3d 575 (S.D.N.Y. 2017) ..............................................................21

*SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017) .......................................................................24

*Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124 (2d Cir. 1994) ......................................................13

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993)............................................................17

*In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220 (S.D.N.Y. 2006) ....................................20

### Regulations

15 U.S.C. § 77q(a) ............................................................................................................................9

15 U.S.C. § 77q(a)(1)..............................................................................................................10, 23

15 U.S.C. § 77q(a)(2)....................................................................................................................10

15 U.S.C. § 77q(a)(3)..............................................................................................................10, 23

15 U.S.C. § 78j(b) ...............................................................................................................9, 10, 23

17 C.F.R. § 240.10b-5(a).......................................................................................................10, 23

17 C.F.R. § 240.10b-5(b) .............................................................................................................10

17 C.F.R. § 240.10b-5(c)........................................................................................................10, 23

### Rules

Fed. R. Civ. P. 9(b)...........................................................................................................................9

**PRELIMINARY STATEMENT**

Between January 2021 and May 2024 (the "Relevant Period"), Defendant Joshua Wander ("Wander") built a multibillion-dollar enterprise on a crumbling foundation. While soliciting $237 million from institutional investors, he misled those investors to believe that the enterprise was thriving by using offering materials that he knew were false and by concealing that the enterprise's most profitable subsidiary was drowning in a $300 million credit facility overdraw of his own making. He told investors the business would generate sufficient net income to pay a 10% annual dividend. He knew it could not. He misappropriated nearly $25 million of investor funds the same day they arrived. And when the scheme unraveled, investors suffered serious financial harm.

For this conduct, Plaintiff Securities and Exchange Commission ("SEC" or "Commission") alleges that Wander violated Section 17 of the Securities Act of 1933 ("Securities Act")[15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [15 U.S.C. § 240.10b-5].[1]

Wander now asks this Court to dismiss the Complaint as a matter of law. His motion fails on every ground.

*First*, Wander argues the Complaint's core allegations rest on inactionable opinions and projections. But the securities laws protect only *sincere* opinions—not statements the speaker knows to be false. The Complaint pleads, with specificity, that Wander knew the projected $132 million in net income for 2021 had no basis in fact given the $300 million overdraw he had directed and concealed. A speaker who knows his projections are groundless cannot hide behind

---

[1] On October 16, 2025, a criminal indictment was unsealed charging Wander with securities fraud and wire fraud offenses for similar conduct to that alleged in the SEC's Complaint. That criminal case remains pending before Judge Oetken. *United States v. Wander*, 25-cr-00473 (JPO).

the opinion doctrine.

*Second*, Wander invokes the bespeaks caution doctrine. But that doctrine shields only genuine uncertainty—not statements a defendant knows to be false or misleading when made. And for a defendant to invoke the bespeaks caution doctrine, the cautionary language must directly relate to the specific risk that was allegedly not disclosed. But here, none of the cautionary language Wander cites warned investors of the one risk that mattered: that SuttonPark Capital LLC ("SuttonPark"), the engine of the enterprise's profitability, was crippled by a $300 million overdraw Wander himself had engineered. *Third*, Wander characterizes the Complaint's omission allegations as non-actionable "pure omissions." They are not. Wander made affirmative representations about projected income and dividend coverage while withholding the facts that made those representations misleading. That is a half-truth—and half-truths are prohibited under Rule 10b-5(b).

*Fourth*, Wander contends he was not the "maker" of the challenged statements. The Complaint pleads otherwise: Wander reviewed, approved, and personally distributed a false or misleading investor presentation; directed employees to build a false financial model; and authorized the placement agent to disseminate these materials to investors. Under *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) and its progeny, that establishes ultimate authority.

*Fifth*, Wander argues the Complaint fails Federal Rule of Civil Procedure 9(b)'s particularity requirement. But that argument is meritless because the Complaint identifies the specific statements, the specific speaker, the specific dates, and the specific reason each statement was false or misleading, including two text messages from the CFO alerting Wander to the $300 million hole and its catastrophic implications.

The Court should deny the motion to dismiss in its entirety.

## SUMMARY OF COMPLAINT'S ALLEGATIONS

### A.  The Issuers and Their Dependence on SuttonPark

Wander and Steven Pasko ("Pasko") co-founded 777 Partners LLC and 600 Partners LLC (the "Issuers") as private holding companies with operating subsidiaries in consumer and commercial finance, insurance, aviation, and media and entertainment. (Compl. ¶¶ 1, 19–20, 25.) Damien Alfalla ("Alfalla") served as CFO of both entities. (*Id.* ¶ 1.) Wander, Pasko, and Alfalla managed the Issuers as a unified business and reported their financials on a consolidated, combined basis. (*Id.* ¶¶ 1, 19–20.)

The largest operating company in the Issuers' portfolio was SuttonPark, a consumer and commercial finance company that bought annuities—primarily structured settlements and lottery payouts—and then securitized or resold them. (*Id.* ¶¶ 26–27.) Wander, together with Pasko, exercised control over SuttonPark. (*Id.* ¶¶ 3, 29.) As of year-end 2020, SuttonPark accounted for more than 50% of the Issuers' total balance-sheet assets. (*Id.* ¶ 27.) The Issuers' dependence on SuttonPark's income was striking: in 2020, SuttonPark generated $184 million in net income while the Issuers as a whole generated only $69 million—meaning SuttonPark's profits offset losses across the rest of the portfolio. (*Id.*)

### B.  SuttonPark's Dependence on the Credit Facility

SuttonPark financed its annuity purchases through credit facilities, including a line of credit from Lender A ("Credit Facility"), first signed in March 2017 and renewed in May 2021. (*Id.* ¶ 31.) Under the Credit Facility's terms, SuttonPark committed to: use borrowed funds only to purchase annuities; pledge those annuities as collateral; not double-pledging any collateral; deposit all annuity-generated funds into a dedicated Collections Account; and withdraw from

3

that account only after satisfying all fees, interest, and amortization payments to Lender A. (*Id.* ¶ 32.)

Wander knew the Credit Facility's terms intimately—he interacted with Lender A on SuttonPark's behalf—and understood that any threat to the Credit Facility would jeopardize SuttonPark and, in turn, the Issuers. (*Id.* ¶¶ 33–34.)

### C. Wander Misuses the Credit Facility, Creating a $300 Million Overdraw

Beginning around 2020 and continuing throughout the Relevant Period, Wander—with Alfalla's assistance—misused the Credit Facility in three distinct ways. (*Id.* ¶ 35.)

*First*, between January 2020 and September 2021, Wander diverted more than $100 million of Credit Facility cash to the Issuers for purposes other than purchasing annuities, violating the facility's use-of-proceeds provision and leaving the debt unsupported by collateral. (*Id.* ¶ 36.)

*Second*, between January and September 2021, Wander directed more than two dozen disbursements—totaling nearly $80 million—from the Collections Account to the Issuers, in violation of the Credit Facility's Collections Account restrictions. (*Id.* ¶ 37.)

*Third*, Wander caused SuttonPark to pledge to other lenders annuities already serving as collateral for the Credit Facility. By September 2021, he had double-pledged annuities then valued at more than $146.6 million, leaving multiple credit facilities under-secured. (*Id.* ¶ 38.)

The cumulative result was that by September 2021, the Credit Facility was overdrawn by about $300 million, and SuttonPark lacked sufficient collateral to secure that debt. (*Id.* ¶ 39.) By diverting Credit Facility cash to non-income-producing uses, Wander directly compromised SuttonPark's ability to generate profits—and thus the Issuers' ability to generate profits. (*Id.* ¶ 42.)

4

Wander was fully aware of the overdraw as it grew. In December 2020, Alfalla sent Wander and Pasko a spreadsheet showing a large collateral "discrepancy." (*Id.* ¶ 43.) In February 2021, Alfalla told Wander via chat that "the deficit is like $75m." (*Id.*) By September 2021, Alfalla confirmed the overdraw had surpassed $300 million. (*Id.*) Wander responded not by disclosing the problem but by directing employees to transmit false compliance reports to Lender A—reports that misstated the cash collateral in the Collections Account and falsely listed double-pledged annuities as unencumbered collateral. (*Id.* ¶ 40.)

### D.  The Preferred Equity Offering

Against this backdrop, Wander and Pasko decided to raise capital through a preferred equity offering (the "Offering"). (*Id.* ¶ 46.) Beginning in summer 2021, the Issuers marketed the Offering to prospective investors through a registered broker-dealer, Placement Agent A. (*Id.* ¶ 47.) The Offering sold preferred equity units in 777 Partners and 600 Partners, entitling holders to 10% annual dividends. (*Id.*) Wander, Alfalla, and Pasko signed board consents creating the new preferred equity class, approving the Subscription Agreement's form and terms, and authorizing the issuance of units to investors. (*Id.* ¶¶ 48–50.)

The Issuers raised about $237 million from 13 investors across four capital raises: $211 million from eight investors on September 21, 2021 (including $40 million from Investor A); $9 million from four investors on December 28, 2021; $14 million from Investor B on August 22, 2022; and an additional $3 million from Investor B on February 2, 2023. (*Id.* ¶ 51.)

### E.  Wander Misleads Investors About the Issuers' Financial Condition

Wander and Alfalla used an Investor Presentation to market the Offering. While Alfalla drafted the financial slides, Wander approved the entire Investor Presentation (including the financial slides), personally distributed it to some prospective investors, and authorized

5

Placement Agent A to distribute it to prospective investors. (*Id.* ¶ 52.)

The Investor Presentation's "Dividend Service Coverage" slide falsely represented that the Issuers were earning—and would continue to earn—substantial positive net income sufficient to pay a 10% annual dividend. Specifically, the slide asserted: (1) the Issuers had earned $113 million in net income in 2020; (2) the Issuers projected $132 million in net income for 2021; and (3) assuming the Offering raised $250 million, net income combined with anticipated debt-refinancing savings would cover the $25 million dividend obligation sixfold. (*Id.* ¶ 53.)

Wander also directed employees to build an Excel model ("Model") supporting the $132 million projection, which forecast that more than half of 2021 net income ($71.8 million of $132.3 million) would come from SuttonPark's "Consumer and Commercial" segment. (*Id.* ¶ 54.) Wander directed Placement Agent A to make the Model and related diligence materials ("Diligence Materials") available to investors through an electronic data room. (*Id.* ¶ 55.) The Diligence Materials included a schedule of the Issuers' credit facilities—listing the Credit Facility by name, with amounts outstanding, collateral type, and maturity date—but disclosed nothing about the $300 million overdraw or the collateral misuse that had crippled SuttonPark's income-generating capacity. (*Id.*)

Wander knew, or recklessly disregarded, that the representations in the Investor Presentation, Model, and Diligence Materials were false or misleading. He knew the $300 million overdraw meant the Issuers had no realistic prospect of earning $132 million in net income in 2021. He knew, or recklessly disregarded, SuttonPark had historically been the Issuers' primary profit engine—and that the overdraw had gutted it. He concealed these facts from investors anyway. (*Id.* ¶ 56.)

The misrepresentations were material. A representative of Adviser A, after reviewing the

6

Investor Presentation and meeting with Wander and Alfalla, concluded the Issuers presented low credit risk and would generate substantial cashflow from SuttonPark sufficient to cover the dividend. On that basis, Adviser A recommended that Investor A commit $40 million—which it did. (*Id.* ¶ 57.)

The Issuers' financial condition continued to deteriorate after the September 2021 raise. On September 25, 2021, Alfalla texted Wander and Pasko: "we still have a $300m+ borrowing base deficiency that needs to be addressed between now and 12/31/21. . . . Effectively, we need to cure the borrowing base by at least $100m per month." (*Id.* ¶ 59.) On November 15, 2021, Alfalla again texted Wander, warning that the overdraw was "too vast" to cure through additional equity raises, that "we need several millions that we don't have" to cover payroll, that "liabilities are growing at an astronomical pace," and that he could not continue at the company if "the situation does not dramatically improve." (*Id.* ¶ 60.) Despite these warnings, Wander continued using the same false Investor Presentation to solicit four more investors in the December 2021 raise. (*Id.* ¶ 61.)

### F. Wander Diverts Investor Funds to Himself

Wander also misled investors about how the Issuers would use the Offering proceeds. The Investor Presentation and Term Sheet represented that proceeds would be used for "general corporate purposes"—to "reduce inefficient funding facilities" and "support growth trajectory." (*Id.* ¶¶ 63–65.) Neither document disclosed that, contrary to those representations, Wander intended to direct a portion of the proceeds to himself and Pasko personally. (*Id.*)

On September 21, 2021—the same day the Issuers received funds from the September 2021 investors—the Issuers transferred $24,914,722.13 to Wander's personal bank account and $8,028,681.54 to Pasko's personal brokerage account, at Wander's direction. (*Id.* ¶ 68.)

7

### G. Wander Misleads Investor B

In summer 2022, Wander and Alfalla marketed the Offering to Investor B using the same materially false 2021 Investor Presentation—unchanged since summer 2021—without disclosing that the Issuers had suffered $504 million in losses in their financial assets line-item in the first quarter of 2022, contributing to a quarterly operating loss of $382 million, following Federal Reserve interest rate increases. (*Id.* ¶¶ 70–72.)

Investor B's Subscription Agreement, which Wander approved, and which Investor B first received in summer 2022, represented that the Issuers had provided "the unaudited combined balance sheet of the Company as of December 31, 2021" and that there had been "no material adverse change to the financial condition of the Company since the date of the most recent Financial Statements provided." (*Id.* ¶ 73.) That representation was false: the Issuers had sustained a $382 million quarterly operating loss as of March 31, 2022—a loss Wander never disclosed to Investor B. Relying on these misrepresentations, Investor B invested $14 million on August 22, 2022, and an additional $3 million on February 2, 2023. (*Id.* ¶¶ 74–75.)

### LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court must "take all well-pled factual allegations as true" and draw "all reasonable inferences . . . in a light most favorable to the plaintiff." *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996). Factual disputes cannot be resolved on the pleadings. *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022).

Section 10(b) of the Exchange Act prohibits "any manipulative or deceptive device or

contrivance" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). To establish a violation of Section 10(b) and Rule 10b-5, the SEC must show: (1) a materially false or misleading statement, omission, or fraudulent device; (2) in connection with the purchase or sale of securities; and (3) scienter. *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013). Scienter "may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012), *citing SEC v. McNulty,* 137 F.3d 732, 741 (2d Cir. 1998).

Section 17(a) of the Securities Act prohibits fraud in the offer or sale of securities. 15 U.S.C. § 77q(a). Sections 17(a)(2) and (3) require no scienter. *Aaron v. SEC*, 446 U.S. 680, 697 (1980). In all other respects, the elements parallel those of Section 10(b). *Pentagon Capital Mgmt. PLC*, 725 F.3d at 285. Scheme liability and misrepresentation liability can rest on the same facts, as the subsections of Rule 10b-5 "considerably overlap." *Lorenzo v. SEC*, 587 U.S. 71, 80 (2019).

Under Rule 9(b), fraud must be pleaded "with particularity"—meaning the complaint must "(1) detail the statements or omissions the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 403 (2d Cir. 2015). Scienter, however, "may be alleged generally." Fed. R. Civ. P. 9(b).

## ARGUMENT

### I.   THE COMPLAINT ADEQUATELY PLEADS FRAUD

The Complaint adequately pleads that Wander committed securities fraud through making material misrepresentations to investors and by engaging in a fraudulent scheme. *See* Section 17(a)(2) of the Securities Act and Section 10(b) and Rule 10b-5(b) of the Exchange Act (for misrepresentation), and Section 17(a)(1) & (3) of the Securities Act and Section 10(b) and Rule 10b-5(a ) & (c) of the Exchange Act (for scheme).

### A.   The Complaint Pleads that Wander Made Material Misrepresentations

Wander argues the Complaint fails to plead that he "made" the challenged statements under *Janus*, 564 U.S. 135 (2011). The argument is meritless.

Under *Janus*, the "maker" of a statement is "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." 564 U.S. at 141. Ultimate authority "can be found if implicit from surrounding circumstances or evidenced by various indicia of control." *Li v. Eqonex Ltd.*, No. 1:23-CV-03346-GHW, 2024 WL 4241951, at *8* (S.D.N.Y. Sept. 18, 2024) (internal quotation omitted). An executive who "vetted and approved documents containing omissions and misstatements and . . . filed those documents" exercises ultimate authority. *Liberty Media Corp. v. Vivendi Universal, S.A.,* 861 F. Supp. 2d 262, 271 (S.D.N.Y. 2012).

The Complaint pleads Wander's ultimate authority in multiple, overlapping ways. He reviewed and approved the entire Investor Presentation. (Compl. ¶¶ 52–53.) He personally distributed it to some investors and authorized Placement Agent A to distribute it to others. (*Id.* ¶ 52.) He directed employees to build the Model and directed Placement Agent A to make the Model and Diligence Materials available through the electronic data room. (*Id.* ¶¶ 54–55.) He

signed the board consent approving the Subscription Agreement's form, terms, and provisions. (*Id.* ¶ 49.) He participated in conversations about what financial representations to make to prospective investors. (*Id.* ¶ 52.) These allegations establish, collectively, that Wander controlled what investors saw and what they did not.

Because SuttonPark was technically a subsidiary only of 600 Partners, Wander attaches significance to the fact that he held no official title, managerial role, or board seat in 600 Partners, and held only a contractual right to be consulted on significant decisions. (Motion at 9[2]). These corporate formalities do not alter Wander's liability under *Janus* because Wander's ultimate authority over the statements in the Investor Presentation, Diligence Materials, Model and Subscription Agreement is what controls under *Janus*, not his official title at 600 Partners. But to the extent it is relevant, the Complaint sufficiently pleads Wander's active and controlling role in both 600 Partners and SuttonPark. For example, the Complaint pleads that Wander and Pasko managed 600 Partners' subsidiaries, including SuttonPark, Wander directly interacted with Lender A regarding the Credit Facility on behalf of SuttonPark, Wander caused the overdraw with his misuse of the SuttonPark Credit Facility, and he concealed the overdraw from Lender A. (Compl., ¶¶ 20, 33, 35-42). Moreover, the Complaint pleads that Wander and Pasko managed 600 Partners and 777 Partners as a combined business, reporting their financial statements on a consolidated basis. (*Id.*, ¶¶ 1, 20).

Wander's reliance on *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 F. App'x 664, 669 (2d Cir. 2016), is misplaced. There, the court found insufficient allegations of "control essential to maker liability" as to a broker-dealer hired to conduct a private offering for statements in the issuer's private offering memorandum that were drafted "with the approval and input" of the

---

[2] Citations to pages in Wander's Motion are to the ECF pagination.

11

broker-dealer. *Id.*

Here, the Complaint pleads far more: Wander did not merely consent to the inclusion of language in a document controlled by a third party. Rather, in his controlling role with the Issuers, he directed, approved, and distributed the statements at issue. *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 261, 267 (S.D.N.Y. 2014) (underwriters were "makers" of statements where complaint alleged they actively participated in creating the prospectus, drafted it jointly with management, approved the documents, and solicited investors for the offering and distributed the prospectus to investors); *SEC v. Carter*, No. 10 C 6145, 2011 WL 5980966 (N.D.Ill. Nov. 28, 2011) (Because the amended complaint states that defendant, in his capacity as CEO, approved the releases before they were made available to the public, plaintiff has sufficiently alleged that defendant had ultimate authority for the statements and "made" them for purposes of *Janus*); *Liberty Media Corp. v. Vivendi Universal, S.A.*, 861 F. Supp. 2d 262, 271 (S.D.N.Y. 2012) (finding "ultimate authority" where defendant vetted and approved documents containing omissions and misstatements).

## B. The Complaint Satisfies Rule 9(b)

### 1. Particularity

Wander argues the Complaint lacks the particularity Rule 9(b) requires. It does not. The Complaint identifies the specific statements Wander made (the Dividend Service Coverage slide, the $132 million net income projection, the "sixfold" dividend coverage ratio, the "general corporate purposes" representation, the "no material adverse change" representation); the speaker (Wander, as approver and distributor); the time and place (the Investor Presentation distributed beginning in summer 2021, the Subscription Agreements signed September 21, 2021, December 28, 2021, and August 22, 2022); and why each statement was false or misleading (the

12

$300 million overdraw Wander had directed and concealed).  (Compl., ¶¶ 27, 29, 39, 54-76).

That satisfies Rule 9(b)'s four-part test.[3] *Fin. Guar. Ins. Co.*, 783 F.3d at 403.

    2.  Scienter

Wander contends the Complaint does not adequately plead his state of mind. (Motion at

27-29). This is not correct. The Complaint pleads facts reflecting that Wander knew or recklessly

disregarded that the statements in the Investor Presentation and other investor materials were

false or misleading because he was aware of the Credit Facility overdraw and its impact on the

Issuers' financial prospects. (Compl., ¶¶ 27, 29, 39, 54-76). Knowing or reckless conduct

satisfies the scienter requirement. *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998).

Accordingly, the Complaint adequately pleads that Wander acted knowingly or recklessly.

While the Complaint clearly pleads Wander's knowing or reckless conduct, under Rule

9(b), scienter may be also be "alleged generally," and, if so, it must be supported by "facts that

give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d

1124, 1128 (2d Cir. 1994). The inference may be established by alleging either "motive and

opportunity to commit the fraud" or "strong circumstantial evidence of conscious misbehavior or

recklessness." *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The

Complaint pleads facts that reflect both.

    **Motive.** Wander dismisses the Complaint's motive allegations as generic—every

executive who raises capital wants capital. (Motion at 28.) But the Complaint pleads a far more

specific motive: that Wander used the Offering to secure a personal benefit to himself in the form

of the $24.9 million payment.  (Compl. ¶ 68).  Further, the Complaint alleges that Wander had

---

[3] Wander notes that the Complaint does not allege whether the Issuers failed to pay dividends to investors. (Motion at 12). Whether the Issuers ultimately paid dividends to investors is a factual issue, but one that is irrelevant to and does not impact the determination of whether Wander fraudulently misled investors to invest their funds in the first place.

personally directed the misuse of the Credit Facility, creating a $300 million overdraw he was actively concealing from Lender A through false compliance reports. (Compl. ¶¶ 35–42.) In addition to enabling Wander to benefit himself, raising the $237 million from equity investors and concealing the overdraw from investors also served two purposes simultaneously: it provided capital to attempt to cure the overdraw (*Id.* ¶ 46, ¶ 60), and it delayed the day Lender A would discover the fraud. Disclosing the overdraw to investors would have exposed Wander's concealment scheme to Lender A. That is a concrete, personal motive—not a generic desire for capital.

**Circumstantial Evidence of Scienter.** The Complaint also pleads strong circumstantial evidence of conscious misbehavior. Wander directed the three forms of Credit Facility misuse. (*Id.* ¶¶ 36–38.) He directed employees to transmit false compliance reports to Lender A. (*Id.* ¶ 40.) He received Alfalla's explicit warnings—in December 2020, February 2021, and September 2021—that the overdraw was growing and was catastrophic. (*Id.* ¶¶ 43, 59–60.) He approved projections of $132 million in net income for 2021 while knowing SuttonPark—the source of more than half that projected income—was crippled. He then continued raising money from new investors in December 2021 and August 2022 using the same false and misleading materials, even after Alfalla warned in November 2021 that the situation was unsalvageable. (*Id.* ¶¶ 60–61.) "Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001).

Wander attempts to disclaim his knowledge of the Issuers' deteriorating financial condition by arguing that the Complaint does not plead that he acknowledged or read the text messages Alfalla sent him in September and November 2021. (Motion at 29). However, the SEC

14

is entitled to the reasonable inference on a motion to dismiss that Wander read the text messages that the Complaint pleads were sent to him. *1199SEIU United Healthcare Workers E. v. Alaris Health at Hamilton Park,* No. 1:22-CV-00531 (LJL), 2022 WL 17251772, at *4 (S.D.N.Y. Nov. 28, 2022) (fact that a communication was sent to a person's email creates an inference that it was received); *Braxton/Obed-Edom v. City of New York,* No. 17-cv-00199 (GBD)(SDA)*,* 2018 WL 11316020*,* at *8 (S.D.N.Y. Dec. 20, 2018) (at the pleading stage, plaintiff entitled to the reasonable inference that Defendant received his communications). To the extent Wander argues that he never read the messages, Wander describes a factual dispute for a fact finder to resolve, and not an issue for the Court to resolve at this stage. *Int'l Code Council, Inc.,* 43 F.4th at 53.

Wander also seeks to downplay the import of Alfalla's text messages, arguing that they do not mention the Investor Presentation and "simply acknowledge that an overdraw existed and that the Company was working to cure it," which he contends supports an inference that Wander had a "good-faith belief" in the company's prospects. (Motion at 24). However, at this stage the Court must draw all reasonable inferences in the SEC's favor, not Wander's. *Leeds*, 85 F.3d at 53. In any event, Wander's argument simply defies common sense as Alfalla's messages paint a picture of a catastrophic and deteriorating financial picture with the company CFO explaining, for example, on November 15, 2021 that the situation needs to "dramatically improve" over the next 45 days or he can no longer remain with the company, that liabilities are growing at an "astronomical pace" and the company "needs several millions that we do not have" to help make payroll. (Compl., ¶60). And there is no indication in these messages, as Wander appears to suggest, that the Issuers had any plan in place to resolve the difficulties. (*Id*., 59-60). Instead, these messages more than support a reasonable inference that Wander was aware of the Issuers' dire financial predicament and prospects and was not justified in making the projections he made

in the Investor Presentation, Model, and Diligence Materials. At most, Wander's "good-faith" argument again offers a factual dispute about what the text messages convey, which should be left for the fact finder to resolve. *Int'l Code Council, Inc.,* 43 F.4th at 53.

### C. The Complaint Adequately Pleads Misrepresentations Regarding Use of Proceeds and Investor B

**Use of Proceeds.** Wander argues that transferring $24.9 million to his personal bank account on the day investor funds arrived is "perfectly consistent with many legitimate corporate purposes." (Motion at 30.) That argument defies common sense. "[A]ny common-sense understanding of 'general corporate purposes' does not include funneling shareholder funds to company insiders." *SEC v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 391 (S.D.N.Y. 2014). Whether a legitimate corporate purpose existed is a factual dispute that cannot be resolved on a motion to dismiss. *Int'l Code Council*, 43 F.4th at 53. At this stage, the Court should accept as true the SEC's allegation that the transfer was for Wander's personal benefit— not any legitimate corporate purpose he now invents.

**Investor B.** Wander argues that a first-quarter loss does not necessarily establish a material adverse change by the third quarter. (Motion at 31.) But the Complaint does not allege a minor fluctuation. It alleges a $382 million quarterly operating loss—driven by $504 million in financial asset losses—suffered less than five months before Wander told Investor B that no material adverse change had occurred since December 2021. (Compl. ¶¶ 72–73.) Whether that loss constituted a material adverse change is a factual question for the finder of fact, not for resolution on a motion to dismiss. The Court must draw all reasonable inferences in the SEC's favor. *Leeds*, 85 F.3d at 53.

Moreover, Wander misled Investor B in a second, independent way: he presented the same materially false 2021 Investor Presentation—unchanged since summer 2021—to solicit

16

Investor B's investment in August 2022. (Compl. ¶ 70.) By that point, the 2021 projections were no longer forward-looking; they were representations about a year already past. Investor B relied on those representations and invested $14 million. (*Id.* ¶ 74.)

### D. Wander's Defenses Concerning His Material Misrepresentations are Baseless.

Wander argues the Complaint's allegations are not actionable because the challenged statements were (1) opinions, (2) forward-looking statements protected by the bespeaks caution doctrine, or (3) pure omissions. Each argument fails. The Complaint pleads that Wander made materially false statements he did not believe, withheld specific known facts that made those statements misleading, and did so while fully aware of the $300 million overdraw he had engineered. The Complaint also pleads that Wander committed a securities scheme fraud.

### 1. The Opinion Doctrine Does Not Shield Statements the Speaker Knows Are False.

Wander's core defense is that the Dividend Service Coverage slide contained inactionable opinions. This argument fails for multiple reasons.

***First***, the securities laws protect only *sincere* opinions. "Statements regarding projections of future performance may be actionable . . . if the speaker does not genuinely or reasonably believe them." *In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 266 (2d Cir. 1993) (projections are "not beyond the reach of the securities laws" when "defendants either did not have these favorable opinions on future prospects when they made the statements or the favorable opinions were without a basis in fact"). Wander himself concedes this point. (Motion at 17, quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186, 194 (2015).)

The Complaint pleads that Wander did not believe the materially false and misleading projections in the Investor Presentation. The Complaint alleges with specificity that Wander knew the $132 million net income projection and "sixfold" dividend coverage were groundless

17

given the $300 million overdraw he had directed. (Compl. ¶¶ 3, 27, 29, 33, 35–39, 56–60.) He controlled SuttonPark, dealt directly with Lender A, and received Alfalla's explicit warnings—in December 2020, February 2021, and September 2021—that the collateral deficit was growing toward $300 million. (*Id.* ¶¶ 33, 43.) By summer 2021, when the Offering launched, Wander knew, or recklessly disregarded, SuttonPark's income-generating capacity was massively crippled. He projected $132 million in net income anyway.

Wander counters that the Issuers' other subsidiaries could have compensated for SuttonPark's shortfall. (Motion at 18.) The Complaint forecloses that argument. In 2020—the most recent year for which results were available—SuttonPark generated $184 million in net income while the Issuers as a whole generated only $69 million: SuttonPark's profits offset losses across the rest of the portfolio.[4] (Compl. ¶ 27.) Wander knew this. He also knew, or recklessly disregarded, that the Credit Facility cash he had diverted went to purchase non-income-producing assets that could not serve as collateral, directly impairing SuttonPark's ability to generate new revenue. (*Id.* ¶¶ 36, 38, 55.) Whether other subsidiaries could realistically have filled a $300 million hole is a factual dispute that cannot be resolved on a motion to dismiss. *Int'l Code Council*, 43 F.4th at 53. Wander's other argument – that the Offering proceeds could have been used to correct the overdraw through debt refinancing (*see* Motion at 18) – is also a factual dispute given that the $300 million hole was so large that it was unreasonable to expect the Offering proceeds to cover it and given that the Offering proceeds ultimately taken in were less than the overdraw amount. These are issues that a fact finder can resolve after discovery.

---

[4] Wander argues that the 2021 projections were justified because the COVID-19 pandemic caused the Issuers' other subsidiaries to have lower profitability in 2020 than in prior years and those companies would have rebounded in 2021. (Motion at 18, fn. 5). Wander's proffered facts are irrelevant for consideration in this motion to dismiss because they are in dispute and outside the pleadings. Wander can argue these facts to the factfinder after discovery.

*Second*, the projections embedded untrue statements of present fact. When Wander used the same Investor Presentation to solicit the December 2021 and August 2022 investors, the 2021 net income projection was no longer forward-looking—it was a statement about a year already in progress or past. At those points, the $132 million figure and the "sixfold" coverage ratio were representations of present or historical fact, not forecasts. *See In re Int'l Bus. Machines Corp.*, 163 F.3d at 107 (projections may be actionable when "supported by specific statements of fact").

*Third*, the projections omitted facts that made them misleading. *Omnicare* holds that even a sincerely held opinion statement is actionable when the speaker omits facts "whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." 575 U.S. at 194. The Diligence Materials listed the Credit Facility among the Issuers' credit facilities—disclosing the lender, amounts outstanding, collateral type, and maturity date—but said nothing about the $300 million overdraw or the collateral misuse that had rendered SuttonPark's income projections fictitious. (Compl. ¶ 55.) Projecting $132 million in net income while concealing the overdraw that made that figure impossible is precisely the kind of misleading half-truth the securities laws prohibit. *SEC v. Amah*, 2023 WL 6386956, at *12 (S.D.N.Y. Sept. 28, 2023) ("defendant consistently offered positive projections while failing to disclose the serious losses he consistently incurred . . . [s]uch projections . . . would clearly mislead a reasonable investor") (*vacated in part on other grounds by SEC v. Amah*, 2026 WL 504794 (2d. Cir. Feb. 24, 2026)).

Relatedly, Wander's argument that his conduct was justified because the Investor Presentation specifically contemplated using the Offering proceeds to refinance existing debt, (*see* Motion at 18), is a red herring. While Wander disclosed the existence of the Credit Facility in the Diligence Materials, he did so misleadingly, by omitting that it had been surreptitiously

19

overdrawn by $300 million and that he was actively concealing the overdraw from Lender A. Thus, simply disclosing in the Investor Presentation that the Issuers might use Offering proceeds to refinance debt did not tell investors the full story they were entitled to under the securities laws.

### 2. The Bespeaks Caution Doctrine Does Not Protect Known, Specific Risks Deliberately Withheld.

The "bespeaks caution" doctrine makes "[c]ertain alleged misrepresentations in a stock offering . . . immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002). However, the doctrine does not insulate deliberate concealment of known facts. It "provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996). The doctrine does not apply "when defendants knew [statements] were false when made." *Id.* The doctrine is also inapplicable when "the cautionary language [does] not expressly warn of or did not directly relate to the risk that brought about [the] loss." *Id.* at 359; *see also Hunt v. All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) ("The cautionary language . . . must relate directly to that by which plaintiffs claim to have been misled."); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 235 (S.D.N.Y. 2006) (doctrine "applies only where the cautionary language is reasonably specific as opposed to generic or boilerplate so as to constitute a real warning to investors").

The cautionary language Wander cites—general warnings about key-person risk, COVID-19, reputational risk, and regulatory changes—said nothing about a $300 million credit

facility overdraw that Wander himself had engineered and was actively concealing. (Motion at 21–22.) To invoke the doctrine, cautionary language must "precisely address the substance of the specific statement or omission that is challenged." *In re Prudential*, 930 F. Supp. at 72. A warning that "actual results may differ" does not warn investors that the speaker has already destroyed the factual basis for his projections. *Matignon Fin., Inc. v. Ameritel Commc'ns Corp.*, No. 88 Civ. 5742 (JFK), 1989 WL 153282, at *5 (S.D.N.Y. Dec. 14, 1989).

*In re Lottery.com*, which Wander cites (Motion at 22–23), is distinguishable. There, the proxy statement itself warned that the company had identified material weaknesses in its internal accounting controls—the very risk that later materialized. *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 538–39 (S.D.N.Y. 2024). Here, no warning disclosed the $300 million overdraw. The cautionary language was silent on the one risk that mattered.

The doctrine also has a categorical limit: it applies only to forward-looking statements and omissions and not to an "omission of present fact." *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010) ("the bespeaks-caution doctrine applies only to statements that are forward-looking"); *SEC v. Thompson*, 238 F. Supp. 3d 575, 603 (S.D.N.Y. 2017). When Wander presented Investor B in summer 2022 with the same 2021 Investor Presentation, the 2021 net income projection was no longer forward-looking—it described a year already elapsed. The "no material adverse change" representation in Investor B's Subscription Agreement described the Company's financial condition as of August 2022 compared to December 2021—a statement about past and present facts, not future prospects. Neither statement falls within the scope of the bespeaks caution doctrine.

### 3.    The Complaint Does Not Plead Pure Omissions.

Wander characterizes the Complaint's omission allegations as non-actionable "pure omissions" under *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024).

He misreads both *Macquarie* and the Complaint.

*Macquarie* distinguished between "pure omissions"—standalone failures to disclose—and "half-truths"—affirmative statements rendered misleading by what they leave out. 601 U.S. at 263–64. Rule 10b-5(b) does not reach the former but squarely prohibits the latter. *Id.* The Complaint does not allege that Wander simply failed to volunteer information about the Credit Facility. It alleges that Wander made affirmative representations about projected net income and dividend coverage—representations that were at minimum misleading because he omitted the $300 million overdraw that made them impossible. That is a half-truth. *Omnicare*, 575 U.S. at 192 ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another.").

The Diligence Materials illustrate the point precisely. They included a schedule listing the Credit Facility—naming the lender, stating amounts outstanding, describing the collateral, and noting the maturity date. (Compl. ¶ 55.) That schedule invited investors to conclude the Issuers were compliant under the Credit Facility – that it was a functioning source of liquidity for the Issuers. It was not. Listing the Credit Facility while concealing SuttonPark's breach of the Credit Facility as a result of the $300 million overdraw and collateral misuse that had gutted it was not silence—it was misdirection. The omission made the affirmative representation misleading.[5]

---

[5] While Wander argues that the Subscription Agreement purports to limit the representations that are attributable to the Issuers, and which investors could rely on, to only those "contained in [the Subscription] Agreement," (*see* Motion at 12), the Complaint pleads that the Subscription Agreement incorporated by reference the representations in the Term Sheet, Investor Presentation, and Diligence Materials. (Compl., ¶¶ 7. 48, 65, 79), Thus, investors were relying on any representations made in those documents, and Wander is responsible for the "half-truths" expressed in them.

### E. The Complaint Pleads Scheme Liability

Wander argues the Complaint fails to allege any practice that operated as a fraud, citing Section 17(a)(3) of the Securities Act or Section 10(b) of the Exchange Act and Rule 10b-5(c).

Section 17(a)(1) of the Securities Act prohibits a person from "employ[ing] any device, scheme, or artifice to defraud," and Section 17(a)(3) of the Securities Act prohibits "engag[ing] in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(1), (a)(3). Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act similarly make it unlawful for any person "in connection with the purchase or sale of any security," 15 U.S.C. § 78j(b), to "employ any device, scheme, or artifice to defraud," or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit. 17 C.F.R. § 240.10b-5(a), (c). Taken together, these statutes and rules "create what courts have called 'scheme liability' for those who, with scienter, engage in deceitful conduct." *SEC v. Sason*, 433 F. Supp. 3d 496, 508 (S.D.N.Y. 2020) (internal citations omitted). To prove liability, the Commission must show "that defendants: (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter." *SEC v. Collector's Coffee, Inc.*, 697 F. Supp. 3d 138, 157 (S.D.N.Y. 2023) (internal citations omitted).

Here, the Complaint's allegations satisfy the scheme liability provisions because they allege that Wander misappropriated investor funds when he transferred nearly $25 million of Offering proceeds to himself without the knowledge of all investors. *See, e.g., SEC v. Saw*, No. 23 CIV. 6573 (PGG), 2025 WL 2105903, at *10 (S.D.N.Y. July 25, 2025) (SEC granted summary judgment on scheme liability claims under Securities Act 17(a)(1), (3) and Exchange Act 10b-5(a), (c) where securities broker misappropriated funds from client); *SEC v. Kane*, No.

23

97 Civ. 2931 (CBM), 2003 WL 1741293, at *3 (S.D.N.Y. Apr. 1, 2003) ("misappropriat[ing] approximately $595,000 of customer funds" is "fraudulent conduct" in "violation[ ] of Section 17(a) of the Securities Act"); *SEC v. Kinetic Inv. Grp., LLC*, No. 8:20-CV-394-MSS-SPF, 2024 WL 4869623, at *30 (M.D. Fla. Nov. 22, 2024) ("misappropriation [ ] of investor funds for ... personal use" can "serve as a basis for establishing scheme liability" under Sections 17(a)(1) and (3) of the Securities Act).

Moreover, the Supreme Court has held that dissemination of misstatements and omissions can form the basis for scheme liability, even if the defendant does not "make" the statements under *Janus*. *See Lorenzo*, 587 U.S. at 76, 78–79; *see also SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (a defendant can engage in actionable scheme liability claim where there is conduct beyond misstatements and omissions, such as dissemination of misstatements). Accordingly, to the extent Wander is not the "maker" of the statements alleged in the Complaint, the Complaint still alleges actionable scheme liability securities fraud because the Complaint alleges that Wander personally sent the Investor Presentation to prospective investors and authorized Placement Agent A to distribute it to others. (Compl. ¶ 52.) That dissemination of false statements is scheme liability.  *See Rio Tinto, 41 F.4th at 49; SEC v. Solarwinds*, 741 F.Supp.3d 37, 87 (S.D.N.Y. 2024) (claim stated against individual who disseminated statement).

### F. Because the Complaint Adequately Pleads Scienter, the Negligence Standard is Satisfied

Wander argues that the Complaint fails to plead negligence. (Mot. at 32). However, because the Complaint adequately pleads scienter—a higher standard—it necessarily satisfies the negligence standard as well. *SEC v. Wey*, 246 F. Supp. 3d 894, 913 (S.D.N.Y. 2017).  Finally, contrary to Wander's assertions, the Complaint's allegations adequately plead Section 17(a)(2)'s additional requirement that "defendant actually obtained money or property by means of the

untrue statements." *SEC v. Farnsworth*, 692 F. Supp. 3d 157, 177 (S.D.N.Y. 2023). As described above, the Complaint pleads that Wander made untrue statements in the Investor Presentation, Model, Diligence Materials and Subscription Agreements to induce the Offering and then transferred $24.9 million of the proceeds to himself. (Compl., ¶¶ 27, 29, 39, 54-76). As such, the Complaint's allegations satisfy Section 17(a)(2). *Collector's Coffee*, 697 F. Supp. 3d at 170-71 ("misappropriation of funds" from investors sufficient to demonstrate a likelihood of success on the merits of the SEC's claim under Securities Act 17(a)(2).

## CONCLUSION

Wander built his motion on three premises: that his materially false and misleading statements reflected his sincere opinions, that his warnings were adequate, and that his role was peripheral. The Complaint alleges specific facts that destroys each premise. Wander knew, or recklessly disregarded, the net income projections were false and misleading. Wander's warnings said nothing about the relevant risk. And Wander directed, approved, and distributed every document investors received. The Court should deny the motion in its entirety.

If the Court grants any part of the motion, the SEC respectfully requests leave to amend.[6]

---

[6] The SEC does not believe its Complaint is deficient in any respect and cannot therefore cite with any specificity those amendments it could make at this time. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d160, 190-91 (2d Cir. 2015) (reversing District Court's dismissal without leave to amend where plaintiff could not anticipate the defects prior to full briefing and a decision and could not therefore propose specific amendments).

Dated: New York, New York
        May 1, 2026

                                Respectfully Submitted,

                                /s/ *Ben Kuruvilla*
                                Ben Kuruvilla
                                Nicholas Andrew Flath
                                Securities and Exchange Commission
                                New York Regional Office
                                100 Pearl Street
                                New York, New York 10007
                                (212) 336-5599
                                kuruvillabe@sec.gov

26

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with Rule 7.1 of the Local Rules of the United States District Court for the Southern District of New York because it is 7,623 words (exclusive of the table of contents, table of authorities, and this certificate). The document was prepared using 12-point font and includes one-inch margins. All text is double-spaced, except for footnote text, which is single-spaced.

/s/ Ben Kuruvilla
Ben Kuruvilla
Securities and Exchange Commission
New York Regional Office
100 Pearl Street
New York, New York 10007
(212) 336-5599
kuruvillabe@sec.gov

27